```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  MICHAEL J. MONROE,

 4                           Plaintiff,

 5                                   20 CV 10944(PMH)
        -vs-
 6                                   JURY TRIAL
    TOWN OF HAVERSTRAW POLICE OFFICER
 7  SEAN CAMPBELL, POLICE OFFICER WILLIAM
    SANTIAGO, POLICE OFFICER IAN KAYE,
 8  and TOWN OF HAVERSTRAW,

 9                           Defendants.

10  ------------------------------------x

11                              United States Courthouse
                                White Plains, New York
12
                                May 9, 2023
13
    Before:  THE HONORABLE PHILIP M. HALPERN, District Judge
14

15  APPEARANCES:

16  LOCKE LORD LLP
         Attorneys for Plaintiff
17       200 Vesey Street, 20th Floor
         New York, New York 10281
18  BY:  IRA G. GREENBERG
         HARRY K. TIWARI
19
    MORRIS DUFFY ALONSO FALEY & PITCOFF
20       Attorneys for Defendants
         101 Greenwich Street, 22nd Floor
21       New York, New York 10006
    BY:  KENNETH E. PITCOFF
22       FRANK H. FOSTER

23

24

25
```

050923PMH                          Proceedings

```
 1          THE DEPUTY CLERK:  In the matter of Michael J. Monroe
 2  against Sean Campbell, et al.
 3          Will the plaintiffs please note your appearance?
 4          MR. GREENBERG:  Good morning, Your Honor.  Ira
 5  Greenberg and Harry Tiwari for the plaintiff, Michael Monroe,
 6  who is sitting between us.
 7          THE DEPUTY CLERK:  Defense counsel, please note your
 8  appearance.
 9          MR. PITCOFF:  Good morning, Your Honor.  Kenneth
10  Pitcoff and Frank Foster representing Lieutenant Kaye, Officers
11  Campbell and Santiago.
12          THE COURT:  All right.  Counsel, good morning.  Be
13  seated, everybody.  All right.  I understand we have a panel
14  downstairs.  Orientation is starting, so that's good news.  They
15  will be up shortly.
16          Mr. Cangelosi, we are going to -- I guess we're going
17  to use the side door.  Okay.  I am worried about these chairs in
18  the back and the jury coming in, but we don't -- we have our new
19  configuration.  So we are good.
20          Okay.  All right.  Since our last encounter, plaintiff
21  wrote Document 116 asking that language be added to Question 30
22  noting that the defendant consented to it.  I'm not going to ask
23  that question.  I don't think it's helpful to us and, frankly,
24  it could be -- push us down a religious path that I don't think
25  is appropriate.  So the application is denied.
```

1          With respect to the exhibit binder, the Google Maps L1

2    L2, L3, were not in our binders, and so I'm hoping you have L1,

3    L2, L3 for each of the binders and the revised defendants

4    exhibit list.

5          MR. FOSTER:  Your Honor, if I may?  Before you came

6    out, I gave it to your clerk.

7          THE COURT:  Oh, good.  So here are the binders, the

8    defendant's binder I'll give it back.  Make sure you give the

9    binders.  You have all three binders, Pratik?  We will revise

10   them and take care of that.

11         All right.  There are two stipulations.  There are two

12   stipulations that we noted.  One is, "On November 6, 2020,

13   plaintiff was inside Jessica Locke's apartment in violation of

14   the fully stay-away order of protection."

15         At some point you will tell me what you want me to do

16   with that.  Have you agreed upon how we are going to read that

17   to the jury?  Or what have you decided, Mr. Pitcoff?

18         MR. PITCOFF:  I don't think we have talked about it.

19   I think, you know, the proper time to do it would be during the

20   charge.  That's just my thought, if we are going to do it at

21   all.

22         THE COURT:  You meet and confer and tell me what you

23   want to do.  I don't need a snap judgment.

24         MR. PITCOFF:  Okay.

25         THE COURT:  You and Mr. Greenberg should talk.

050923PMH                         Proceedings

```
 1          Likewise, the other stipulation is the parties agreed
 2   that if Mr. Monroe prevails on any of his claims against Officer
 3   Campbell or Officer Santiago or Lieutenant Kaye, the Town of
 4   Haverstraw also is liable.  What do you want me to do with that?
 5          MR. GREENBERG:  I would like you to read it just
 6   before we rest, Your Honor.
 7          MR. PITCOFF:  I'm sorry.  I didn't hear that.
 8          MR. GREENBERG:  I'm sorry.  I said, I would like you
 9   to read it just before we rest, Your Honor.
10          MR. PITCOFF:  No.  Again, I think the proper time to
11   read it would be during the charge.
12          THE COURT:  I think it's true, I think it's a
13   stipulation.  So you will meet and confer, and you will talk
14   about it.  I think it's a legal issue, Mr. Greenberg.  I don't
15   think it's a proof issue, but talk about it, and if you need me
16   to rule on it, I will decide when to read it; but as to both,
17   talk to each other.  There is no harm really in reading it at
18   any point, frankly.
19          MR. PITCOFF:  Sure.
20          THE COURT:  You know, what one is -- once you agree
21   that that's a fact or a legal conclusion, there's no harm.
22          Okay.  So we will leave that as an open item, and
23   should it arise today, you should talk now probably.  I would
24   guess there will be probably half an hour or so before the jury
25   panel comes up.  They will be pre-numbered, so we will have 1
```

1   through 14.  We will put the rest in the benches, and we will

2   get to work.  All right?

3              Anything else, Mr. Greenberg?  Anything on your mind?

4              MR. GREENBERG:  No, Your Honor.

5              THE COURT:  Mr. Pitcoff?

6              MR. PITCOFF:  Yes, judge, I brought this up before

7   your clerk.  I just wanted to make sure during the openings and

8   closings, as long as I speak loudly, that I don't have to be

9   standing at the podium.  I would like to just stand over there

10  and not be hugging the podium, and I just wanted to make sure

11  that's okay.

12             THE COURT:  Well, we are in the post Covid era, so the

13  use of the courtroom floor is back and available, as long as

14  it's not offensive to counsel or the jury, I'm not going to make

15  you stand at a podium anymore.  I'm kind of tired of watching

16  lawyers stand at the podium myself.  So have at it.

17             MR. PITCOFF:  -- to wear a mask.

18             THE COURT:  Be respectful, please.

19             MR. PITCOFF:  A hundred percent.

20             THE COURT:  I am going to have the jury, just so you

21  know, the panel wear masks until we pick a jury.  There is 35 of

22  them coming into the room.  It's my option.  I've asked that

23  they all be masked until we pick our jury, and then they will be

24  free to take off their masks.  So if any of you want to wear

25  masks during the process, you are welcome to.  I don't intend

050923PMH                        Jury Selection

```
 1  to, but I think having 35 strangers in my courtroom, prudence
 2  suggests that we have them mask up because the last thing I need
 3  is one of you to get Covid in the middle of this trial.  That I
 4  don't need.  All right?  I will be back out when the jury is
 5  here.
 6              THE DEPUTY CLERK:  All rise.
 7              (Recess)
 8              (Jury panel enters the courtroom)
 9              THE DEPUTY CLERK:  All rise.  Hear ye, hear ye, hear
10  ye.  All persons having business before the United States
11  District Court for the Southern District of New York draw near
12  and give your attention, and you shall be heard.  The Honorable
13  Philip M. Halpern presiding.
14              In the matter of Michael Monroe against Sean Campbell,
15  would the plaintiffs please note your appearance?
16              MR. GREENBERG:  Good morning, Your Honor.  Ira G.
17  Greenberg and Harry K. Tiwari for the plaintiff, Michael J.
18  Monroe.
19              THE DEPUTY CLERK:  Defense counsel, please note your
20  appearance.
21              MR. PITCOFF:  Sure.  Good morning, Your Honor.
22  Kenneth Pitcoff and Frank Foster for the defendants Officer Sean
23  Campbell, Officer Will Santiago, and Lieutenant Ian Kaye.
24              THE COURT:  Good morning, everybody.  Good morning.
25  Please be seated.
```

1            Good morning, everybody.  My name is Philip Halpern.

2   I'll be the judge presiding for this trial.  I want to make a

3   few remarks before we start.  You should all know that this

4   court, the United States District Court for the Southern

5   District of New York, is sometimes referred to as the Mother

6   Court, as it is the first court that was established under the

7   Judiciary Act of 1789 after the United States Constitution came

8   into force.  Our Court actually predates the United States

9   Supreme Court's commencement by a few months.  Our Court held

10  its first session on the first Tuesday of November in 1789, and

11  Judge James Duane presided.  Our court has become respected as

12  the gold standard for trial courts around the United States.

13          Throughout its long history, it has stayed open and

14  operational during wars, depressions, in the aftermath of the

15  September 11th terrorist attacks, and even during this Covid

16  pandemic that we have all lived through.

17          Jury trials are fundamental to our system of justice,

18  which, despite its imperfections, is the envy of the world.  As

19  such, jury trials are also part of the bedrock of American

20  democracy.  Citizen jurors, not judges or bureaucrats, decide

21  the outcome of civil and criminal disputes.  The right to trial

22  by jury is so important that it is enshrined in the Sixth and

23  Seventh Amendments to our Constitution.  Each of you in this

24  room has responded to the call to serve, and this is a very

25  important thing.  What each of you are doing is sending a

1 message to your family, to your friends, and to the community at

2 large that you want the cherished American institution of trial

3 by jury to continue.

4          Now, this morning we are going to be selecting a jury

5 of eight people to hear and decide this case.  This is a civil

6 case.  Let me introduce you to some of the trial participants.

7          Michael Monroe is the plaintiff in this case, and his

8 attorneys are Ira G. Greenberg and Harry Tiwari of the law firm

9 of Locke Lord.  Mr. Monroe, Mr. Greenberg, Mr. Tiwari, please

10 stand and face the jury.  All right.  Thank you.

11          The defendants in this case are the Town of

12 Haverstraw, Police Officer Sean Campbell, Police Officer William

13 Santiago, and Lieutenant Police Officer Ian Kaye, and the Town

14 of Haverstraw as well.  The defendants' attorneys are Kenneth

15 Pitcoff and Frank Foster of the law firm of Morris, Duffy,

16 Alonso, Faley & Pitcoff.  Please stand and face the jury so they

17 can see you.  All right.  Thank you very much.

18          As I indicated, this is a civil case as opposed to a

19 criminal case.  The trial is expected to take a couple of three,

20 four days.  I suppose that if something unexpected happens, it

21 could take longer, but I'm pretty confident it's not going to

22 take longer than that.  We will sit from 9:30 to 5:00 each day.

23 We will have a lunch break and shorter breaks in midmorning and

24 mid- afternoon.  What we are going to do first is select eight

25 of you who will decide the issues of this case fairly and

1 impartially without bias, prejudice or sympathy for or against

2 either side.  To be sure we do that, I'm going to ask certain

3 questions about your personal background, your family, your

4 beliefs and attitudes about certain matters, how you are

5 employed and so forth.  You are required to give true and

6 complete answers to my questions.  It's important that you

7 understand I'm not trying to pry into your lives.  I just want

8 to make sure that we select fair and impartial jurors who can

9 listen to the evidence with an open mind and decide the case

10 based only on the evidence and on my instructions to you about

11 the law.  If you have an answer to any question that for obvious

12 reasons is very private, such that you do not want to answer it

13 in public, please let me know, and I will hear you at the side

14 bar.  However, almost all of these questions, virtually all of

15 them, can be answered from your seat in the courtroom.

16        Now let me say a few words about the claims in this

17 case.  I'm not trying to give you instructions about what you

18 have to do to decide this case.  I will give you those

19 instructions later, specifically to the jurors that we select.

20 I'm just going to give you a brief description of the type of

21 case.

22        This is a civil lawsuit.  There's one plaintiff,

23 Michael J. Monroe, and four defendants:  Officers Sean Campbell,

24 Santiago, Kaye, and the Town of Haverstraw.  Plaintiff Michael

25 Monroe claims that on November 6, 2020, defendant Officer Sean

1  Campbell used excessive force during his arrest inside the

2  bathroom of the ground floor apartment at 10 Captain Shankey

3  Drive, Garnerville, New York, 10923.  He claims that defendant

4  Lieutenant Ian Kaye failed to intervene and prevent the

5  excessive force used by Officer Campbell.

6          In addition, Mr. Monroe claims that Officer William

7  Santiago used excessive force when Monroe was outside Santiago's

8  patrol vehicle and when Monroe was being placed into the back

9  seat of the patrol vehicle.  Defendants Campbell, Lieutenant

10 Kaye, and Officer Santiago deny plaintiff Michael Monroe's

11 allegations and claim that the use of force was reasonable under

12 the circumstances.  That's all I need to say at this point.  If

13 you get selected as a juror, you will hear much more about this

14 in short order.

15         Let's talk about your role as jurors.  If you are

16 selected as a juror, your job as jurors will be to decide the

17 questions of fact, that is, to decide any disputed issues.  You

18 will be the only judges of the facts.  Nothing that I say or do

19 or that the lawyers say or do can interfere with your role as

20 the exclusive finders of fact.  In fact, it's not up to me to

21 decide what happened.  I have no opinion about that.  If you get

22 the impression from anything that I say or do that I do have an

23 opinion about the facts, you must disregard it.  We have juries

24 to decide these things because we trust your common sense, and

25 your common sense is certainly as good as my common sense.

1            When it comes to the law, however, you must take my --

2    the instructions I give you, and you are bound to follow those

3    instructions.  You may not substitute your own ideas of what the

4    law is or what you think it should be.  At the end of the case,

5    your job will be to determine, in accordance with my

6    instructions, whether the plaintiff has proven his claims, and

7    if so, whether he's entitled to damages.  The reason for this is

8    that we all need to play by the same set of rules, which were

9    designed to ensure that all matters are decided in a just,

10   speedy and hopefully inexpensive fashion.  You may not like the

11   law.  You may think the law should be different.  But if you

12   don't follow my instructions on the law, then we wouldn't all be

13   playing on the same level playing field.

14            Let me say a few words about the mechanics of what we

15   are about to do.  Those of you who are sitting in the actual

16   jury box, the first 14 of you, are what I will call our virtual

17   jury.  In a minute, I'm going to ask you to respond to my

18   questions.  Now initially, I'm going to ask questions to the

19   first 14 of you in the jury box.  However, if any one of the

20   first 14 are excused, the person seated in number 15 will become

21   one of the 14 potential jurors in the virtual jury box.  I will

22   then ask that person, without repeating all of the prior

23   questions, whether any of my questions called for a yes answer

24   or an explanation on his or her part.  And if any other

25   potential jurors are excused, I will do the same thing for the

1  next numbered juror.  Eventually, we will get to the part where

2  there are 14 qualified jurors, which is the number we need to

3  select to get a jury of eight in this civil case.

4         Because any one of you in my courtroom may be needed

5  to take your place in the virtual jury box, I will need all of

6  you to listen carefully to the questions.  There are two sets of

7  questions.  The first set of questions are about the case and

8  any experiences that you may have had that might affect your

9  ability to serve as a juror in this case.  I will ask these

10  questions out loud to the group.  If you have a yes answer to

11  any of these questions, please raise your hand, and I will ask

12  you some followup questions.

13         The second set of questions, once we get through part

14  one, are basic background questions about you, your occupation,

15  your education, your family and the like.  Both sets of

16  questions will be on a list that my courtroom deputy and law

17  clerks will hand out to you in a minute.

18         Now, please, don't assume anything from the questions

19  asked because the mere fact that these questions are asked has

20  no bearing on the evidence in this case.  During the

21  questioning, you may be excused from serving as a juror in this

22  case.  If that happens, it's certainly not a reflection on you

23  personally.  It's just how the system works.  You will have done

24  your duty by your presence and your readiness to serve if

25  chosen.  When appropriate, I will ask you to give your answers

1  to my questions using the microphone which Mr. Cangelosi will

2  hand to you to make sure everyone can hear you.  All right.

3          Let's do one thing at a time.  First, Mr. Cangelosi,

4  let's have all of the potential jurors stand, please, and swear

5  them in.

6          THE DEPUTY CLERK:  You, and each of you, do solemnly

7  swear that you shall give true answers to all questions that

8  shall be put to you touching upon your qualification to serve as

9  jurors in this case, so help you God.

10          (All answer affirmatively)

11          THE DEPUTY CLERK:  Please be seated.

12          THE COURT:  All right.  Ladies and gentlemen of the

13  jury, now the first 14 of you are, starting with juror number

14  one here, the first 14 of you are now in our virtual jury box.

15  So before we get to the questions with respect to the first 14

16  of you, is there anyone who has commitments that would interfere

17  with your serving on this jury for a trial that's going to go

18  four days?  If so, please raise your hand.

19          Now, before we get to any particular problem, let me

20  just tell you, serving on a jury is an inconvenience.  I

21  understand that.  And it may be you have to disrupt or revise

22  your doctors' appointments or schedules.  I'm sorry about that.

23  So unless it's really something that is urgent, you know, I'm

24  going to require you to remain.  Okay?  It's really meant --

25  it's not meant for convenience.  Serving on a jury is not

1    convenient for anybody, right?  You would rather be doing

2    something else, but it is part of your obligation as a citizen.

3            With that background, juror number four?

4            PROSPECTIVE JUROR:  I'm currently self-employed, and

5    being out a couple of days is --

6            THE COURT:  I appreciate that, but I'm going to -- I'm

7    going to have you remain.  Thank you.

8            Next?  Number five.

9            PROSPECTIVE JUROR:  My father just became very ill the

10   past week.  He is in Vassar Hospital in Poughkeepsie, and they

11   are putting a feeding tube in him today.  I'm just worried that

12   if something worse happens that --

13           THE COURT:  Are you concerned that your mind would be

14   on your father during this --

15           PROSPECTIVE JUROR:  Absolutely.

16           THE COURT:  -- and not on the matter here?

17           PROSPECTIVE JUROR:  Yes.  Absolutely.

18           THE COURT:  All right.  Juror number five, I'm going

19   to excuse you.

20           PROSPECTIVE JUROR:  Thank you.

21           THE COURT:  Juror number 15 will take the seat of

22   juror number 5.  You are to report back downstairs, ma'am.

23           Was there another hand?  Juror number 6?  All right.

24   Let's hand out the questionnaires to everybody, and those in the

25   back, don't think you are unimportant.  It happens very often

1  that we bring people from the back to the jury pool so pay

2  attention, please, as we go through the questions.

3          All right.  Everybody has the questions.  Now let's

4  stay on the same page.  I know a lot of you type A's, don't get

5  ahead of me.  Don't read ahead.  Don't lag behind.  Let's try to

6  stay together.  We've got a lot of work to do, and if we work

7  together, we will get through this rapidly, and you will be on

8  your way.  Okay?  This is not my first rodeo, so work with me,

9  and we will get through this.  All right?

10          Do you have any hesitation or -- now the first 14 of

11  you, if you have any "yes" answers, you raise your hand.  The

12  rest of you, you don't have to raise your hands just yet.  Okay?

13  So this is for the first 14.

14          Do you have any hesitation or unwillingness to accept

15  the rules and instructions that I have already stated?  Do you

16  have any doubt that you will be able to apply the law as I

17  explain it, even if you disagree with it?  Do you have any

18  difficulty reading, speaking or understanding the English

19  language?

20          Do you have a problem with hearing or vision that

21  would affect your ability to follow the testimony or the

22  evidence?  Are you taking any medication or experiencing any

23  medical condition or problem that might make it difficult for

24  you to give your full attention for the entire duration of this

25  trial or might otherwise interfere with your service as a juror?

1            Juror number eight.  Yes, ma'am?  Hold on.

2            PROSPECTIVE JUROR:  I just started a new medication.

3  I'm having some side effects.  I don't know if it will progress

4  or stop.  I would rather stay private with what I am taking.

5            THE COURT:  All right.  I will hear you on the side.

6  Counsel to the side, please.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (At the side bar)

 2              PROSPECTIVE JUROR:  I just took a cardiopathic

 3  injection, my first one on Monday.

 4              THE COURT:  You took a what, ma'am?

 5              PROSPECTIVE JUROR:  Cardiopathic.  It's an injection

 6  for cardiovascular disease.  I couldn't tolerate the statin.  I

 7  am having some backaches and headaches.  I can't swear it's

 8  that.  I don't know but --

 9              THE COURT:  You took the injection?

10              PROSPECTIVE JUROR:  Every two weeks, the first one.

11              THE COURT:  You took the first one yesterday?

12              PROSPECTIVE JUROR:  No, it's a week.

13              THE COURT:  A week.

14              PROSPECTIVE JUROR:  I am still having -- I don't know

15  for sure where the backaches or headaches come from.

16              THE COURT:  Okay.  So you are telling me you have

17  backaches and headaches, but you're not sure it comes from the

18  medicine that you are --

19              PROSPECTIVE JUROR:  I have to check it.  That's one of

20  the side effects what I --

21              THE COURT:  Well, is it interfering with your ability

22  to --

23              PROSPECTIVE JUROR:  It's painful to sit.

24              THE COURT:  I see.  And are you experiencing that pain

25  right now?

1              PROSPECTIVE JUROR:  Over here.

2              THE COURT:  Okay.  And is it interfering with your

3   ability to concentrate this morning on the questions?  I mean, I

4   understand you have back pain, but I have shoulder pain every

5   day of my life, and it's -- I struggle with it.  Is it something

6   that's going to prevent you from participating in this trial?

7   Is it that painful to you?

8              PROSPECTIVE JUROR:  At times it is.

9              THE COURT:  Okay.  I am going to excuse you.  Juror

10  number eight is excused for cause.

11              (End of side bar)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court)

 2              THE COURT:  Juror number eight is excused for cause.

 3  Juror number 16 will sit in juror number eight's seat.

 4              Juror number eight, you have heard the first few

 5  questions.  Is there any question so far that you would answer

 6  yes to?

 7              PROSPECTIVE JUROR:  No.

 8              THE COURT:  Thank you.

 9              All right.  Is there anyone here who is not a U.S.

10  citizen?

11              Given the brief description of the allegations I

12  provided you, is there anything about this case that would cause

13  you to believe you could not consider the evidence fairly and

14  impartially according to the law?  Juror number 14.

15              PROSPECTIVE JUROR:  Cam I talk in private?

16              THE COURT:  No, we are not going to the private, not

17  for this question.

18              PROSPECTIVE JUROR:  I have had situations where I have

19  seen excessive force, and I have had guns drawn on me for no

20  cause.

21              THE COURT:  Okay.

22              PROSPECTIVE JUROR:  Literally a gun drawn to my head.

23  Another time a gun drawn to my groin while I sat in a car.

24              THE COURT:  And tell me how many years ago, months ago

25  was that?

1              PROSPECTIVE JUROR:  Well, I grew up in Mount Vernon.

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  So it was in my early 20s.  The

4    other incidents happened when I moved to Pelham Parkway in the

5    Bronx.

6              THE COURT:  Okay.  And do you believe that because

7    those incidents occurred to you, you couldn't be fair and

8    impartial in this case, some 20 years later?

9              PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  Why?

11             PROSPECTIVE JUROR:  Because it was simple --

12             THE COURT:  Why do you think you would be -- you

13   couldn't be impartial?

14             PROSPECTIVE JUROR:  Okay.  I have never done a drug in

15   my life.  So --

16             THE COURT:  No, no.  No slow down.  Slow down.  Juror

17   number 14, stay with me.

18             PROSPECTIVE JUROR:  Sure.

19             THE COURT:  This is a civil case where a plaintiff is

20   seeking damages based on excessive force.  You are indicating to

21   me that you grew up in Mount Vernon, which is a tough place to

22   grow up in; that you had guns drawn when you were younger in

23   your 20s, and they were pointed at your head you said and in

24   your groin.  And I'm saying, that's a terrible experience.  Of

25   course that's a terrible experience, but what does that have to

050923PMH                          Jury Selection

1 do with your ability to be impartial in my case here for these

2 parties?

3              PROSPECTIVE JUROR:  Because there's several incidents.

4 One, I saw my cousin get roughed up for no reason.  Another

5 time --

6              THE COURT:  Roughed up by whom?

7              PROSPECTIVE JUROR:  Police.

8              THE COURT:  I see.

9              PROSPECTIVE JUROR:  Another time I was on the subway

10 station with my friend, who was in the academy at the time.  It

11 was in the middle of a summer day, very few people on the

12 platform.  He was pulled down by officers.  They asked him if he

13 was -- because he had that chain around his neck.  He didn't --

14 he was told not to allow anyone down the staircase, and then

15 when he came back, he was shaken.

16              THE COURT:  So --

17              PROSPECTIVE JUROR:  Because they beat up a perp.

18              THE COURT:  Is it your statement to me, your truthful

19 statement to me that based on those experiences, you could not

20 be fair and impartial in this case?

21              PROSPECTIVE JUROR:  I'll be honest with you, I'd

22 believe anything.

23              THE COURT:  I am not sure I understand what that

24 means.

25              PROSPECTIVE JUROR:  Well --

1          THE COURT:  Listen, I get it.  You had a rough

2    childhood.  You had a rough period in your 20s.  You grew up in

3    one tough neighborhood, Mount Vernon.  All of us know Mount

4    Vernon is a tough place to grow up in, but I'm looking for fair

5    and impartial here, and if having had tough experiences growing

6    up doesn't mean you can't be fair and impartial here.  The last

7    statement you made to me was, you know, I will believe anything,

8    meaning if you think it's truthful, you would believe it or if

9    you -- are you gullible?  What are you saying to me?

10          PROSPECTIVE JUROR:  Yes.  It's extreme.  Because I've

11   seen a lot.  That's what I am trying to tell you.  I've seen a

12   lot firsthand, and I've been mistreated for no reason as well.

13   I mean, no reason.

14          THE COURT:  So your life experience has been

15   difficult, but can you be fair and impartial for other people

16   who are coming to court and looking for their day in court?

17          PROSPECTIVE JUROR:  I have seen firsthand --

18          THE COURT:  No, no.  You have to answer my question.

19   Can you be fair and impartial, sir?  Yes, I can, Judge.  No, I

20   can't, Judge.

21          PROSPECTIVE JUROR:  No, I can't.

22          THE COURT:  Okay.  I'm going to excuse you juror

23   number 14.  Juror number 17, you report back downstairs, and

24   they will send you to another jury trial.  Okay.

25          Are we pushing buttons?  Juror number 17, who is now

1 | juror number 14, good morning.

2 |         PROSPECTIVE JUROR:  Good morning.

3 |         THE COURT:  You have heard all the questions that I

4 | have asked so far.  Is there any question that you would answer

5 | "yes" to so far?

6 |         PROSPECTIVE JUROR:  (Shakes head)

7 |         THE COURT:  All right.  Let's continue.

8 |         Do you have any personal knowledge of the claims in

9 | this case other than what I have just described to you?  Have

10 | you seen or read anything about the case?  This is a civil

11 | lawsuit brought by plaintiff Michael J. Monroe.  Do you know or,

12 | to your knowledge, have you had any dealings directly or

13 | indirectly with Mr. Monroe or with any relative, friend or

14 | associate of his?

15 |         The defendants in this case are Sean Campbell, William

16 | Santiago and Ian Kaye.  Do you know or, to your knowledge, have

17 | you had any dealings, directly or indirectly, with them or with

18 | any of their relatives, friends or associates?

19 |         The plaintiffs -- plaintiff is represented by Ira

20 | Greenberg and Harry Twitter of the law firm of Locke Lord.  Do

21 | you know or, to your knowledge, have you had any dealings

22 | directly or indirectly with these individuals or any employees

23 | or members of the law firm of Locke Lord LLP?  Juror number two?

24 |         PROSPECTIVE JUROR:  I am in banking, and I do work

25 | with lawyers from Locke Lord from time to time.

1              THE COURT:  All right.  Is there any -- you are in

2   banking, so it's transactional?

3              PROSPECTIVE JUROR:  Transactional, yes.

4              THE COURT:  And do they represent you and your

5   company?

6              PROSPECTIVE JUROR:  Typically.

7              THE COURT:  Okay.  And the fact that there are lawyers

8   at Locke Lord who represent your company in banking

9   transactions, is that going to interfere with your ability to be

10  fair and impartial here?

11             PROSPECTIVE JUROR:  No.  I don't believe so.

12             THE COURT:  Okay.  Thank you.

13             Defendants are represented by Kenneth Pitcoff and

14  Frank Foster of the law firm of Morris, Duffy, Alonso, Faley &

15  Pitcoff.  Do you or, to your knowledge, have you had any

16  dealings, directly or indirectly, with these individuals or any

17  employees or members of the law firm of Morris, Duffy, Alonso,

18  Faley & Pitcoff?

19             Do any of you know me or anyone else associated with

20  this court?  Do you know any other members of the jury panel?

21             PROSPECTIVE JUROR:  I used to work in this courtroom,

22  so I know you, but not personally.

23             THE COURT:  Well, we have to explore now.  So give her

24  the microphone.

25             PROSPECTIVE JUROR:  Not personal.  I just worked here

1  previously.

2          THE COURT:  When did you work here, ma'am?

3          PROSPECTIVE JUROR:  I was a federal agent, and I

4  worked in this building up at the prosecutor's office, and I

5  would be in court sometimes.

6          THE COURT:  Okay.  Are you --

7          PROSPECTIVE JUROR:  I retired in June.

8          THE COURT:  You retired this past June.  Well, thank

9  you for your service.

10          PROSPECTIVE JUROR:  Thank you.

11          THE COURT:  Is the fact that you were a federal agent

12  working in the courthouse, is that going to impact on your

13  ability to be fair and impartial in my case?

14          PROSPECTIVE JUROR:  No.  No.

15          THE COURT:  Thank you.  Do any of the other members --

16  do you know any of the other members of the panel?  That's

17  happened to me a couple of times.  As you look around the room,

18  do you recognize anybody?

19          The following is a list of people who may be mentioned

20  or who may testify at trial.  Do you know or have you heard of

21  any of these people:  Jessica Locke, Jamal Johnson, Dr. Barry

22  Kraushaar?

23          Have you or any member of your family or any close

24  friends ever testified as a witness either at a deposition,

25  trial, or grand jury investigation?

```
 1              Have you or has a close friend or relative ever been
 2  involved in a civil or criminal legal proceeding?
 3              THE DEPUTY CLERK:  Judge, juror number four.
 4              THE COURT:  Juror number four.
 5              PROSPECTIVE JUROR:  I have a close friend on a civil
 6  trial.
 7              THE COURT:  Okay.  How long ago?
 8              PROSPECTIVE JUROR:  2017.
 9              THE COURT:  What kind of case was it?
10              PROSPECTIVE JUROR:  It was malpractice with a doctor.
11              THE COURT:  All right.  And when you say a friend, did
12  he talk to you about the case?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  Did he tell you he was a juror in a case?
15              PROSPECTIVE JUROR:  No.  He was -- he was the one in
16  the trial.
17              THE COURT:  Oh, he was a party to the proceeding.
18  Okay.  Did you participate in the trial?
19              PROSPECTIVE JUROR:  No.
20              THE COURT:  Did he tell you about the trial?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  And would anything about that experience
23  of him telling you -- did you watch the trial?
24              PROSPECTIVE JUROR:  No.
25              THE COURT:  Would anything about the experience of him
```

1  talking, your friend talking to you about him being a party to a

2  trial impact on your ability to be fair and impartial here?  How

3  could it, frankly?

4            PROSPECTIVE JUROR:  Say it again?

5            THE COURT:  How could it?

6            PROSPECTIVE JUROR:  No.  It should be okay.

7            THE COURT:  Okay.  Thank you.

8            Have you ever served as a juror in any court?  Juror

9  number seven, juror number five, we will start with you.  Yes,

10 ma'am.

11           PROSPECTIVE JUROR:  I have.  It was settled in the

12 end, though.

13           THE COURT:  What was it civil case?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  Were you impaneled?  In other words, you

16 got past this part of the voir dire?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  And the judge -- you were part of the jury

19 panel?

20           PROSPECTIVE JUROR:  We heard the entire testimony, and

21 then when it was all done, they settled.

22           THE COURT:  They settled, those dogs.  Lawyers like to

23 do that, you know.  All right.  But will anything about that

24 experience impact your ability to be fair and impartial?

25           PROSPECTIVE JUROR:  No.

1                THE COURT:  Thank you, ma'am.

2                Juror number seven.

3                PROSPECTIVE JUROR:  I was a juror in a criminal case.

4                THE COURT:  How long ago?

5                PROSPECTIVE JUROR:  About 20 years ago.

6                THE COURT:  All right.  And what kind of case,

7    generally?

8                PROSPECTIVE JUROR:  Husband abused wife.

9                THE COURT:  Okay.  Was there anything about that case

10   that would impact on your ability to be fair and reasonable and

11   impartial here?

12               PROSPECTIVE JUROR:  I don't think so.

13               THE COURT:  All right.  Thank you.

14               Have you or any close friend, or member of your family

15   ever been an employee of the Town of Haverstraw or any local

16   government agency, including the Town of Haverstraw Police

17   Department?

18               Have you had any personal experience or any

19   interaction with any law enforcement agency or any law

20   enforcement officers?  By law enforcement officer, I mean a

21   police officer, a parole officer, a corrections officer, an FBI

22   agent, or anyone who is responsible for enforcing criminal laws?

23   Well, we know you have.

24               PROSPECTIVE JUROR:  Just me.

25               THE COURT:  You have had experience with yourself.

1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Is any of that going to impact on your

3   ability to be fair and impartial here, ma'am?

4              PROSPECTIVE JUROR:  No.

5              THE COURT:  Okay.  Thank you.

6              Have you had any personal experience or any

7   interaction --

8              THE DEPUTY CLERK:  Judge, judge.

9              THE COURT:  I am sorry.  Juror number 12.

10             PROSPECTIVE JUROR:  Good morning.

11             THE COURT:  Good morning.

12             PROSPECTIVE JUROR:  My first cousin is a New York City

13  police officer.

14             THE COURT:  All right.  We were talking about --

15             PROSPECTIVE JUROR:  You said New York City.

16             THE COURT:  Yes.  Your first cousin.  Is he currently

17  employed by the New York City Police Department?

18             PROSPECTIVE JUROR:  (Nods head)

19             THE COURT:  All right.  Is there anything about him

20  being a police officer that's going to impact on your ability to

21  be fair and impartial in this case?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Okay.  Thank you.

24             Anyone else?  Raise those hands.  Let them go up so I

25  see them so we can get to you.

1              All right.  I will ask again.  Have you had any

2    personal experience or interaction with the Town of Haverstraw,

3    New York?  No?

4              Have you or has any member of your family, any

5    associate or any close friend ever been arrested or charged with

6    a crime?

7              Have you had --

8              THE DEPUTY CLERK:  Judge?

9              THE COURT:  Juror number one.  Okay.

10             PROSPECTIVE JUROR:  My first cousin was arrested.

11             THE COURT:  Okay.  How long ago?

12             PROSPECTIVE JUROR:  Ten years.

13             THE COURT:  All right.  What was the nature of the

14   offense, if you know?

15             PROSPECTIVE JUROR:  It was a violent offense.

16             THE COURT:  I am sorry?

17             PROSPECTIVE JUROR:  It was a violent offense.

18             THE COURT:  Violent offense.  Okay.  Is there anything

19   about the fact that your first cousin was arrested that could

20   impact on your ability to be fair and impartial here?

21             PROSPECTIVE JUROR:  No, there is not.

22             THE COURT:  Thank you.  Anyone else?

23             Have you, or has any member of your family, any

24   associate or any close friend ever been the victim of a crime?

25             Juror number five.  This is a lively bunch this

1  morning.  Yes, ma'am.

2            PROSPECTIVE JUROR:  My husband owned a jewelry store

3  that was held up.

4            THE COURT:  I am sorry about that.  How long ago?

5            PROSPECTIVE JUROR:  1992.

6            THE COURT:  Long time ago.

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Is the fact that your husband's jewelry

9  store was robbed going to impact on your ability to be fair and

10  impartial here?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  All right.  Thank you, ma'am.

13           Anyone else?

14           Would the fact that plaintiff was convicted of one or

15  more crimes or the defendants are police officers affect your

16  ability to be fair and impartial as a juror?

17           Might you more or less likely -- might you be more or

18  less likely to award money damages to a plaintiff when the

19  defendants are government employees or law enforcement officers?

20           Do you, members of your family or close friends now

21  have or ever had a lawsuit or claim for compensation against the

22  State of New York or any of its agencies or employees?

23           Do you believe that more often than not, law

24  enforcement officers abuse their authority?

25           Do you or any member of your family or close friends

1    ever work -- did you or -- let me start over.

2              Did you, or any member of your family or close friends

3    ever work as a law enforcement officer?  I know juror number

4    eight would say yes to that.  Juror number 12 would say yes to

5    that.  Juror number nine?  Yes, tell me.

6              PROSPECTIVE JUROR:  I have three family members that

7    are police officers.

8              THE COURT:  Where are they police officers?

9              PROSPECTIVE JUROR:  Poughkeepsie, NYPD, and New York

10   State Police.

11             THE COURT:  All right.  Would the fact that your

12   family members are police officers impact on your ability to be

13   fair and impartial here?

14             PROSPECTIVE JUROR:  I don't think so.

15             THE COURT:  Okay.  Thank you.

16             Are you, any member of your family or any close friend

17   now involved or have you ever been involved in the state or

18   federal court system, the federal, state or local police prison

19   or parole systems, or any other area of law enforcement?

20             Juror number eight was an FBI agent.  Anyone else?

21             Do you have any religious, philosophical or other

22   beliefs that would make you unable to render a verdict in this

23   case?

24             If you are selected as a juror, you may not allow race

25   religion or ethic background to influence your evaluation of the

1 evidence presented during the trial.  Do you have any

2 reservations or hesitations about that?  Do you have any

3 hesitation that you could decide this case fairly and

4 impartially without prejudice or sympathy for or against any

5 party, and that you will render a fair and impartial verdict

6 based solely on the evidence presented at trial and upon the law

7 as the Court instructs you?

8             Are you comfortable with accepting responsibility for

9 evaluating the credibility of the parties and the witnesses?

10             Do you have any hesitation -- I'm sorry.  Do you have

11 any reservations about discussing your opinions with other

12 people or about sitting in judgment of others?

13             I have tried to draw your attention through my

14 questioning to possible reasons that you might not be able to

15 sit as a fair and impartial juror, but only you know whether

16 there is something else that I did not mention that I should

17 have asked about.  I'm going to ask you to put yourself in the

18 position of the lawyers and the parties.  If you were sitting in

19 their position, is there any reason to be concerned that a juror

20 like yourself could not be fair and impartial in this case?  Can

21 you think of any reason why you cannot or should not serve as a

22 juror in this case?  If so, please raise your hand.  All right.

23 Thank you.

24             Now we will go to part two.  Some of you are old

25 enough to remember Johnny Carson.  Some of you are scratching

1  your heads saying, who is Johnny Carson?  So we are not -- this

2  is like a little bit of an interview process.  So I'll start

3  with juror number one, and we will go through these questions.

4  And somewhere along the line one of you will pick up with the

5  idea that the judge wants me to answer these questions, and off

6  you will go, and we will get right down through all 14 of you.

7  All right?  So we will start juror number one.  Please tell me

8  how old you are.

9           PROSPECTIVE JUROR:  Thirty-eight.

10          THE COURT:  Where were you born, and where did you

11  grow up?

12          PROSPECTIVE JUROR:  The Bronx and Eastchester.

13          THE COURT:  What city, town or village and county of

14  residence do you reside in today?

15          PROSPECTIVE JUROR:  Hawthorne, New York.

16          THE COURT:  How long have you been there?

17          PROSPECTIVE JUROR:  Eight years.

18          THE COURT:  And where did you reside before that?

19          PROSPECTIVE JUROR:  Eastchester.

20          THE COURT:  How far did you go in school?

21          PROSPECTIVE JUROR:  College degree.

22          THE COURT:  And where do you work and for how long,

23  and what did you do before that?

24          PROSPECTIVE JUROR:  I am an accountant.  I have been

25  with my current company for ten years.

1           THE COURT:  Are there any other adults in your

2  household?

3           PROSPECTIVE JUROR:  My wife.

4           THE COURT:  What does she do?

5           PROSPECTIVE JUROR:  Graphic designer.

6           THE COURT:  And do you have any children?

7           PROSPECTIVE JUROR:  Yes.  Two.

8           THE COURT:  How old?

9           PROSPECTIVE JUROR:  Three and one year.

10           THE COURT:  I assume they are not working yet?

11           PROSPECTIVE JUROR:  They are not.

12           THE COURT:  Have you or has any member of your

13  immediate family served in the armed services?

14           PROSPECTIVE JUROR:  My grandfather served.

15           THE COURT:  All right.  Other than that?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  What newspapers, magazines, websites or

18  blogs do you regularly read?

19           PROSPECTIVE JUROR:  None.

20           THE COURT:  All right.  Radio, TV, what do you look

21  at?

22           PROSPECTIVE JUROR:  Fiction mostly.

23           THE COURT:  All right.  And how about Facebook,

24  Twitter, Instagram, Snapchat, TikTok?

25           PROSPECTIVE JUROR:  I do, but minimally.

1              THE COURT:  What which ones do you look at?

2              PROSPECTIVE JUROR:  Oh, Facebook and Instagram.

3              THE COURT:  And not very often?

4              PROSPECTIVE JUROR:  Not very often, no.

5              THE COURT:  All right.  And what do you like to do in

6    your free time?

7              PROSPECTIVE JUROR:  Read.

8              THE COURT:  Read.  Okay.  Thank you.

9              Juror number two.  Off we go.  How old are you?

10             PROSPECTIVE JUROR:  Forty-three.

11             THE COURT:  Where were you born?

12             PROSPECTIVE JUROR:  Somers, New York.

13             THE COURT:  Where did you grow up?

14             PROSPECTIVE JUROR:  Somers, New York.

15             THE COURT:  And where do you reside now?

16             PROSPECTIVE JUROR:  South Salem, New York.

17             THE COURT:  How long?

18             PROSPECTIVE JUROR:  About 12 years.

19             THE COURT:  All right.  How far did you go in school?

20             PROSPECTIVE JUROR:  Graduate school.

21             THE COURT:  And what sort of work do you do?

22             PROSPECTIVE JUROR:  Banking.

23             THE COURT:  How long?

24             PROSPECTIVE JUROR:  Fifteen-plus years.

25             THE COURT:  All right.  Anything before that?

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Just a student.  All right.  Other adults

 3  in your household?

 4              PROSPECTIVE JUROR:  Yes, my wife.

 5              THE COURT:  What does she do?

 6              PROSPECTIVE JUROR:  Psychology.

 7              THE COURT:  All right.  How many kids, if any?

 8              PROSPECTIVE JUROR:  Two kids, 10 and 12.

 9              THE COURT:  All right.  They are not working.

10  Immediate family members serving in the armed services?

11              PROSPECTIVE JUROR:  Father served.

12              THE COURT:  All right.  What about newspapers,

13  magazine, websites or blogs?

14              PROSPECTIVE JUROR:  *Wall Street Journal*.

15              THE COURT:  All right.  Radio stations, and TV shows

16  you watch?

17              PROSPECTIVE JUROR:  No.  Nothing in particular.

18              THE COURT:  All right.  Social media, Facebook,

19  Twitter, Instagram?

20              PROSPECTIVE JUROR:  Generally not.

21              THE COURT:  And what do you like to do in your free

22  time?

23              PROSPECTIVE JUROR:  Play with my kids.

24              THE COURT:  Good for you.

25              Juror number three, how old are you?
```

1            PROSPECTIVE JUROR:  Fifty-eight.

2            THE COURT:  All right.  Where were you born?

3            PROSPECTIVE JUROR:  Nigeria.

4            THE COURT:  And where did you grow up?

5            PROSPECTIVE JUROR:  Nigeria.

6            THE COURT:  All right.  And where do you live now?

7            PROSPECTIVE JUROR:  New Rochelle.

8            THE COURT:  All right.  And how long have you been

9     there?

10           PROSPECTIVE JUROR:  Nineteen years.

11           THE COURT:  All right.  And how far did you go in

12    school?

13           PROSPECTIVE JUROR:  Graduate.

14           THE COURT:  Okay.  And what sort of work do you do and

15    for how long?

16           PROSPECTIVE JUROR:  I am a social worker.  I work for

17    City of New York for 27 years.

18           THE COURT:  All right.  Are there any other adults in

19    your household?

20           PROSPECTIVE JUROR:  My husband.

21           THE COURT:  And what does he do?

22           PROSPECTIVE JUROR:  Mechanical engineer.

23           THE COURT:  Mechanical engineer.  How about children?

24           PROSPECTIVE JUROR:  Four.

25           THE COURT:  And how old are they?

 1          PROSPECTIVE JUROR:  Twenty-eight, twenty-six,

 2  twenty-one and eighteen.

 3          THE COURT:  All right.  What do the adults do?  I

 4  guess they are all adults.

 5          PROSPECTIVE JUROR:  My oldest son works as a project

 6  manager with Apple.  My second son works PA with a clinic in

 7  Connecticut.  The 21-year-old is graduating this year, and the

 8  18-year-old is going to college this year.

 9          THE COURT:  Terrific.  Have you or any of your

10  immediate family members served in the armed services?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Okay.  What about newspapers, magazines,

13  websites or blogs?

14          PROSPECTIVE JUROR:  Old-fashioned.  Just --

15          THE COURT:  So it's no.

16          PROSPECTIVE JUROR:  Yeah, I watch TV once in a while,

17  you know.

18          THE COURT:  What do you watch?

19          PROSPECTIVE JUROR:  CNN.

20          THE COURT:  CNN.  How about social media?

21          PROSPECTIVE JUROR:  I'm not on Facebook or anything

22  like that, but once in a while I go to Instagram.

23          THE COURT:  Okay.  And what do you like to do in your

24  free time?

25          PROSPECTIVE JUROR:  I cook a lot.

```
 1              THE COURT:  You cook.  What do you cook?

 2              PROSPECTIVE JUROR:  Everything.

 3              THE COURT:  Everything.

 4              PROSPECTIVE JUROR:  Continental, African, American,

 5    anything.  I love cooking.

 6              THE COURT:  Good for you.

 7              All right.  Juror number four.  Good morning again.

 8    All right.  Tell me how old you are.

 9              PROSPECTIVE JUROR:  Thirty-seven.

10              THE COURT:  And where were you born?

11              PROSPECTIVE JUROR:  Nyack, New York.

12              THE COURT:  And where did you grow up?

13              PROSPECTIVE JUROR:  Nanuet, New York.

14              THE COURT:  And where do you live now?

15              PROSPECTIVE JUROR:  Nanuet.

16              THE COURT:  And how long have you lived in the current

17    residence?

18              PROSPECTIVE JUROR:  My life.

19              THE COURT:  Your whole life.  Good for you.  How far

20    did you go in school?

21              PROSPECTIVE JUROR:  Four years of college.

22              THE COURT:  All right.  And what kind of work do you

23    do and for how long?

24              PROSPECTIVE JUROR:  Self-employed 12 years.  I do work

25    for new car dealers.
```

1              THE COURT:  All right.  Any other adults in your

2    household?

3              PROSPECTIVE JUROR:  I have my mother with the house.

4              THE COURT:  All right.  And does she do any work?

5              PROSPECTIVE JUROR:  Retired.

6              THE COURT:  Retired.  All right.  What did she do

7    before she retired?

8              PROSPECTIVE JUROR:  Office assistant.

9              THE COURT:  Okay.  How about children?

10             PROSPECTIVE JUROR:  No kids.

11             THE COURT:  Okay.  Have you or any member of your

12   immediate family served in the armed forces?

13             PROSPECTIVE JUROR:  My father did.

14             THE COURT:  Okay.  And what about newspapers,

15   magazines, websites or blogs you regularly read?

16             PROSPECTIVE JUROR:  I flip through magazines.  It's

17   more along, you know, the news websites.

18             THE COURT:  Okay.  Radio stations and TV shows?

19             PROSPECTIVE JUROR:  Not really.

20             THE COURT:  Okay.  Social media?

21             PROSPECTIVE JUROR:  I have Facebook for work.

22             THE COURT:  Okay.  And how often do you look at

23   Facebook?

24             PROSPECTIVE JUROR:  Multiple times a day.

25             THE COURT:  Okay.  And what do you like to do in your

1  free time?

2          PROSPECTIVE JUROR:  Projects around the house, working

3  on cars.

4          THE COURT:  Okay.  Juror number five, good morning

5  again.

6          PROSPECTIVE JUROR:  Good morning.

7          THE COURT:  Tell me how old you are, ma'am.

8          PROSPECTIVE JUROR:  Sixty-three.

9          THE COURT:  All right.  And where were you born?

10         PROSPECTIVE JUROR:  Yonkers.

11         THE COURT:  Where did you grow up?

12         PROSPECTIVE JUROR:  In Park Slope.

13         THE COURT:  And where do you currently reside, for how

14 long?

15         PROSPECTIVE JUROR:  Ardsley for about 18 years.

16         THE COURT:  All right.  And how far did you go in

17 school?

18         PROSPECTIVE JUROR:  College.

19         THE COURT:  What sort of work do you do, and for how

20 long?

21         PROSPECTIVE JUROR:  I am retired, but I was a

22 kindergarten teacher.

23         THE COURT:  Good for you.  Any other adults in your

24 household?

25         PROSPECTIVE JUROR:  My son, my youngest son.

1                THE COURT:  And how old is he?

2                PROSPECTIVE JUROR:  Twenty-seven.

3                THE COURT:  And what does he do?

4                PROSPECTIVE JUROR:  Cyber security.

5                THE COURT:  Okay.  Any members of your immediate

6    family served in the armed forces?

7                PROSPECTIVE JUROR:  My dad.

8                THE COURT:  Okay.  What about newspapers, magazines,

9    websites or blogs you regularly read?

10               PROSPECTIVE JUROR:  Newspapers, whatever NPR, and

11   online.

12               THE COURT:  Okay.  Radio stations or TV shows?

13               PROSPECTIVE JUROR:  No.  Not really.

14               THE COURT:  Okay.  Social media?

15               PROSPECTIVE JUROR:  Instagram.

16               THE COURT:  How often?

17               PROSPECTIVE JUROR:  I check it daily.

18               THE COURT:  Okay.  And what do you like to do in your

19   free time, ma'am?

20               PROSPECTIVE JUROR:  I read a lot.

21               THE COURT:  Okay.  That's good thing to do.

22               Juror number six.  Good morning --

23               PROSPECTIVE JUROR:  Good morning.

24               THE COURT:  -- again.  All right.  One of you pick up

25   the pace here for me, okay?

1                PROSPECTIVE JUROR:  Sixty-one.

2                THE COURT:  Sixty-one.  Here we go.

3                PROSPECTIVE JUROR:  I was born in Dallas, Texas.  I

4    grew up in Morristown, New Jersey.  I've lived in Sugarloaf.  My

5    mailing address is Chester.  I've been at that residence

6    probably about 16 years now, I think.  How far in school, one

7    year of college.  The kind of work I do, I work for Ferguson

8    Enterprises.  I've pretty much worked in plumbing my whole life.

9    My wife is in the house.  She is -- she works as a director for

10   disability services at a college.

11               I have one child.  He just got a job.  He is 22.

12   Sorry about that.  He just got a job working with the State of

13   New Jersey with staff -- family-owned services and data.  My

14   father was in the army.  Magazines, websites, stuff like that,

15   nothing really.  Radio stations, I listen to Sirius XM, and

16   pretty much social media, nothing at all, and I just like

17   working around the house, you know, at home.

18               THE COURT:  Terrific.  And thank you for grabbing the

19   bull by the horns.

20               Juror number seven.

21               PROSPECTIVE JUROR:  Good morning, Your Honor.

22               THE COURT:  Good morning.

23               PROSPECTIVE JUROR:  I am 68 years old.

24               THE COURT:  You don't look 68.

25               PROSPECTIVE JUROR:  Thank you very much.  I am

1  executive director of a medical publication.  I live at home

2  with my wife.  She is a media planner.  I have a 39-year-old

3  daughter, who is director of events at a golf course.

4          THE COURT:  Where were you born?

5          PROSPECTIVE JUROR:  I was born in Bucks County,

6  Pennsylvania.  I grew up there, and I went to school through

7  graduate degree.  Let's see, what else were you asking here?  I

8  have no one that served in the armed forces.

9          I don't really watch any television or listen to radio

10 on a regular basis, nor Facebook or anything.  And I am a

11 baseball coach in my free time.

12         THE COURT:  Terrific.  I used to coach when my kids

13 were little.  It's fun.

14         Juror number eight.  Good morning.

15         PROSPECTIVE JUROR:  Good morning.  I am 51.  I was

16 born in White Plains.  Grew up in North Salem.  Currently live

17 in Somers, New York where I've been for 15 years.  I went -- I

18 have my master's degree.  I am currently working at M&T Bank

19 doing money laundering investigations.  Prior employment, as you

20 know, I was a federal agent, which I did for 23 years in the

21 city and up here in White Plains.

22         I have my husband in the house.  He is a guidance

23 counselor, and I have two children who are 18 and 15.  Both

24 work, but doing retail and delivering pizza.

25         THE COURT:  Good all-American jobs.

 1              PROSPECTIVE JUROR:  That's right.  My father was in
 2   the army.  No newspapers, magazines.  Television, some.  I watch
 3   Netflix documentaries and things like that, and then I obsessed
 4   with Twitter and Facebook, and Instagram rarely, but sometimes.
 5              THE COURT:  All right.  And what do you like to do in
 6   your free time?
 7              PROSPECTIVE JUROR:  Hiking, reading, gardening.
 8              THE COURT:  Terrific.  All right.  Thank you.
 9              Juror number nine.  Just let's get the mic, juror
10   number nine, off you go.
11              PROSPECTIVE JUROR:  Good morning.
12              THE COURT:  Good morning.
13              PROSPECTIVE JUROR:  I am 55.  I was born in Beacon.  I
14   reside in Fishkill.  I have been there for over 20-plus years.
15   I was born in Ecuador.  College degree.  I retired.  Previously
16   did audit and financial type work.  My wife lives at my
17   household.  She is an owner of a funeral home.  I have two
18   children, 21 and 14, both students.  Nobody served in the armed
19   forces.  Really not on any social media.  Primarily look at news
20   and stream music for the most part, and I enjoy outdoor
21   activities.
22              THE COURT:  Terrific.  Thank you very much.
23              Juror number ten?
24              PROSPECTIVE JUROR:  Good morning.  I am 24 years old.
25   I was born, raised and currently live in Poughkeepsie, New York.

1  I am currently in college.  I am in a master's program,

2  international criminal justice.  I work for youth advocate

3  programs at Dutchess County, so I work with troubled youth 12 to

4  18.  I do work were the juvenile court system in Dutchess County

5  as well as probation.

6           In my household is my father.  He is an engineer.  And

7  my 18-year-old sister who is working at Buffalo Wild Wings.  I

8  have no children.  I have a cousin, a first cousin that's

9  currently in the reserves in the military.

10          Newspapers, magazines, websites, blogs, all of it

11  let's just say, every single social media website, all of it,

12  every day.  I am in withdrawal currently for not having my

13  phone.  And in my free time I like to creative write.

14          THE COURT:  Isn't it interesting the generational

15  difference?  It's so interesting, right?  To you, it's you have

16  to have it every minute of every day, and the first nine could

17  care less.  So interesting.

18          All right.  Good morning.

19          PROSPECTIVE JUROR:  Good morning.

20          THE COURT:  Juror number -- what am I up to?  Eleven,

21  yes.

22          PROSPECTIVE JUROR:  Good morning.  I am 34 years old.

23  I was born in Middletown, New York.  Grew up in Bloomingburg,

24  New York.  I am currently in Greenville, New York for the last

25  two years.  Prior to that, I was in Middletown for eight years.

1  I have a college degree.  I work in business operations.  I have

2  my fiancée in that house, and she is a care manager.  I have one

3  child seven years old.  No immediate family served in the armed

4  forces.  Websites, sports related.  Radio, Sirius XM.  I'm not

5  active on social media, and spending time with the family and

6  doing things outdoors.

7          THE COURT:  Terrific.  Thank you very much.

8          Juror number 12, good morning.

9          PROSPECTIVE JUROR:  Good morning.  I am 55 years old.

10 I was born in Jordan.  I came up age of 18 to college in the

11 United States.  I have been here for 35 years in the United

12 States.  I have been -- I lived all my life in the United States

13 in Yonkers.  I have been at my residence for 15 years.  I have a

14 masters in electrical engineering.  I am an electrical engineer.

15 I have my wife.  She is a housewife.  She doesn't work.  I have

16 two boys.  One is 22.  He is autistic.  And one is 20 years.  He

17 goes to college and has a part-time job at a local store.  And I

18 have no family member in the armed services.  I read technical

19 magazines and books.  I do get on Facebook, Twitter, TikTok, and

20 for my free time is all technical books.

21         THE COURT:  All right.  Juror number 13.  Good

22 morning.

23         PROSPECTIVE JUROR:  Good morning.  I'm 56 years old.

24 I was born in New York City.  Grew up in Airmont, New York.  I

25 currently reside in Airmont, New York for 20 years.  I made it

1  through college.  I worked for UPS in IT for 33 years.

2            As far as adults in my house, there is my wife, and

3  she is a teacher's assistant.  I have two children.  My son is

4  22 and he is 24, and he is a welder.  My daughter is 22, and she

5  is a teacher assistant.  I don't have anybody -- family members

6  in the armed forces.  As far as newspapers and anything, I don't

7  read anything.  If anything on the web, it's going to be

8  technical related.  No social media.  And listen to I Heart

9  Radio and free time is just outdoors.

10            THE COURT:  Terrific.  Thank you very much.

11            Juror number 14.

12            PROSPECTIVE JUROR:  Good morning.

13            THE COURT:  Good morning.

14            PROSPECTIVE JUROR:  I am 53.  I was born in Manchester

15  in England in the U.K., and that's where I grew up.  I currently

16  reside in Scarsdale and have done for 20 years.  I got as far as

17  a Master's degree in school.  I am currently a nursery

18  schoolteacher, which I have been doing for three years.  Prior

19  to that, I was just raising my children.  My husband is in the

20  house.  He is the CEO of a corporate -- of a public information

21  company in the city.  I have four grownup children.  My oldest

22  is 24.  She lives in D.C.  She works for Deloitte.  My son is

23  just about to graduate college in about two weeks.  He is going

24  to go into teaching.  My third child just finished her second

25  year at college.  She is just home now, and my youngest is just

1  about to graduate high school and go to college.  That's my

2  family.

3          Nobody in my immediate family served in the armed

4  forces.  I do go on Facebook and Instagram to connect with my

5  family in the U.K.  I watch BritBox, which is British TV.  I

6  like to work out and spend time with my family.

7          THE COURT:  Terrific.  Thank you very much.

8          PROSPECTIVE JUROR #5:  I forgot to mention that my

9  children -- my oldest is a lawyer, and my second one is a doctor

10  of psychology, and the third one is an editor.

11          THE COURT:  All right.  Is the lawyer practicing law?

12          PROSPECTIVE JUROR:  The lawyer is in a corporate

13  setting.

14          THE COURT:  Where?

15          PROSPECTIVE JUROR:  In the city.

16          THE COURT:  In New York City?

17          PROSPECTIVE JUROR:  Right.

18          THE COURT:  Thank you.

19          (Pause)

20          THE COURT:  May I see counsel at the side bar, please?

21

22

23

24

25

```
 1              (At the side bar)

 2              THE COURT:  All right.  Counsel are there any for

 3   causes that you want me to consider?  Plaintiff?

 4              MR. GREENBERG:  No, Your Honor.

 5              MR. PITCOFF:  No, Your Honor.

 6              THE COURT:  Okay.  Are you satisfied with the

 7   selection of the jury so far?  Plaintiff?

 8              MR. GREENBERG:  I would like just one more question

 9   for the man -- I don't remember his number -- but he was an

10   editor of a medical journal, and I would like to know about the

11   nature of the journal.

12              THE COURT:  All right.

13              MR. PITCOFF:  The banker does work for counsel's --

14   works for the counsel's firm.  We would like to just to know the

15   nature of the work, how much it is, and --

16              THE COURT:  Okay.

17              MR. PITCOFF:  -- the interaction.

18              (End of side bar)

19

20

21

22

23

24

25
```

1              (In open court)

2              THE COURT:  Okay.  I think juror number seven is

3  editor of a medical journal?

4              PROSPECTIVE JUROR:  Yes, sir.

5              THE COURT:  Could you just describe a little bit about

6  the journal and what the nature of it is, please?

7              PROSPECTIVE JUROR:  It's a professional physician's

8  journal, *The Dermatology Digest*.  It's for dermatologists to get

9  further education.

10             THE COURT:  Okay.  Thank you.

11             Juror number two, you indicated that Locke Lord does

12 work for your bank.  Just give us an idea of the nature of the

13 work and the frequency.

14             PROSPECTIVE JUROR:  Sure.  So it's generally corporate

15 lending transactions, and they would represent as the bank's

16 counsel to help draft documentation and, you know, close

17 transactions.

18             THE COURT:  Do you interact with them often,

19 infrequently?

20             PROSPECTIVE JUROR:  We interact with a number of

21 firms, but Locke Lord is one of the ones that we do work with on

22 occasion.

23             THE COURT:  It's on occasion.

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Counsel, to the side bar, please.

```
 1              (At the side bar)

 2              THE COURT:  All right.  Mr. Greenberg, satisfied.

 3              MR. GREENBERG:  Yes, Your Honor.

 4              THE COURT:  Mr. Pitcoff, satisfied?

 5              MR. PITCOFF:  Yes.  No for causes.

 6              THE COURT:  Okay.  Are you satisfied with the

 7    selection process so far?  Mr. Greenberg?

 8              MR. GREENBERG:  Yes, Your Honor.

 9              THE COURT:  Mr. Pitcoff?

10              MR. PITCOFF:  Yes, Your Honor.

11              THE COURT:  Okay.

12              (End of side bar)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (In open court)

2            THE COURT:  All right.  Ladies and gentlemen, so what

3    we are going to do is a couple of things.  First, ladies and

4    gentlemen in the back, we are going to discharge you back down

5    to the first floor with the thanks of the Court.  You will

6    report back to the jury assembly room, and Mr. Cangelosi will

7    escort you to the elevators now.  It was nice to meet you.

8    Sorry we didn't get to use you.  Hope to run into you in another

9    jury panel some day.  I know you don't, but I do.  Thank you for

10   your service.  I don't think you are done, but you will be

11   downstairs.  All right?  So we will do that first.

12            (Prospective jurors excused)

13            THE COURT:  In the meantime, we will pass the

14   questionnaires forward, and we will take those questionnaires

15   back from the 14 of you.  Just giving the first group a chance

16   to clear out, and then what we are going to do is we are going

17   to take a recess, and you will go out into the hallway.  Don't

18   disappear.  Don't go wandering.  Use the restrooms.

19            And I have some business to deal with the lawyers, and

20   we will call you back in a few minutes.  All right?  So you will

21   be excused now, and we will call you back in very short order.

22   Just you be in the hallway, and Mr. Cangelosi will round you up

23   and bring you back in.  All right?

24            (Juror panel excused)

25            (In open court; recess not present)

1          THE COURT:  All right.  Counsel, be seated.

2          Like all good lawyers, I know you are not ready to

3   pick just now unless you are.  Do you need a minute?

4   Plaintiff's ready.  Defendant needs couple of seconds?

5          MR. PITCOFF:  Your Honor, may I confer with my clients

6   in private?

7          THE COURT:  Of course you can.

8          MR. PITCOFF:  I would like a few minutes.

9          THE COURT:  Let's move it along.  It's not that

10  complicated.

11         MR. PITCOFF:  Sure.  Yes.

12         THE COURT:  I will be back out on the bench -- it's

13  quarter to.  It's say five to?

14         MR. PITCOFF:  That's fine.  Thank you.

15         THE DEPUTY CLERK:  All rise.

16         (Recess)

17         (In open court; jury not present)

18         THE DEPUTY CLERK:  Be seated.

19         THE COURT:  All right.  Plaintiff?

20         MR. GREENBERG:  Your Honor, the plaintiff challenges

21  juror number 16, who was sitting in seat number eight.

22         THE COURT:  Well, let's just stick with the seat they

23  are sitting in.

24         MR. GREENBERG:  Seat eight.

25         THE COURT:  All right.  So plaintiff is knocking out

1    juror number eight.  Defendant?

2              MR. PITCOFF:  Defendants are going to exercise a

3    challenge on juror number three.

4              THE COURT:  And?  Next?

5              MR. PITCOFF:  Juror number five.

6              THE COURT:  Mr. Greenberg?

7              MR. PITCOFF:  And -- okay.  Just our two now?

8              THE COURT:  Yes.

9              MR. GREENBERG:  Juror number nine, and juror number

10   six.

11             THE COURT:  Mr. Pitcoff?

12             MR. PITCOFF:  Juror number ten.

13             THE COURT:  Okay.  At the risk of being bold, let's

14   see if I got the numbers right.  Juror number one is juror

15   number one.  Juror number two is juror number two.  Juror number

16   four is juror number three.  Juror number seven is juror number

17   four.  Juror number 11 is juror number five.  Juror number 12 is

18   juror number six.  Juror number 13 is juror number seven.  Juror

19   number 14 is juror number eight.  All in agreement?  Mr.

20   Greenberg?

21             MR. GREENBERG:  Yes, Your Honor.

22             THE COURT:  Mr. Pitcoff?

23             MR. PITCOFF:  Yes, Your Honor.

24             THE COURT:  Does anybody have any objection to the

25   procedures used to select this jury?  Mr. Greenberg?

```
 1              MR. GREENBERG:  No, Your Honor.

 2              THE COURT:  Mr. Pitcoff?

 3              MR. PITCOFF:  No, Your Honor.

 4              THE COURT:  Is each side satisfied with the jury as

 5    listed?

 6              MR. GREENBERG:  Yes, Your Honor.

 7              MR. PITCOFF:  Yes.

 8              THE COURT:  All right.  Let's bring them back in.

 9              MR. GREENBERG:  Before you that do that, Your Honor,

10    may I just have two minutes because I didn't want to go out

11    there while the jurors were in the hall, if I could use the

12    restroom for two minutes?

13              THE COURT:  We'll bring them in, and you can use the

14    restroom for two minutes, so make it a minute.

15              MR. GREENBERG:  All right.  I will do that.

16              (Recess)

17              THE COURT:  All right.

18              THE DEPUTY CLERK:  Jury entering the courtroom.

19              (In open court; jury panel present)

20              THE COURT:  All right.  Ladies and gentlemen, be

21    seated.

22              Now, Mr. Cangelosi will now read the names of the

23    individuals that have been chosen to be jurors for this trial.

24              THE DEPUTY CLERK:  Juror number one is Michael

25    Sangregorio.  Juror number two is Douglas Moore.  Juror number
```

1  three is Christopher Klimek.  Juror number four is Donald

2  Berman.  Juror number five is John Hoey.  Juror number six is

3  Mathher Abbassi.  Juror number seven is Brian Wulfson.  And

4  juror number eight is Nicola Lloyd.

5           THE COURT:  All right.  Ladies and gentlemen, if your

6  name was not called, I thank you for your service.  Please

7  return to the jury assembly room and to the jury clerk for

8  further instructions.  I thank you very much for being here.  I

9  thank you for your attention, and thank you for being ready to

10 serve as part of my jury.

11          (Prospective jurors excused)

12          THE COURT:  Mr. Cangelosi, arrange them by their

13 seats, please, so juror number three sits in the third seat.

14          All right.  Those are your seats, ladies and

15 gentlemen.  When you come and go each day, that's where you will

16 sit.  All right?  Mr. Cangelosi will now swear you in as the

17 impaneled jury in this action.

18          (A jury of eight was impanelled and sworn)

19          THE COURT:  All right.  Ladies and gentlemen, you are

20 now a jury.  There is no higher function in our legal system.

21 In fact, other than service in the military, there is no more

22 important public service that you can perform.  From now on,

23 whenever you enter or leave the room as a jury, the parties and

24 the audience will rise as the same they do for me because each

25 of you is as every bit as powerful and as important as any judge

1    in the building.

2            Let me introduce or reintroduce you to some of the

3    people who are here.  As I told you before, my name is Philip

4    Halpern.  I am a United States district judge for the Southern

5    District of New York.  You have already met the plaintiff, Mr.

6    Monroe, and his attorneys, Mr. Greenberg and Mr. Tiwari; as well

7    as the defendants, Sean Campbell, William Santiago, and Ian

8    Kaye, and their counsel, Kenneth Pitcoff and Frank Foster.  The

9    Town of Haverstraw is also a defendant in this case.

10           My courtroom deputy seated right in front of me is

11   Frank Cangelosi.  He is the person you will talk to most during

12   the trial.  If you have any questions or difficulties, he is the

13   person you will consult.

14           Pratik Ghosh is to his left.  He is one of my law

15   clerks, and his job is to help me do any research on any legal

16   issues that come up.

17           Darby is our court reporter.  She is the best we have.

18   She will take down everything that is said and done so there is

19   a record of what happened.

20           I am now going to give you some preliminary

21   instructions.  In our system of justice, the judge and the jury

22   have separate roles.  My job is to instruct you on the law that

23   governs this case.  I will give you some instructions now and

24   other instructions from time to time during the trial.  At the

25   end of the trial, I will give you detailed instructions about

1  the law you will need to apply when you deliberate.  Your job as

2  jurors is to determine the facts based on the evidence presented

3  at this trial.  You are the only triers of fact, and your

4  decisions on the factual issues will determine the outcome of

5  this case.  You may not take anything I may say or do during the

6  trial as indicative of what my opinion is or what your verdict

7  should be.  It's not my job to even have an opinion, and if I

8  did, it should not influence you in any way.

9          You must pay close attention to all of the evidence

10  presented.  Evidence consists of the testimony of witnesses,

11  documents, and other things that are admitted into evidence as

12  exhibits or stipulations agreed to by the attorneys.  A

13  stipulation is just an agreement between the lawyers about facts

14  or testimony.  Certain things are not evidence in the case, and

15  you must not consider them as evidence such as:  Nothing I say

16  is evidence.  Statements and arguments by the lawyers are not

17  evidence.  They are simply arguments in which they will tell you

18  what they think the evidence proves and how they think you

19  should analyze the evidence.  You should not give these

20  statements and arguments weight -- let me strike that.  You

21  should give these statements, arguments weight only to the

22  extent that they appeal to your own common sense, and you should

23  consider under no circumstances any of that as evidence.

24          Questions by the lawyers are not evidence.  The

25  evidence is the answers given by the witnesses.  Of course, you

1  don't have to accept a witness's answer at face value.  One of

2  the most important things you will do is assess credibility of

3  witnesses, which I will talk to you about in a moment.

4          Objections to questions are not evidence.  The lawyers

5  are obliged to make an objection when they believe evidence

6  being offered is improper under the rules of evidence.  You

7  should not be influenced by the objection or my ruling on it.

8  If the objection is sustained, ignore the question and any

9  answer that may have been given.  If it's overruled, treat the

10 answer like any other answer.

11         Any testimony that I exclude or strike or tell you to

12 disregard is not evidence, and you must not consider it.  If I

13 instruct you that some evidence is only to be considered for a

14 certain purpose, you must follow that instruction.

15         Finally, anything you may see or hear outside the

16 courtroom is not evidence, and you should disregard anything of

17 that nature.  You are to decide the case only on the evidence

18 presented here in the courtroom.

19         In deciding the facts of the case you will have to

20 assess the credibility of the witnesses, that is, how truthful

21 and believable they are.  So how do you decide what to believe

22 and what not to believe?  You are going to have to listen to the

23 witnesses, watch them and observe them, and then decide just

24 like you would decide such questions every day in your ordinary

25 lives.  Did they know what they were talking about?  Did they

1  appear to be honest, open and truthful?  Do they have a motive

2  to falsify, exaggerate or distort their testimony?  Is there any

3  reason to think they might be mistaken about what they are

4  telling you?  How does their testimony square with the other

5  evidence in this case?  Considering these sorts of issues will

6  help you determine what testimony to accept and what testimony

7  to reject.

8          As the trial proceeds, you may have impressions of a

9  witness or a subject, but you must not allow these impressions

10 to become fixed or hardened because if you do, in a sense you

11 foreclose consideration of the testimony of other witnesses or

12 other evidence that may be presented after the witness you

13 heard.  That would be unfair to one side or the other.  A case

14 can be presented only step by step, witness by witness, until

15 all the evidence is before you.

16          You know from your own experience that frequently you

17 can hear a person give his version of an event, which sounds

18 most impressive, and even compelling, and yet, when you hear

19 another person's version of the same event or even the same

20 witness when cross-examined with respect to it, what seem quite

21 compelling may be completely weakened.  Likewise, if a witness

22 testifies about something, and it doesn't make much of an

23 impression, but later evidence supports what the witness said,

24 what didn't seem particularly compelling when you first heard it

25 may be considerably stronger.  So remember that there may be

1  another side to any witness's story, and there may be more to

2  come on any issue.  You must therefore keep an open mind until

3  the trial is over and not reach any conclusions until you have

4  all the evidence before you.

5          Also, remember you promised to be a fair juror.  A

6  fair juror is a person who will keep the promise to be fair and

7  impartial and will not base the decision in this case upon a

8  bias or prejudice in favor of or against a person who may appear

9  in this trial on account of that person's race, color, national

10  origin, ancestry, gender, gender identity or expression,

11  religion, religious practice, age, disability or sexual

12  orientation.  A fair juror must be mindful of any stereotypes or

13  attitudes about people or groups of people that the juror may

14  have, including implicit biases and must not allow these stereo-

15  types or attitudes to affect their decisions.

16          You can do this by asking yourself whether your views

17  and conclusions would be different if the parties, witnesses, or

18  others that you have heard about or seen in court were of a

19  different race, color, national origin, ancestry, gender, gender

20  identity or expression, religious practice, age, or sexual

21  orientation or did not have a disability.  If the answer is yes,

22  then in keeping with your promise to be fair, reconsider your

23  views and make sure your decision is based on the evidence and

24  not on the stereotypes or attitudes that we just referred to.

25  Justice requires no less.

1          Now, let me interrupt for a second.  I asked everybody

2    to wear masks this morning because we had 35 people in the room.

3    We are now down to the eight.  You are free to take your masks

4    off if you prefer to.  You don't need to leave them on, but you

5    can if you want to.  One of the concerns in this Covid era that

6    I have always have for the parties and the lawyers is that we

7    not get the staff infected.  If the lawyers or the parties get

8    infected, and we have to postpone, it becomes a huge headache.

9    So with 35 in the room, even though we are past the protocols, I

10   exercised my discretion and require everybody.  So you don't

11   need to wear your masks anymore.  If you choose to, that's fine,

12   and there is no problem with that.  Okay?

13         In order to ensure that you decide the case only on

14   the evidence, and that you not be influenced in any way by

15   anything that might occur outside the courtroom, I must give you

16   a specific set of instructions.  First, do not discuss this case

17   with anybody while the case is going on.  That includes family

18   members, friends, and co-workers.  You may tell your friends and

19   families and employers that you are a juror in a case; that it

20   is a civil case, and how long you expect it to last, but don't

21   tell them anything else about the case until after you have been

22   discharged.  Not discussing the case includes not blogging,

23   tweeting, texting, using Facebook and the like.  Until you are

24   discharged, you can't say anything by any means in any form

25   other than you are on a jury in a civil case for a few days.  I

1  cannot emphasize strongly enough how important it is that you

2  not discuss the case in person, by social media, or otherwise

3  until the case is over.

4        And I'm sure that instruction doesn't surprise you,

5  and it appeals to your common sense, but what may be a little

6  bit surprising is that you may not discuss the case even amongst

7  yourselves while the trial is ongoing.  You will have the

8  opportunity.  Indeed, it is your duty to discuss the case

9  amongst yourselves later on, but that can only happen after all

10 of the evidence is in, and the case is given to you to discuss

11 and decide in the jury room.

12       This rule is very important because experience has

13 shown that when people express an opinion about the case, or

14 about a witness, they may become attached to that opinion, and

15 their views may harden, and it is important that that not happen

16 and that you keep an open mind until you have heard all of the

17 evidence in this case.  So don't talk about the case, even with

18 each other, until I tell you to do so.

19       Not talking to each other about the case includes not

20 texting, not emailing, creating a Facebook group or doing

21 anything like that.  You are not to read anything published in

22 the newspapers or elsewhere about the case if that should occur.

23 Also, you are not to listen to or view any reporting about the

24 case if that should be broadcast on TV or over the radio or on

25 the Internet, nor are you to expose yourself to anything on

1  social media regarding this case.  If you come across anything,

2  turn it off, turn the page, click out of it.  Don't read it.

3         Don't do any research or investigation on your own

4  about this case.  Don't visit any place you may hear described

5  during the trial.  Don't do any research on the Internet or in

6  the library or any other reference source.  Don't Google anyone

7  or anything related to the case.  I know it's hard in this day

8  and age not to go to the Internet when you are curious about

9  something, but I can't emphasize enough how important it is to

10 me and to the parties that you not do any form of outside

11 research relating to this case while the trial is going on.  The

12 reasons for the rules against media reports and outside research

13 are that what you might learn may be wrong, and it would be

14 unfair to these parties if you were to have information from

15 outside sources that the parties did not know about and did not

16 have the opportunity to address.

17        Be sure that I am informed if any person you recognize

18 comes into the courtroom.  This is a public trial, so that could

19 happen, but it's important that you do not hear from them as to

20 what has happened in the court if the jury was not present.  If

21 you see someone you know come into the courtroom, please send a

22 note to me through Mr. Cangelosi at your first opportunity.

23        You are not to allow anyone to speak to you about this

24 case.  If you are approached by anyone to speak about it,

25 politely tell them that the judge has directed you not to do so.

1  If any person approaches you or seeks to contact you about the

2  case, you are required to report the incident promptly to me,

3  and you can do that by telling Mr. Cangelosi.  The lawyers, the

4  parties, and the witnesses are not supposed to talk to the jury

5  outside the courtroom or even offer a friendly greeting.  So if

6  you happen to see any one of them outside the courtroom, they

7  will not and should not speak to you.  Please take no offense to

8  that.  They will only be acting properly by doing so.

9          Experience has shown that even innocent conversations

10 with jurors can sometimes be misinterpreted, so courts have a

11 hard and fast rule that the lawyers, the parties, and witnesses

12 cannot talk to jurors, period.

13         The parties are entitled to have you personally render

14 a verdict in the case on the basis of your independent

15 evaluation of the evidence presented here in the courtroom.  So

16 speaking to others about the case or exposing yourself to

17 information outside the courtroom would compromise your fairness

18 to the parties.  So that's the reason for all of these rules of

19 conduct.

20         Finally, if anything should happen involving any juror

21 that is of an unusual nature or which you think is something I

22 should be told about, don't discuss it with anyone else,

23 including any other jury -- any other juror.  Simply give Mr.

24 Cangelosi a note to the effect that you want to speak to me

25 about it, and then I can hear what it is and what you have to

1  say.  I'm saying this to you not because I'm expecting anything

2  unusual or improper to happen.  It's just safer to take the

3  precaution of alerting you in advance.

4          Finally, let me say a few words about trial procedure.

5          First, each side will have the opportunity to make

6  opening statements to you, and they are going to do that

7  momentarily.  As I've told you already, these statements are not

8  evidence.  Their purpose is to give you an idea in advance of

9  the evidence the lawyers expect you to hear from the witnesses,

10 sort of a roadmap for the case.  But evidence only comes from

11 the witnesses and the exhibits.

12         Second, after the opening statements, you will hear

13 from the testimony of the witnesses.  The plaintiff's witnesses

14 go first.  Each witness will first give direct testimony.  Then

15 he or she may be cross-examined by the other side.  Sometimes

16 there is redirect and occasionally recross.  Documents and items

17 get received into evidence.

18         Following the plaintiff's case, the defendants may

19 present witnesses and other evidence.  Those witnesses, if the

20 defendants choose to present witnesses, will be examined and

21 cross-examined just as the plaintiff's witnesses were.  If the

22 defendants present evidence, it's possible that the plaintiff

23 would present some rebuttal evidence.

24         After all of the evidence has been received, each

25 attorney will have the opportunity to make closing arguments.

1  They will review the evidence and make arguments to you as to

2  what conclusions they think you should or you should not draw

3  from the evidence.  Again, these arguments are not evidence, but

4  they may be helpful to you in reviewing the evidence during your

5  deliberations.

6           After these arguments, I will give you detailed

7  instructions as to the law that applies and controls in this

8  case, and you must follow those instructions.  These

9  instructions to the jury are sometimes referred to as the jury

10 charge.  After the jury charge, you will go to the jury room to

11 deliberate and discuss the evidence in order to decide the facts

12 and render a verdict.

13          At the conclusion of the trial, I will tell you in

14 detail what the plaintiff must prove in order to recover.  For

15 the moment I will just say that a party with the burden of proof

16 must prove their claim by a preponderance of the evidence.  This

17 burden of proof by a preponderance of the evidence is different

18 from the burden imposed on the state in a criminal case where

19 the government's allegations must be proven beyond a reasonable

20 doubt.  I will tell you more when I instruct you at the

21 conclusion of the trial concerning this burden.  For the moment,

22 I'll just say this burden means that if after hearing all of the

23 evidence, you believe that it is more likely than not that some

24 event occurred, then the facts have been proven to you by a

25 preponderance of the evidence.  If you believe that it is more

1    likely that it did not occur, it has not been proven to you by a

2    preponderance.  If you find the likelihood evenly balanced,

3    maybe yes, maybe no, the party having the burden of proof has

4    not succeeded.

5         A few housekeeping matters before we begin.  Each

6    morning you will report to the jury deliberation room.  Mr.

7    Cangelosi will familiarize you with that when we take a break.

8    He will also give you his cellphone number where you can reach

9    him in the event of an emergency.  You are required to give him

10   your cellphone and home phone numbers just in case we have a

11   last-minute emergency.  Our trials begin promptly at 9:30, which

12   means you must be here at 9:15, and it's important that you be

13   here on time because we cannot start until everyone is here.  So

14   if one of you is late, all of you is late.

15        We will take a break at 11:00 for about ten minutes.

16   We will have a lunch break from 1:00 to 2:00, and we will take a

17   midafternoon break somewhere around 3:00 or 3:30.  You know, I

18   will figure it out so as not to interrupt the witness flow.

19        If for some reason you need a personal break before

20   any of those, you will let me know, but please, please try to --

21   we will try to stick to our schedule.

22        Finally, if you wish, you may take notes during the

23   trial.  Mr. Cangelosi will hand out the notebooks to you in a

24   moment.  If you do take notes, you will have to leave your

25   notebooks here when you leave at the end of each day.  If you do

1  take notes, be sure that your note-taking does not interfere

2  with your listening to and considering all of the evidence.

3  Also, if you do take notes, you can't discuss them with anyone

4  before or during your deliberations.  If you take notes, they

5  are to be used solely to assist you, and your notes are not your

6  substitute for your recollection of the evidence in the case.

7  Your notes are for your own personal use.  They are not to be

8  given or read to any other juror.  The fact that one juror has

9  taken notes entitles that juror's view to no greater weight than

10 those of any other juror, and your notes are not to be given to

11 or shown to any other juror during the course of deliberations.

12 You may use your notes to refresh your recollection, but the

13 official record of what occurs during the trial will be the

14 transcript prepared by the court reporter.

15         If during your deliberations you have any doubt of the

16 testimony, you will be permitted to request that the official

17 transcript, which is being taken down during these proceedings,

18 be read back to you.

19         All right?  Mr. Cangelosi, let's hand out the

20 notebooks.

21         All right.  Ladies and gentlemen, we are now going to

22 begin with our opening statements.  Mr. Greenberg?

23         MR. GREENBERG:  Thank you, Your Honor.

24         May it please the Court, members of the jury.

25         This is a case about police officers charged with

1  protecting the public to treat citizens, people with respect,

2  who dishonored their badge.  Who, instead of doing that, they

3  either mauled or acquiesced in the mauling of the plaintiff,

4  Michael J. Monroe.

5          It was the evening of November 6, 2020.  It was in

6  Haverstraw, New York.  Mr. Monroe earlier that day had

7  reestablished his relationship with his girlfriend, Jessica

8  Locke, and was at her apartment.  He was at her apartment at her

9  invitation, but he shouldn't have been there because there was

10 an order of protection outstanding which said that he shouldn't

11 be at her apartment; couldn't be at her apartment.  And even

12 though it had only one month to go, and even though there were

13 efforts to have it removed, it was still in force.

14          At some point that evening Ms. Locke became

15 distraught.  She believed that Mr. Monroe, who had had an

16 on-again, off-again --

17          MR. PITCOFF:  Objection.  I am sorry.  But he is

18 referring to speculation from a witness who is not coming into

19 evidence in his opening.

20          THE COURT:  Overrule the objection.  Please limit your

21 comments to the evidence you intend to prove at trial.

22          MR. GREENBERG:  Yes, Your Honor.

23          Ms. Locke called her friend, a man named Jamal

24 Johnson, and complained.  Mr. Johnson, in turn, called the

25 police in Haverstraw and said that he didn't know what was going

1  on at the apartment, but that his friend, Ms. Locke, had called

2  him and was hysterical.  The next thing that happened was that

3  three policemen arrived at Ms. Locke's apartment.  They were the

4  three defendants in this case:  Officer Campbell, Officer

5  Santiago, and Lieutenant Kaye.

6           They knocked on the door.  Plaintiff, Mr. Monroe, was

7  in the bathroom at that time.  Ms. Locke came to the door.  She

8  opened the door.  There was no screaming.  There was no indicia

9  of any problem.  There was no sounds of clanging, banging or

10 anything like that.  There were no sounds of violence.  Ms.

11 Locke, who came to the door, showed no signs of injury.  She

12 said, when inquired by the police people, that absolutely

13 nothing was wrong.  She went back into the apartment

14 voluntarily.

15          A few minutes later, Jamal Johnson, the friend who had

16 called the police, arrived at the apartment.  He came, and he

17 started screaming and banging on the door.  Meanwhile, Mr.

18 Monroe was still in the bathroom.  After Mr. Johnson came, the

19 police followed Mr. Johnson to the door, and Ms. Locke came out

20 for a second time.  There was still no sign of anything being

21 amiss.  There was still no signs of injury.  There was still no

22 sound of screaming or banging or anything going on in the

23 apartment, and Ms. Locke didn't request the police to go in.

24          What happened instead was that the police people who

25 showed up said -- had been informed that there was this order of

1  protection.  Ms. Locke confirmed that Mr. Monroe was still in

2  the apartment, and so the police went in based upon the order of

3  protection.

4       Now, when the three police people went into the

5  apartment, nobody else was present in the apartment.  There were

6  the three police people, and Mr. Monroe, Ms. Locke, and Mr.

7  Johnson stayed outside.

8       A few words about the apartment.  The apartment -- and

9  you will see pictures of the outside of the apartment -- was a

10 studio apartment in the basement level of a house.  There was

11 one room in the apartment.  It was very small, approximately 12

12 or 15 by 12 or 15, and there were no closets in the main room.

13 In addition to the main room -- I should say, there was no place

14 for a man like Mr. Monroe, who at the time was about 5'8", still

15 is 5'8", and weighed about 270 pounds.  There was no place for

16 him to hide.

17      Police went -- and there were no closets.  The police

18 went into the apartment, looked around the main room, didn't see

19 Mr. Monroe.  The only other room in the apartment was the

20 bathroom, and they started calling his name.  They said,

21 "Michael Monroe, Michael Monroe," and Mr. Monroe opened the door

22 voluntarily.  When Mr. Monroe came out, he did not have a

23 weapon.  He made no threats.  He didn't attack the police.  He

24 did not try to escape, which he couldn't have done anyhow

25 because there were three trained, armed police people standing

1   outside the bathroom door, and there was no other way out of

2   that apartment where a man like Mr. Monroe could have gone.

3        Mr. Monroe immediately put his hands in the air and

4   left them there for the duration until the events in question

5   here saying to the police he believed he had done nothing wrong.

6   Defendant Sean Campbell, one of the officers was there -- who

7   was there took the lead.  After frisking Mr. Monroe, Officer

8   Campbell lunged at Mr. Monroe and rammed Mr. Monroe back into

9   the sink in the bathroom hard enough so that first the pipes

10  under the sink got disconnected with water spewing all over the

11  bathroom floor; and second, deformed a fixture on the wall -- a

12  light fixture on the wall.

13       In addition, Officer Campbell stomped on Mr. Monroe's

14  foot sufficiently hard as to break his toe.  Meanwhile, Mr.

15  Monroe, wary of what had happened to Black people --

16       MR. PITCOFF:  Objection.

17       THE COURT:  Sit down, Mr. Pitcoff.  Overruled.

18       MR. GREENBERG:  Mr. Monroe will testify that he was

19  wary of what had happened to Black people in the recent past,

20  kept his hands in the air all of the time.  Mr. Monroe did not

21  attack the officers; did nothing bad to them.  He merely said

22  that he didn't believe that he was doing anything wrong.

23       He repeatedly asked the other two officers, Officer

24  Santiago and Lieutenant Kaye, to extricate him from the

25  bathroom, but Officer Kaye, who had the authority to stop

1  Officer Campbell, did nothing.

2           Eventually, Officer Santiago and Officer Campbell got

3  Mr. Monroe out of the bathroom.  They put on handcuffs on him

4  without any resistance, and after he was handcuffed, he was led

5  by Officer Santiago to Officer Santiago's police vehicle, which

6  was in the street outside of the building.

7           On the way to the car, plaintiff, Mr. Monroe, and Mr.

8  Johnson got into a screaming match.  They were bad-mouthing each

9  other, and it wasn't very pretty, but nothing happened.  Officer

10 Santiago, who was not happy about the entire set of events, told

11 Mr. Monroe to, and I quote, "Shut the fuck up," close quotes;

12 threw Mr. Monroe against the side of the police vehicle and then

13 shoved him into the back seat of the vehicle hard enough so that

14 he went all the way across the back seat hitting his back on the

15 handle to the door on the other side of the car.

16          The rest is fairly prosaic.  He was taken to the

17 police station.  He was booked.  X-rays establish that Mr.

18 Monroe's right small toe was broken with considerable pain as a

19 result.  Mr. Monroe had restricted mobility for a while.  He had

20 to wear a protective boot for about four months.  X-rays showed

21 that the break did not heal for four months because, among other

22 reasons, Mr. Monroe had diabetes mellitus, commonly known as

23 diabetes, and that prevents healing because it reduces blood

24 flow.

25          Even after the healing had taken place, the X-rays

050923PMH                    Opening - Mr. Greenberg

1  show, and that took four months, there was a loss of bone mass,

2  and there was incipient beginning arthritis.  Those problems,

3  the arthritis, continues -- continues to plague Mr. Monroe to

4  this day.

5        Now, Mr. Monroe is not in this case disputing the

6  police's right to arrest him.  He pleaded guilty to violating

7  the order of protection.  He served the time that he was

8  sentenced to, and he is now living in Pennsylvania and working

9  and an active contributor to society; but the right to arrest

10  doesn't carry the right to use force that has -- that is

11  objectively unreasonable, and the evidence will show that is

12  precisely what happened in this case.

13        One more thing.  The police have claimed that Mr.

14  Monroe resisted arrest.  The evidence will not support that

15  claim, but one thing that you should take a note of is that the

16  evidence will show that while there is a crime in the state of

17  New York of resisting arrest, Mr. Monroe was never charged with,

18  tried for -- tried for, or convicted of that charge.  They never

19  charged him with resisting arrest.

20        The purpose of an opening is to lay a roadmap for what

21  we intend to prove, and I've done that.  We get to talk to you

22  again at the end of the case at which time we will put the

23  evidence in context and establish for you why Mr. Monroe

24  deserves to prevail under the law and on the facts, and why you

25  should award him money compensation.  Thank you.

050923PMH                    Opening - Mr. Pitcoff

```
 1              THE COURT:  All right.  Mr. Pitcoff?
 2              MR. PITCOFF:  Thank you, Your Honor.  May it please
 3  the Court, counsel, ladies and gentlemen of the jury.  If I am
 4  standing too close and making anybody uncomfortable, please let
 5  me know.  I will back up.  Okay?
 6              Folks, there are cases where the force used by police
 7  officers is excessive.  You are going to see, and the evidence
 8  is going to show, that this is not one of those cases, and that
 9  the force they used to get Mr. Monroe in custody was entirely
10  reasonable given the circumstances and certainly not excessive.
11              I want to reintroduce myself to you.  My name is
12  Kenneth Pitcoff, along with Frank Foster, I represent Lieutenant
13  Ian Kaye, Police Officer Will Santiago, and Police Officer Sean
14  Campbell, and you are going to hear from this in the trial --
15  this trial you are going to see nobody dishonored their badge,
16  and nobody -- I forgot the word that was used -- bludgeoned or
17  whatever it was, Mr. Monroe.  But you are going to hear about
18  that day, and Mr. Monroe violated an order of protection.  There
19  was an order of protection which was a stay-away order which was
20  already issued by a court that he was not to go near Jessica
21  Locke; not to go near her, and he knew about that, and he knew
22  he shouldn't go near her, but he made the decision to violate
23  that order of protection in violation of the law and go to her
24  house that day.  And sure enough, what happened is they get into
25  an argument, and not just any argument, a really, really bad
```

1 argument.  And you are going to hear about that argument and how

2 angry they were.  And by the way, you are not going to be

3 hearing from Ms. Locke, so about whether Ms. Locke wanted,

4 neither I or counsel is qualified to say, but we do know certain

5 things; that they got into a crazy argument, and it got so bad,

6 it escalated that she had to call her friend, her best friend, a

7 fellow by the name of Jamal Johnson, and she wanted to get the

8 heck out of there, so she called him.  He came to get her.  She

9 didn't have a car.

10         And he was so concerned by the call because he hears

11 the yelling from Mr. Monroe in the background, and you will hear

12 evidence on that from the 911 tape, which is in evidence; that

13 when he calls the police, he is so concerned, and he says,

14 because of that and the history, that's what he says of what's

15 gone on between them.  So it's a 911 call.  The police respond,

16 and Will Santiago and Sean Campbell are dispatched to the house.

17         Now, Will Santiago is going to tell you about the

18 computer in his car.  You can punch in the address, and the

19 address -- and it will come up, everybody who is associated with

20 it, and in this case, Mr. Monroe came up and the order of

21 protection.

22         So they go to the scene.  Officer Campbell was there.

23 Lieutenant Kaye happened to be close by, so he came just to make

24 sure he didn't -- there was a backup if needed.  And you hear

25 about the dangers any time you go into a domestic house, you

1  never know what's there.

2          So they knock on the door, and there is no answer

3  initially, and this is concerning to them.  This was a report

4  that there was just yelling.  Mr. Johnson was very concerned and

5  the order of protection.  Then the landlady, you will see a

6  private home with an apartment there, she came out, and she

7  confirmed to them that there was yelling.  So they knock again,

8  and this time Ms. Locke does come out, and while it's true she

9  does say everything is okay, she looks upset.  She looks

10  nervous, and after saying that Mr. Monroe is not there, quickly

11  shuts the door on them.

12          You are going to hear they were concerned about her

13  well-being given the fact that they have two people saying that

14  there was yelling, given the stay-away order of protection, and

15  they were concerned.  So they were in the driveway when a couple

16  of minutes later Jamal Johnson, the best friend who was so

17  concerned that he called the police, comes up in a car,

18  screeches up, comes running out and says to the officers, "What

19  are you doing out here?  What are you doing out here?  He is

20  going to kill her.  He is going to kill her."  And he starts

21  banging on the doors -- on the door for her to come out.  This

22  is his best friend.  And that's when she does come out, and she

23  comes out, and she is crying and she falls into his arms, and

24  she is upset.  And they say, just as counsel said in his

25  opening, the police officers say, "Is he in there?"  And they

1    nod yes.

2           And you are going to hear about this order of

3    protection and the nature of it.  It's a mandatory arrest.  The

4    police have no discretion.  You are violating a stay-away order

5    of protection, it's a mandatory arrest.  So they have to arrest

6    him.

7           So they go in the house.  It's a small apartment, and

8    they look around, and he is hiding in the bathroom.  He is in

9    the bathroom with the door shut, and you are going to hear

10   testimony he was looking out the window in the bathroom waiting

11   for the police to leave.  He is hiding in there, and they say

12   time after time for him to come out the bathroom, at least a

13   half a dozen times, and he doesn't come out until finally the

14   last time.  And he actually doesn't come out then.  He opens the

15   door, and once in the door, just what counsel said, he starts to

16   plead his case.  They said, "Come out with your hands behind

17   your back."  And they keep telling him.  And he's going, "I

18   didn't do anything.  I didn't do anything."  And he's

19   gesticulating his arms.

20          You are going to see he knew darn well he was in

21   violation of that order of protection.  He knew it.  And they

22   keep telling him, "Hey, you're under arrest.  Come out with your

23   hands behind your back."  After another half a dozen times of

24   saying this -- and by the way, these aren't -- it's not a

25   negotiation.  The police are giving him commands to come out

1  with your hands behind your back, and he doesn't.  And you are

2  going to hear about the danger of it escalating.

3          So Officer Campbell at that point, after telling him

4  at least six times, goes into the bathroom to try to put his

5  hands behind his back and bring him out, and he flails

6  backwards, and they both knock into the sink, not just Mr.

7  Monroe.  And you are going to see no one stomped on the

8  plaintiff's foot.  And I am going to talk to you about the

9  plaintiff's claims in a second, but listen carefully to what he

10 saw regarding that and what he didn't see, and what he felt, and

11 what he did not feel.

12         And we are going to talk about the fracture to the

13 pinky toe in a second.  But so they go into the sink, at which

14 point he is trying to get him out, and Will Santiago reaches in,

15 and together they get him out, and they get him in cuffs.  No

16 weapon was ever used on him.

17         So they are bringing him outside and to the police

18 car, and you heard part of this story just now.  Jamal Johnson

19 is there with Jessica Locke, and she is upset.  She is standing

20 with him, and Mr. Monroe starts screaming and yelling at Jamal

21 Johnson, who he doesn't like, and he starts cursing at him,

22 calling him all kind of names.  Jamal Johnson is yelling back.

23 And then he threatens Jamal Johnson physically as he is in cuffs

24 and being led to the car, and then he is put in the police car.

25         You are going to see nobody slams him against the car,

050923PMH                    Opening - Mr. Pitcoff

1   and nobody pushed him across the car.  Now I want to talk to you

2   about the plaintiff's testimony, and as the judge told you, you

3   are going to be asked to evaluate credibility, and I ask that

4   you evaluate credibility of everyone testifying:  Lieutenant

5   Kaye, Officer Campbell, Officer Santiago, absolutely, and

6   compare their testimony to the plaintiff's.

7           He is going to tell you that he is in that bathroom,

8   and nobody gives him a single command.  Nobody, none of the

9   officers tell him to raise his hands.  None of them say, go

10  behind the back.  None of them even say come out of the

11  bathroom.  He opens up the door and he is just staring at them,

12  and then for absolutely no reason when he is just standing there

13  like this, Officer Campbell just loses his mind and tackles him

14  into the sink.  You are going to see that his testimony, using

15  common sense, is not accurate.

16          I already talked to you about the foot.  Listen

17  closely what he is going to say about how his foot was stomped

18  on.  And then when he goes to the car, you are going to see that

19  he, himself -- well, you are going see what he said about going

20  into the car, but listen to what he is going to tell you about

21  being thrown across the car.  He is going to admit to you that

22  he is seated in the back seat of the car with his butt on the

23  back seat of the police car.  He is 270 pounds, and he is seated

24  fully in the car, and Will Santiago pushes him -- one motion --

25  and pushes this 270-pound man and has his butt slide all the way

050923PMH                    Opening - Mr. Pitcoff

1  across the police -- back seat of the car and into the other

2  door.  Folks, you are going to see that his own version of how

3  this accident happened defies the laws of physics.  And, by the

4  way, he says he was pushed in the upper chest and was pushed all

5  the way across.

6          I want to talk to you about his injuries and what we

7  think the evidence is going to show.  You are going to see the

8  plaintiff was diagnosed with a fracture below the pinky toe on

9  one foot.  You are going to hear from Dr. Kraushaar, who is an

10  orthopedic surgeon, and he is going to -- he examined the

11  plaintiff, and he reviewed the records, and plaintiff did have a

12  fracture.  He is going tell you it completely healed.  The

13  plaintiff himself will tell you it completely healed.  The only

14  X-rays you will see will be in March of the following year, four

15  months afterwards that it had fully healed, and you will hear

16  from the plaintiff's own admissions that he is not in any pain,

17  and it's fully healed, and he had no limitations at all.

18          And Dr. Kraushaar is going to tell you that it's

19  healed, and there's going to be no residuals.  You are going to

20  hear -- not that you are going to hear from any doctor that the

21  plaintiff is going to call at all to back up anything that

22  plaintiff's attorney told you the evidence will show.  He also

23  claimed a back injury, that it was better the next day.  And Dr.

24  Kraushaar is also going to talk to you about the diabetes

25  condition and how that figures in with the foot conditions and

1  this type of fracture.

2          So, folks, I want to first off thank you on behalf of

3  my clients for the attention I know that you are going to pay to

4  this matter and you have already paid to it, and to keep an open

5  mind.  I am going to urge you to keep an open mind until all the

6  evidence is in, and when you do that, you are going to find that

7  the evidence will show that there was no excessive force in this

8  case, and the force was entirely reasonable given the

9  circumstances.  Thank you.

10          THE COURT:  All right.  Mr. Pitcoff, thank you.

11          Mr. Greenberg?  Call your first witness.

12          MR. GREENBERG:  Thank you, Your Honor.

13          Plaintiff calls Sean Campbell to the stand.

14          THE DEPUTY CLERK:  Please step forward.  Step into the

15  box.  Remain standing and raise your right hand.

16  SEAN CAMPBELL, having been duly sworn, testified as follows:

17          THE DEPUTY CLERK:  Please be seated.  State your full

18  name for the record and spell it.

19          THE WITNESS:  Sean Francis Campbell.  S-E-A-N,

20  F-R-A-N-C-I-S, C-A-M-P-B-E-L-L.

21          MR. GREENBERG:  If Your Honor please, I think we need

22  to hook the computer into the screen.

23          THE COURT:  You should have done that already.  If you

24  haven't, do it quickly.

25          MR. GREENBERG:  I am going to go ahead and start with

1  some preliminary questions.

2          THE COURT:  Yes, please.  Let's anticipate those

3  things in the future, please.  Thank you.

4  DIRECT EXAMINATION

5  BY MR. GREENBERG:

6  Q.   Good morning, Officer Campbell.  You are a police officer?

7  A.   Yes, sir.

8  Q.   And you are employed by the Town of Haverstraw, New York?

9  A.   Yes.

10  Q.   Which is a town in Rockland County?

11  A.   Yes.

12  Q.   Can you do me a favor, please, officer, and just pull the

13  microphone a little closer to you.  Even with hearing aids, I'm

14  still not as good as I used to be.

15      I am referring you now to the evening of November 6, 2020.

16  You were on duty as a police officer that night?

17  A.   Yeah, I was.

18  Q.   And that was the night that you and the other officers

19  arrested Mr. Monroe?

20  A.   It was.

21  Q.   And the events relating to the arrest of Mr. Monroe were

22  done in the course of duties -- course of your duty as a police

23  officer with the Town of Haverstraw?

24  A.   They were.

25  Q.   Now, you weren't the only Haverstraw Police Department at

1  the premises where Mr. Monroe was arrested, correct?

2  A.   Could you rephrase that question?

3  Q.   Sure.  There were two other officers there that night when

4  Mr. Monroe was arrested?

5  A.   There were.

6  Q.   One of them was Officer William Santiago?

7  A.   Yes.

8  Q.   And he was the principal officer assigned to that -- I am

9  going to use the word "engagement," but that arrest?

10  A.   Yes.

11  Q.   And also there was defendant Ian Kaye, correct?

12  A.   Correct.

13  Q.   Kaye -- I should say Lieutenant -- withdrawn.

14       Mr. Kaye was a lieutenant on the police force, right?

15  A.   He was.

16  Q.   He outranked you?

17  A.   Correct.

18  Q.   And he could have given you orders that evening.  In other

19  words, if he gave you orders, you were obliged to follow them?

20  A.   Yes.

21  Q.   Now, let's talk about what went on that night up to the

22  time that you arrived on the scene.  You were -- you and Officer

23  Santiago were dispatched to the scene -- let me withdraw that.

24       The scene is Number 10 Captain Shankey Drive in Haverstraw,

25  right?

1  A.   Correct.

2  Q.   And you and Officer Santiago were dispatched by the police

3  dispatcher to that scene?

4  A.   Correct.

5  Q.   Which you learned was the apartment occupied by Jessica

6  Locke?

7  A.   Yes.

8  Q.   Now, what precipitated, in your understanding, your going

9  to this scene was a call from a man named Jamal Johnson,

10 correct?

11 A.   I don't believe I knew his name at the time, but later to

12 find out it was.

13 Q.   And am I correct that as of that point you had had no

14 previous contact with Mr. Johnson?

15 A.   That's correct.

16 Q.   And so you had no basis for knowing whether he was telling

17 the truth or not telling the truth or how accurate he was?

18 A.   I didn't know Mr. Johnson.

19 Q.   That call didn't go to you; it went to the police

20 dispatcher, correct?

21 A.   His phone call, yes, to the police dispatcher.

22 Q.   But you learned before the incident, or you learned at

23 about the time of the incident, that Mr. Johnson had told the

24 dispatcher that he didn't know what was going on at the

25 premises; isn't that true?

1  A.   I knew that he called, and I knew that there was an issue

2  at that residence.

3  Q.   I understand that, officer, but my question was a little

4  different.

5       Isn't it true that you learned that Jamal Johnson told the

6  dispatcher that he didn't know what was going on at the

7  premises?

8  A.   Yes.

9  Q.   And so as of the time you arrived at the premises, Number

10 10 Captain Shankey Drive, what you knew was, there was something

11 going on there, and you didn't know what it was?

12 A.   Correct.  We needed to conduct an investigation.

13 Q.   Now, when you arrived at Number 10 Captain Shankey Drive,

14 you didn't hear any yelling, correct?

15 A.   No.

16 Q.   You didn't hear any screaming?

17 A.   No.

18 Q.   You didn't hear any plates crashing or anything like that?

19 A.   No.

20 Q.   There were no sounds of violence?

21 A.   No.

22 Q.   And so you and -- well, let me withdraw that question, and

23 let me try it this way.

24      At some point, one or more officers knocked on the front

25 door of those premises?

 1  A.    Yes.

 2  Q.    And did you do that by yourself or were you with Officer

 3  Santiago at the time?

 4  A.    We were together at the door.

 5  Q.    Was Lieutenant Kaye there also?

 6  A.    Yes.

 7  Q.    Can we take a look at Exhibit L2, please?

 8          MR. GREENBERG:  Your Honor, I don't know if L2 is

 9  technically in evidence because we agreed to that exhibit after

10  the last final pretrial conference, but if it isn't, I move in

11  Exhibits L1, L2 and L3.

12          MR. PITCOFF:  No objection, Your Honor.

13          THE COURT:  L1, L2 and L3 have been admitted to me

14  previously.

15          Do we have a binder for the witness?  L1 and L2 and L3

16  are -- okay.  So that's in the defendants' white binder,

17  officer, at the very end.

18          Hold on, Mr. Greenberg.

19          MR. GREENBERG:  I am sorry, Your Honor.

20          THE COURT:  We are looking at L1; is that it?

21          MR. GREENBERG:  Two, Your Honor.

22          THE COURT:  L2.  You see in the lower right, officer,

23  it says L1, L2?

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Okay.

1           All right.  You may proceed.

2           MR. GREENBERG:  Thank you.

3  Q.   We are showing the jury also a copy of Exhibit L2, and,

4  Officer Campbell, if it's easier for you to look at the one on

5  the scene, that's fine, and if it's easier for you to look at

6  the one in the book, that's fine, too, whichever you prefer.

7  A.   Okay.

8  Q.   And that's true of all of these exhibits.  So Exhibit L2 is

9  the front of Number 10 Captain Shankey Drive, correct?

10 A.   The front and the side, yes.

11          MR. GREENBERG:  And, Your Honor, may I walk over to

12 the --

13          THE COURT:  Sure.

14          MR. GREENBERG:  Thank you.

15 Q.   And this is the entrance to Jessica Locke's apartment right

16 here, the red door?

17 A.   Yes.

18 Q.   And the -- to the left of the red door there is some

19 windows; those are windows belonging to that apartment, correct?

20 A.   Yes.

21 Q.   But everything to the left of those windows and above it

22 belong to the landlord of the apartment, the owner of the house?

23 A.   I don't have a set of blueprints that would say exactly

24 where the apartment was delineated versus the rest of the house.

25 Q.   Fair enough.

1      So you knocked on the door, and at some point Ms. Locke

2  came out; am I right?

3  A.   Yes.

4  Q.   When Ms. Locke came out, you saw no signs of injury on her,

5  correct?

6  A.   Correct.

7  Q.   There were no bruises, there was no bleeding, nothing at

8  all, right?

9  A.   Correct.

10  Q.   And Ms. Locke said to you that everything was okay, didn't

11  she?

12  A.   She did.  However, her demeanor did not -- seemed to

13  contradict her words.

14  Q.   And she said that she didn't need any help, correct?

15  A.   She did say that.

16  Q.   And she said both of those things outside the presence of

17  Mr. Monroe?

18  A.   Correct.

19  Q.   Right?

20           MR. PITCOFF:  Objection.

21           THE COURT:  Overruled.

22  Q.   She said those things -- withdrawn.

23      Mr. Monroe was in the house at that time, correct?

24  A.   Yes.

25  Q.   So she is talking to the three officers; she is there by

1  herself, correct?

2  A.   She came to the door alone.

3  Q.   And she came out of the door, right?

4  A.   She came to the door.

5  Q.   She could have walked out; there was nothing stopping her

6  from walking out?

7  A.   Well, we were having a conversation with her at the door.

8  Q.   Understood.

9  A.   She did not seem willing to come out.

10 Q.   There was nothing stopping her from walking out of the

11 apartment at that point, was there?

12 A.   No.

13 Q.   She did not ask you to enter or -- by "you" I mean the

14 police; isn't that right?

15 A.   No, she did not.

16 Q.   She did not ask you to protect her?

17 A.   No.

18 Q.   She did not ask you to take her away to a safe place, away

19 from Mr. Monroe?

20 A.   She did not say that.

21 Q.   And then she voluntarily, as far as you knew, went back

22 into the apartment?

23 A.   Correct.

24 Q.   Now, at that point neither you nor either of the other two

25 police officers present on the scene went into the apartment,

050923PMH                    Campbell - Direct - Greenberg

1  did you?

2  A.  No.  We did not enter at that time.

3  Q.  And am I correct that you were trained to do that if you

4  had heard Mr. Monroe beating up on Ms. Locke?

5  A.  If he were actively hitting her in our presence?

6  Q.  Yes.

7  A.  Absolutely.

8  Q.  So at that point, Ms. Locke is in the apartment; you and

9  the other two officers were outside the apartment; and up comes

10 Jamal Johnson a couple of minutes later, right?

11 A.  Yes.  He came with great haste.

12 Q.  I am sorry.  I didn't hear that.

13 A.  With great haste he came.

14 Q.  And it was at that point that he started screaming Ms.

15 Locke's name?

16 A.  Yes.  He approached the door screaming her name, telling

17 her to come out.

18 Q.  And banging on the door?

19 A.  Correct.

20 Q.  And slamming the front door; isn't that true?

21 A.  Yes.

22 Q.  Ms. Locke at that point came out again, correct?

23 A.  Yes.

24 Q.  Now, Mr. Monroe, who was in the apartment, did not prevent

25 Ms. Locke from coming out; isn't that true?

 1  A.    That's correct.

 2  Q.    And at that point you -- and by "you" I mean one of the

 3  three of you -- asked Ms. Locke whether Mr. Monroe was in the

 4  apartment?

 5  A.    Yes.

 6  Q.    Right?

 7  A.    Yes.

 8  Q.    And she confirmed that he was in the apartment?

 9  A.    She did.

10  Q.    But she didn't say anything to you at that point to say

11  that she was anything other than okay?

12  A.    She came out of the apartment hysterically crying.

13  Q.    She came out of the apartment hysterically crying after Mr.

14  Johnson had been pounding on the door, pounding on the window,

15  and screaming, right?

16  A.    Yes.  And embraced him in a hug.

17  Q.    And then at that point you had still seen no sign of

18  violence by Mr. Monroe on Ms. Locke, correct?

19  A.    Correct.

20  Q.    And you went back into the apartment because -- or the

21  justification you gave for going back into the apartment was

22  that Mr. Monroe had violated the order of protection?

23  A.    Yes.  That is the justification.

24  Q.    Am I correct -- oh, and that was the only crime, violating

25  the order of protection was the only crime with which Mr. Monroe

1  was charged; isn't that true?

2  A.   That's correct.

3  Q.   Now, to be clear, you understood that there was a crime in

4  the state of New York called "assault," right?

5  A.   I understand that there is the existence of such a crime?

6  Q.   That's exactly right.  That's what I am asking about is:

7  Do you understand that there is a crime in the state of -- such

8  a crime called "assault," and that involves physical force used

9  by one person on another?

10 A.   Yes.

11 Q.   And to be clear, Mr. Monroe was never charged with assault

12 on Ms. Locke in connection with this evening; isn't that true?

13 A.   Specific to this incident, this evening?

14 Q.   That's what I am asking about.

15 A.   He was not charged with assault, no.

16 Q.   On November 6, 2020?

17 A.   Correct.

18 Q.   I am asking you, sir, isn't it true that Ms. Locke -- Mr.

19 Monroe was never charged with assault with respect to the

20 evening of November 6, 2020?

21 A.   That's correct.

22 Q.   Now, oh, one more thing.  Can we take a look at Exhibit D?

23 D as in Delta?

24          MR. TIWARI:  You said D, right?

25          MR. GREENBERG:  D, as in Delta, please.  Is there any

1  way to blow it, enlarge it?  Great.

2  Q.   And I would like to take a look at about a quarter of the

3  way up from the bottom, which is a paragraph that starts with

4  [02] toward the bottom.  It's on the first page, first page

5  toward the bottom.  I'm going to read this while my colleague is

6  trying to get the A/V equipment to work appropriately.

7      But do you have a copy of Exhibit D in front of you,

8  officer?

9  A.   Yes, I do.

10 Q.   All right.  So I'm going to talk about the things -- some

11 of the things that Mr. Monroe was ordered not to do in

12 connection with the order of protection.  He was ordered to

13 "refrain from assault, stalking, harassment, aggravated

14 harassment, menacing, reckless endangerment, strangulation,

15 criminal obstruction of breathing or circulation, disorderly

16 conduct," and on, and on.  I won't read them all.

17      Mr. Monroe, in connection with the charge for violating the

18 order of protection, was not charged with any of those things I

19 just read, was he?

20 A.   There were no additional charges other than the criminal

21 contempt.

22 Q.   So he was not charged for violating the order of protection

23 in relation to any of the things I just read; isn't that true?

24 A.   He was only charged with the one crime.

25 Q.   Right.  And let's see exactly what he is charged with.  Put

 1  up Exhibit B, as in bravo, please.

 2      And looking at the paragraph that starts, "To wit," are you

 3  with me, officer?

 4  A.   Yes, sir.

 5  Q.   "On the aforementioned date," this is the felony complaint,

 6  "on the aforementioned date, time and location, the defendant

 7  was observed inside the residence of the victim, Jessica Locke,"

 8  with a date, "during a domestic dispute," and it goes on.

 9      The only thing he was charged with was being inside that

10  apartment; isn't that true?

11  A.   Yes.  The direct violation of the full stay-away order of

12  protection.

13  Q.   Now, on the night in question, on November 6, 2020, am I

14  correct that none of you had operative or operating videos --

15  pardon me -- body cams on you?

16           MR. PITCOFF:  Objection to form.

17           THE COURT:  Restate your question.  It's a little

18  muddy.

19  Q.   Did you have a body camera on you that night?

20  A.   No.

21  Q.   And, to your knowledge, neither did Officer Santiago or

22  Officer Kaye, correct?

23  A.   Correct.

24  Q.   So there was no video record -- there is no video record of

25  what occurred inside that apartment, correct?

1  A.   Our department does not have body cams.  So we don't have

2  firsthand video records.

3  Q.   Well, I am not trying to be critical, officer.  I'm just

4  trying to get some facts.  So the fact that I am trying to get

5  there is no --

6           THE COURT:  He answered that question.  Ask the next

7  question.

8           MR. GREENBERG:  Yes, Your Honor.

9  Q.   You were never in that apartment before that night,

10 correct?

11 A.   I don't believe so.

12 Q.   And you were only in the apartment for about 15 minutes?

13 A.   Correct.

14 Q.   During which time you were focused on finding and

15 apprehending the plaintiff, Mr. Monroe?

16 A.   Correct.

17 Q.   And then doing the things necessary to bring him to the

18 station?

19 A.   Yes.

20 Q.   This all occurred two and a half years ago, November 2020?

21 A.   More or less, yes.

22 Q.   There are no contemporaneous photos of the apartment?

23 A.   Inside?

24 Q.   Yes.

25 A.   Not that I have seen.

1  Q.  You don't have one is what I am asking.  You have no notes

2  about the layout of the apartment?

3  A.  No.

4  Q.  Or any room in the apartment?

5  A.  No.

6  Q.  But you can confirm for us that the apartment was a studio

7  apartment?

8  A.  Yes.

9  Q.  There was only one room, maybe 15-by-15 or so?

10 A.  Plus the bathroom, yes.

11 Q.  The bedroom wasn't a separate --

12 A.  No.  Bathroom.  I'm sorry.

13 Q.  Yes.  I understand that.  I'm sorry.  You are quite

14 correct, plus a bathroom.  But now I'm focusing on the main

15 room.  There was only one room?

16 A.  Correct.

17 Q.  And it was about 15-by-15 or 12-by-12?

18 A.  I'm unaware of the dimensions of the room.

19 Q.  There were no closets in the apartment?

20 A.  I don't recall.

21 Q.  In any event, you were able to conclude in a matter of

22 seconds that Mr. Monroe was not in the main room of the

23 apartment, correct?

24 A.  Correct.

25 Q.  So if he were in the apartment, he had to have been in the

1  bathroom?

2  A.   Yes.

3  Q.   And am I correct that you did not have to break down the

4  bathroom door?

5  A.   That's correct.

6  Q.   Mr. Monroe opened the bathroom door voluntarily?

7  A.   After several requests, yes.

8  Q.   I understand there were requests.  And after the requests,

9  he opened the door?

10  A.   Correct.

11  Q.   Now, let me talk about what the bathroom looked like.  The

12  bathroom was relatively small also, maybe five-by-seven or

13  thereabouts?

14  A.   It was small.

15  Q.   And there was only one window?

16  A.   I don't recall.

17  Q.   In any event, to the best of your knowledge, the only way

18  Mr. Monroe could have gotten out of that bathroom was through

19  the door?

20  A.   Correct.

21  Q.   And in front of the door were three police people?

22  A.   Correct.

23  Q.   Who were armed?

24  A.   The three police people in front of the door were armed,

25  correct.

1  Q.   And trained?

2  A.   Correct.

3  Q.   Now, at the time you first saw Mr. Monroe, he was standing

4  in the bathroom?

5  A.   Yes.

6  Q.   And he was more or less centered on the door?

7  A.   More or less.

8  Q.   Close to the doorway?

9  A.   Yes.

10  Q.   And directly in front of the sink?

11  A.   Yes.

12  Q.   Now, he was readily visible from the main room?

13  A.   The room -- the bathroom he was in was not well lit, but we

14  could see him, yes.

15  Q.   And the door to the bathroom was smaller than a standard

16  size door?

17  A.   What's a standard size door?

18  Q.   Thirty-six inches.  Let me ask you to assume -- I can't

19  testify -- I'm sorry.  Let me ask you to -- we've all seen doors

20  every day.  It was a narrower-than-a-normal door, wasn't it?

21  A.   Typical for a bathroom, I would say.

22  Q.   And as of the time that you saw Mr. Monroe standing there

23  in the doorway, you have no knowledge that he had been injured?

24  A.   Mr. Monroe injured?

25  Q.   That's right.  You had no knowledge of any injury, for

1  example, to his foot?

2  A.   No knowledge of that, no.

3  Q.   So at that time you told him that -- you said -- one of you

4  said to Mr. Monroe something like, "Mr. Monroe, you are under

5  arrest"?

6  A.   After he opened the door, we told him several times to come

7  out with his hands behind his back.

8  Q.   Did you tell him he was under arrest?

9  A.   Yes.

10 Q.   And at that point, having told him he was under arrest, his

11 liberty of movement had been restricted, hadn't it?

12         MR. PITCOFF:  Objection to form.

13         THE COURT:  I think you can rephrase that.

14 Q.   He couldn't just go -- you are telling him he was under

15 arrest, he couldn't just go anywhere of his own volition, could

16 he?

17         MR. PITCOFF:  Objection.  Legally?

18         THE WITNESS:  No.

19         THE COURT:  I think he answered the question.  So I

20 will overrule the objection.  The answer stands.

21 Q.   Before --

22         THE COURT:  Mr. Pitcoff, if you are going to object,

23 stand up.

24         Officer, if you see Mr. Pitcoff stand up, he is trying

25 to get my attention.  So if you see him stand up, hold off on

1  answering until I get a chance to rule on the objection.  Okay?

2  We will do that in an orderly way.

3           THE WITNESS:  Understood.

4           THE COURT:  Proceed, please, Mr. Greenberg.

5           MR. GREENBERG:  Thank you, Your Honor.

6  Q.  Officer Campbell, Mr. Monroe made no threats to the

7  officers, to you or your colleagues?

8  A.  No explicit threats.

9  Q.  He didn't say he was going to do anything to you, did he?

10  A.  No.

11  Q.  He didn't brandish a weapon?

12  A.  Not that we could see, no.

13  Q.  He didn't have a weapon.  You later found out he didn't

14  have a weapon, didn't you?

15  A.  No, he did not.

16  Q.  He never moved to escape?

17  A.  Correct.

18  Q.  Am I correct, sir, that at no time did you say to Mr.

19  Monroe that he was resisting arrest?

20  A.  That's correct.

21  Q.  And at no time did you warn Mr. Monroe that you were going

22  to use physical force on him?

23  A.  That's correct.

24  Q.  Now, at the time that Mr. Monroe was in the bathroom,

25  facing outwards, he was in the bathroom.  The door is open.  I

050923PMH                  Campbell - Direct - Greenberg

1  am correct, am I not, that he was talking to you, pleading his

2  case?

3  A.    Indeed, he was pleading his case, telling us that he did

4  nothing wrong.

5  Q.    Exactly.  He was telling you he did nothing wrong, and he

6  was telling you why he thought he had done nothing wrong?

7  A.    Yes.

8  Q.    He did that loudly and --

9  A.    Loudly, and with arm gestations, yes.

10 Q.    And he had his arms up or out, correct?  In other words --

11 A.    Out in front of him.

12 Q.    Out in front of him.  And he was gesticulating with his

13 arms, and you could see his hands and arms, right?

14 A.    Yes.

15 Q.    At some point you went -- I guess your words are "hands on"

16 on Mr. Monroe?

17 A.    I did.

18 Q.    And when you went hands on, you used physical force on Mr.

19 Monroe --

20 A.    Yes.

21 Q.    -- without Mr. Monroe's ever having used any physical force

22 on you?

23 A.    Correct.

24 Q.    And you did this without any order or direction from

25 Lieutenant Kaye who was there; you did this of your own

1  volition, correct?

2  A.    Correct.

3  Q.    Now, after you did this, Lieutenant Kaye was right behind

4  you -- not the bathroom side of the door, but the other side of

5  the door, he was standing looking into the bathroom, right?

6  A.    From outside, yes.

7  Q.    Yes.  And he could have ordered you to stop, right?

8  A.    I suppose he could have.  I don't --

9  Q.    And he didn't?

10  A.    I don't know why he would, but no.

11  Q.    Well, that's another question.  But the question I'm asking

12  you is:  And he didn't, did he?

13  A.    No.

14        MR. GREENBERG:  Excuse me one second, Your Honor.

15  Q.    You didn't wait for Mr. Monroe to have his say, tell you

16  why he didn't think he had done anything wrong before you went

17  hands on, did you?

18  A.    He was given a half a dozen commands before, and he

19  continued to plead his case.

20  Q.    I understand that, but I would like to go back to my

21  question, which is:  You didn't wait for him to have his say

22  before you went hands on, did you?

23  A.    I don't understand the question.

24  Q.    You went hands on before he finished trying to explain to

25  you why he thought he didn't do anything wrong; isn't that

050923PMH                 Campbell - Direct - Greenberg

1  right?

2  A.   It wasn't a negotiation.

3  Q.   I didn't say it was a negotiation.  I'm just asking about a

4  time sequence.  So my question about the time sequence is:  He

5  was still pleading his case when you went hands on; isn't that

6  true?

7  A.   That's true.

8  Q.   And you didn't do anything to diffuse the situation, did

9  you?

10  A.   My actions were an attempt to diffuse the situation.

11  Q.   So the way you wanted to diffuse the situation was by going

12  hands on on Mr. Monroe, right?

13  A.   I wanted to get the situation under control as quickly as

14  possible for everyone's safety.

15  Q.   Am I correct that Mr. Monroe never said, "I am refusing" --

16  in words or substance -- "I'm refusing to come out of the

17  bathroom," he just kept pleading his case?

18  A.   I don't believe those specific words were uttered by Mr.

19  Monroe.

20  Q.   And that's why I asked the question in the form of "in

21  words or substance."

22        Am I correct that Mr. Monroe never said, in words or

23  substance that, "I'm not going to come out of the bathroom.  I

24  refuse to come out of the bathroom.  I'm going to stand here all

25  day long and not come out of the bathroom"?

050923PMH                  Campbell - Direct - Greenberg

1            MR. PITCOFF:  Objection to form, Your Honor.

2            THE COURT:  I will sustain the objection.  Please

3   don't answer that.

4            MR. GREENBERG:  Let me try it again.

5            THE COURT:  Ask a new question.

6            MR. GREENBERG:  I apologize.

7   Q.  Am I correct that Mr. Monroe never refused, in words or

8   substance, to come out of the bathroom?

9   A.  Correct.

10  Q.  Now, let me ask you some questions about the phrase "hands

11  on."  I suppose you could have pushed Mr. Monroe at some point.

12  You didn't push him, did you?

13  A.  No.

14  Q.  And another way you could have used your hands on him is,

15  as he was gesticulating, you could have grabbed his hands or

16  arms, right?

17  A.  That's what I did.

18  Q.  Isn't it true that you, rather than just grab his hands or

19  arms, you grabbed him by the body?

20  A.  I grabbed his right arm and attempted to bring his left arm

21  around the back of him for handcuffing.

22  Q.  Officer Campbell, you realize that there were

23  interrogatories served on you in this case, right?

24  A.  Yes.

25  Q.  And interrogatories are written questions that require

1  responses?

2  A.   Yes.

3  Q.   And you, through your counsel, provided those responses,

4  right?

5  A.   Yes.

6  Q.   And not only did you provide those responses, but on

7  January 12th of this year, you reviewed your responses and

8  signed a statement verifying those responses under penalty of

9  perjury?

10  A.   Yes.

11  Q.   And interrogatory number four asked -- these

12  interrogatories were drafted by Mr. Monroe before I entered the

13  case, Your Honor.

14  A.   So I'm -- excuse me.  What's the exhibit?

15         MR. GREENBERG:  It's not an exhibit number.  Mr.

16  Tiwari, do you have a copy of the interrogatories?

17         MR. TIWARI:  Yes.

18         MR. GREENBERG:  Interrogatory answers?

19         MR. TIWARI:  In the binder.

20         MR. GREENBERG:  It's in our binder.  May I have one

21  moment, Your Honor?

22         THE COURT:  If you go to the binder, officer, the

23  other binder, the back of the binder, there appears to be a

24  responsive verification tab, do you see?

25         THE WITNESS:  Yes.  I believe I have my

1   interrogatories.

2           THE COURT:  Okay.  What interrogatory are you asking

3   the officer about, please?

4           MR. GREENBERG:  Number four, Your Honor.

5           THE COURT:  All right.  Do you have it in front of

6   you, officer?

7           THE WITNESS:  I do.

8           THE COURT:  Okay.  You may proceed.

9   Q.  All right.  Interrogatory number four asks:  Where were you

10  all, and how did you all place Michael Monroe under arrest?

11      And after a lengthy objection, the response is:  "Officer

12  Campbell went into the bathroom first and grabbed plaintiff, and

13  Officer Santiago grabbed plaintiff's arm, and they forcibly

14  removed plaintiff from the bathroom."

15      Are you with me?

16  A.  Yes.

17  Q.  And am I correct that you verified that interrogatory

18  response in January of this year?

19  A.  Yes.

20  Q.  So, officer, according to this interrogatory -- oh, and you

21  verified that under penalty of perjury, right?

22  A.  Yes.

23  Q.  So Officer Santiago grabbed plaintiff's arm, but you

24  grabbed plaintiff, correct, according to that answer?

25  A.  Yes.

1  Q.   Now, let's go back to the situation in the bathroom.  So I

2  think we established that the sink -- at the time this all

3  started, that the sink was directly behind Mr. Monroe?

4  A.   More or less, yes.

5  Q.   About two, two and a half feet behind him?

6  A.   More or less.

7  Q.   I am sorry.  That was a bad question.  Let me withdraw it.

8       About two or two and a half feet from the doorway?  The

9  sink, the beginning of the sink was about two or two and a half

10 feet from the doorway?

11 A.   It's a small bathroom.  I imagine those are probably close

12 to accurate.

13 Q.   And between the doorway and the sink were Mr. Monroe -- was

14 Mr. Monroe, right?

15 A.   Yes.

16 Q.   Now, the pipes were under the sink?

17 A.   Yes.

18 Q.   And after you went hands on, the pipes were dislodged, and

19 water was spewing all over the bathroom?

20 A.   The pipes were dislodged, and water came out of the pipes,

21 yes.

22 Q.   Onto the bathroom floor?

23      And there was a light fixture, a sconce I think they call

24 it, on the wall next to the mirror in the bathroom?

25 A.   I don't recall specifically the sconce.

1  Q.   And so you wouldn't know whether it was deformed as a

2  result of your and Mr. Monroe's activities in the bathroom?

3  A.   Correct.

4  Q.   And when the smoke cleared, figuratively speaking, and you

5  had Mr. Monroe under control, you were on top, and he was on the

6  bottom, right?

7  A.   On -- like on the ground?

8  Q.   Not necessarily.  But you had control of Mr. Monroe, right?

9  A.   Yes.  There was no top and bottom, but we were able to take

10 him into custody, yes.

11 Q.   So after you got him out of the bathroom, he didn't resist

12 being handcuffed, right?

13 A.   No.

14 Q.   And he didn't resist being taken out of the apartment?

15 A.   No.

16 Q.   You suffered no injuries?

17 A.   Correct.

18 Q.   And to the best of your knowledge, your two colleagues

19 suffered no injuries?

20 A.   Correct.

21 Q.   And Officer Santiago's involvement was solely that he

22 grabbed plaintiff's arm, Mr. Monroe's arm, and pulled him into

23 the main room?

24 A.   Correct.

25 Q.   And let's talk about the booking, the last subject of this

050923PMH                    Campbell - Direct - Greenberg

1  examination.

2      So we are going to fast forward.  Mr. Monroe is taken to

3  the police station to be booked, right?

4  A.  Correct.

5  Q.  And he was booked soon after the arrest?

6  A.  Correct.

7  Q.  Let's look at Exhibit A.  Exhibit A is a Haverstraw Town

8  Police Department booking data sheet, right?

9  A.  Correct.

10  Q.  And if you look at the middle of the page, it says, booking

11  start time 21:45.  In U.S. speak, that's 9:45 p.m.?

12  A.  That's what it says, yes.

13  Q.  Well, I'm asking you to confirm that that's about right.

14  A.  Yes.

15  Q.  And the arrest date time was 9:35 p.m., correct, two things

16  then?

17  A.  Yes.

18  Q.  And the only thing for which -- I'm sorry.  Withdrawn.

19      In the ordinary course, the booking would have taken place

20  by the desk sergeant, correct?

21  A.  Typically by the arresting officer.

22  Q.  Ah.  And so the information on this is what the arresting

23  officer -- comes from the arresting officer, and this -- and in

24  this case, is that you or Officer Santiago?

25          MR. PITCOFF:  Objection to form.

1           THE COURT:  Overruled.  If you can answer, answer.

2           (Cross-talk)

3           MR. GREENBERG:  -- or any other?

4           THE COURT:  Excuse me.

5           MR. GREENBERG:  I am sorry, Your Honor.

6           THE COURT:  Excuse me.  When I am talking, you are

7   not.

8           MR. GREENBERG:  Absolutely.

9           THE COURT:  If you can answer the question, answer it.

10          The question was:  Who was the arresting officer, you

11  or Officer Santiago?

12          THE WITNESS:  Officer Santiago was the arresting

13  officer.

14  Q.   So Officer Santiago provided the information for Exhibit A?

15  A.   Yes.

16  Q.   At the time of the --

17          MR. GREENBERG:  Actually, Your Honor, I have no

18  further questions of this witness.  I will take that up with

19  Officer Santiago.

20          THE COURT:  All right.  Mr. Pitcoff?

21          MR. PITCOFF:  Sure, Your Honor.  With your permission,

22  I will have Mr. Foster hook up to the computer as I begin the

23  examination.

24          THE COURT:  Absolutely.

25  CROSS-EXAMINATION

1  BY MR. PITCOFF:

2  Q.   Good afternoon, Officer Campbell.

3  A.   Good afternoon.

4  Q.   Okay.  I want to take you back a little bit.  Can you tell

5  us a little bit about your education?

6  A.   I attended North Rockland High School, and went on to get a

7  four-year bachelor of mathematics at St. Thomas Aquinas College

8  in Sparkill, New York.

9  Q.   I'm sorry.  I didn't hear the last part.

10 A.   I'm sorry.  In Sparkill, New York.

11 Q.   I am just going to ask you to keep your voice up a little

12 bit so we all can hear you.

13     And did you work after you graduated college?

14 A.   Yes.

15 Q.   And in what field did you work?

16 A.   I worked in an accounting firm.

17 Q.   And how long did you work in an accounting firm for?

18 A.   Approximately 18 months.

19 Q.   And what did you do after that?

20 A.   After that, I was hired by the Town of Haverstraw Police

21 Department.

22 Q.   And why did you decide to come a police officer?

23 A.   I wanted to follow in my father's footsteps, who was also a

24 police officer.  I saw the pride that he took out of the job,

25 and I wanted to have that as well.

1 Q.   And how long have you been a Town of Haverstraw police

2 officer for?

3 A.   Just over ten years.

4 Q.   Now, I want to take you to the night in question.

5      How did you find out about this call from Jamal Johnson

6 regarding 10 Captain Shankey Drive?

7 A.   I was dispatched to that residence.

8 Q.   Okay.  And when you were dispatched, was that by the police

9 dispatcher?

10 A.   Yes.

11 Q.   And counsel asked you some questions earlier about your

12 knowledge.  What did the dispatcher tell you generally about

13 that call?

14 A.   It was a check-the-welfare-of at that location; that there

15 had been a possible dispute going on there.

16 Q.   And did he give you the basis or what the basis of the

17 thinking there was a dispute was?  In other words, was there any

18 description of the call?

19 A.   That there was yelling could be heard in the background.

20 Q.   Okay.  And were you given the address 10 Captain Shankey

21 Drive?

22 A.   Yes.

23 Q.   Okay.  And now when you proceeded to that drive, was

24 William -- Officer Will Santiago already there?

25 A.   We arrived at approximately the same time.

1  Q.    And did you have a conversation with Officer Santiago at

2  that time?

3  A.    Yes.  Officer Santiago advised that there was a full

4  stay-away order of protection against Michael Monroe.

5  Q.    And I want to talk to you about the full stay-away order of

6  protection, and we will get that up on the screen as soon as we

7  can.  That's Exhibit D.  Okay.  We have it up there.

8        Counsel read you one part of the stay-away order and asked

9  you questions.  I think he read you where it says [02]; is that

10 correct?

11 A.    Yes.

12 Q.    And if we can zoom in on [02], if we are able to do that,

13 and that section of the stay-away order has specific things that

14 he should not be doing involving Ms. Locke, correct?

15 A.    That's correct.

16 Q.    And you heard counsel ask you questions that was about

17 striking or harassment, aggravated harassment, correct?

18 A.    Yes.

19 Q.    And he wasn't charged with any of those things, correct?

20 A.    That's correct.

21 Q.    But is that all that the full stay-away order of protection

22 covered?

23 A.    No.

24 Q.    What did it cover?

25 A.    Above Section [02] is Section [01] where it specifically

1  informs the -- Mr. Monroe that he is to stay away from Jessica

2  Locke, her home, her business, her school and/or place of

3  employment.

4  Q.   So was he allowed to be at her home regardless of what he

5  was doing?

6  A.   No.

7  Q.   And I want to direct your attention -- maybe we can pull it

8  up, blow it up on the screen -- to [14].  It talks about

9  communications.  Do you see that?

10  A.   Yes.

11  Q.   And was he allowed to communicate with Jessica Locke in any

12  way?

13  A.   No.

14  Q.   And was this order of protection valid on the date of the

15  incident?

16  A.   Yes.

17  Q.   And let me talk to you about these stay-away orders.

18       There was questions -- and we are going to get to it -- but

19  there was questions by counsel about why you went into the house

20  when Ms. Locke didn't say she was being bothered; do you

21  remember those questions?

22  A.   Yes.

23  Q.   Once you are told that he is in that house, do you have any

24  choice but to go in that house?

25  A.   No.

1  Q.   And can you tell us why that is?

2  A.   The order of protection is issued by a judge.  It

3  explicitly tells us that if the order is violated, that we have

4  a duty to arrest the violator.

5  Q.   Do you have any discretion in that?

6  A.   No.

7  Q.   And I used the term in opening "mandatory arrest."  Can you

8  tell us what that means?

9  A.   A mandatory arrest arises in a situation where basically

10 our discretion is removed, and we have no choice but to effect

11 the arrest.

12 Q.   Okay.  And was that the situation here?

13 A.   Yes.

14 Q.   Now, I'm going to take you back to the scene that night,

15 and we will pull up Exhibit L, and why don't we go L -- L1.

16 A.   Okay.

17 Q.   The photograph of the outside of the premises.

18      If we can zoom that in a little bit on the screen.  Officer

19 Campbell, can you tell us what that photo shows?

20 A.   The entrance to Ms. Locke's apartment.

21 Q.   And when you pulled your car up, can you describe using the

22 picture where you would have pulled your car up?

23 A.   At the end of the driveway, kind of at the bottom of the

24 picture where it says "Google."

25 Q.   Okay.  And which way would it have been facing?

050923PMH                    Campbell - Cross - Pitcoff

1  A.   I mean, it's a hill, so up the hill.

2  Q.   Okay.  And in the photograph would it have been facing the

3  left or the right?

4  A.   To the -- yeah, to the left.

5  Q.   Okay.  And facing the street?

6  A.   Facing -- it would be up the continuation of Captain

7  Shankey Drive, yes.

8  Q.   And you mentioned that you learned about the stay-away

9  order of protection.  Did that concern you at all given the fact

10 a call came in that there was yelling coming from the premises?

11 A.   Yes.

12 Q.   And can you describe why?  What concerned you about that?

13 A.   When somebody is involved in a situation where an order of

14 protection is being violated, it shows a blatant disregard for a

15 judge's orders.  Generally, those situations would have a

16 certain amount of propensity for violence, and we felt that in

17 the interest -- the best interests of the victim here, that we

18 needed to get her out of that situation as quickly as possible

19 and effect the arrest of Mr. Monroe.

20 Q.   And who applied for this order of protection?

21 A.   Can I refer back to the exhibit?

22 Q.   Sure.

23 A.   Jessica Locke.

24 Q.   Okay.  Against Michael Monroe, correct?

25 A.   Correct.

050923PMH                    Campbell - Cross - Pitcoff

1  Q.   Now, you told us earlier that you walked up to the door,

2  and we will go back to the photograph and zoom in.  Would that

3  be the red door?

4  A.   Yes.

5  Q.   And can you tell us what happened when you walk up and

6  knocked on the door the first time?

7  A.   So the first time we approached the door, Officer Santiago

8  went directly to the door attempting to make contact with the

9  victim in this case.  I went kind of around to the side.  If you

10 look at Exhibit L2, there is a side window there.

11 Q.   Can you describe where that is in the photograph?

12 A.   It would be to the right of the door.

13 Q.   So if you are standing with your -- facing the door, would

14 it be to the right or the left?

15 A.   To the right, yes.  Just to kind of get a peek and see if

16 anything was transpiring inside, if there was any indication,

17 you know, that we can get through the window.  That's what I was

18 checking for at that time.

19 Q.   Now, the first time that Officer Santiago knocked on the

20 door, was there any answer?

21 A.   The first time we approached the door, she ultimately came

22 out.  Yes.

23 Q.   Okay.  Well, at some point did you speak to the landlady

24 who you were told owned that home?

25 A.   Not me personally, but she did come out of the house.

1  Q.   Okay.  And who did she speak to?

2  A.   I believe Lieutenant Kaye.

3  Q.   And did you hear that conversation?

4  A.   Vaguely.  I can't speak to exactly what was said other than

5  that she was implying that there was some sort of incident going

6  on.

7            MR. GREENBERG:  Objection, Your Honor.

8            THE COURT:  Mr. Greenberg, you are going to let the

9  witness finish his answer.  Stand up.  Let me know you object

10  and tell me the basis for your objection, please.

11            MR. GREENBERG:  The comment about implication calls

12  for speculation, Your Honor.

13            THE COURT:  Overruled.  The objection is overruled.

14  The answer stands.

15            But when we are objecting, counsel, both of you,

16  please, let the witness finish his answer.  I will deal with it,

17  and I will instruct the jury appropriately.  Please don't

18  interrupt the answer unless there is an urgent need to do that.

19  Thank you.

20            MR. PITCOFF:  Thank you, Your Honor.

21  Q.   And I'm sorry.  I didn't hear the answer.

22  A.   Yeah.  She implied that he was inside the house, and that

23  they were constantly arguing, and that this night she had also

24  heard the arguing.

25  Q.   Okay.  And so now you have two people that you have heard

1  saying that there was arguing and/or yelling and the order of

2  protection.  What do you do next?

3  A.    Ms. Locke did come out.  She appeared distraught.  She

4  appeared very upset, but she did say that there was no problem.

5  Q.    And did she come out of the house at that time?

6  A.    She came to the door --

7  Q.    But not out --

8  A.    -- and opened the door and spoke to us.

9  Q.    Okay.  Now, you were asked questions about plaintiff; that

10 you didn't charge the plaintiff with assault or battery.  Did

11 you ever witness him hit her?

12 A.    No.

13 Q.    And you were asked questions about she could have left the

14 home, but didn't; is that true?

15 A.    Yes.

16 Q.    And instead she shut the door?

17 A.    Correct.

18 Q.    Well, she said she didn't need you and shut the door.  You

19 said you were concerned.  Why were you concerned?

20 A.    As I stated before, her demeanor seemed to indicate that

21 there was more going on there than she was leading on.  Out of

22 concern for her safety, we convened after she shut the door.  We

23 spoke about what happened, you know, what she said.  We made

24 sure we were all on the same page, and we all felt that she was

25 being less than truthful with us.  So we wanted to make sure we

1  did everything we possibly could and exhaust all options before

2  we left.  We didn't want to leave her there in a potentially

3  dangerous situation just because she said the words "everything

4  is fine."

5  Q.   By the way, I know you said you ultimately learned Mr.

6  Monroe was in the house, but did you know where in the house he

7  was at that point?

8  A.   No.

9  Q.   So he could have been anywhere within the house at that

10 point?

11 A.   Yes.

12 Q.   So what happened next?  You told us that you -- she shuts

13 the door, and you convened.  What happens next?

14 A.   So as we are talking, over the course of a couple of

15 minutes, Mr. Johnson came -- as I said earlier, pulling up in

16 his vehicle in great haste, tires screeching.  And he gets out

17 of the car rather frantically saying, "What are you guys doing?

18 She is in there.  He is in there.  You know, he is going to kill

19 her."

20 Q.   That's what he said?

21 A.   He said that.

22 Q.   And is he the same person -- you said Mr. Johnson -- did

23 you come to learn that he was the same person who called 911?

24 A.   Yes.

25 Q.   And said that there was yelling?

1  A.   Yes.

2  Q.   And what did Mr. Johnson do after he came screeching out

3  and up to the -- and came out of the car in haste and asked you

4  what you were doing and said he was going to kill her?

5  A.   He went straight for Ms. Locke's door and started pounding

6  on it, yelling her name, demanding that she came out.

7  Q.   What happened after he was banging on the door and yelling

8  that, for her to come out?

9  A.   She did come out crying, in relief it seemed, and as I said

10  earlier, embraced him in a hug.

11  Q.   Okay.  And what happened after she came out crying and

12  embraced Jamal Johnson in a hug?

13  A.   We asked her, "Is Michael inside?"  And she indicated yes.

14  Q.   Okay.  Okay.  So first off, you were asked questions about

15  a body camera.  Does the department have body cameras?

16  A.   No.

17  Q.   So is that a choice that you somehow made not to use a body

18  camera?

19  A.   No.

20  Q.   And when you went in, can you tell us what you did?

21  A.   We entered, as was stated earlier, the studio apartment.

22  We checked the main common areas, the larger parts of the

23  apartment.  We did not find Mr. Monroe in those areas.  The only

24  thing that was left, the only location that was left was the

25  closed -- what we found out to be a bathroom door.

1  Q.   Was -- did you see a light on in that bathroom or was it

2  dark?

3  A.   It was dark.

4  Q.   And what did you do when you came to the bathroom door?

5  A.   We demanded that Mr. Monroe come outside; come out of the

6  bathroom --

7  Q.   And how many times?

8  A.   -- and open the door.

9  Q.   How many times did you do that?

10 A.   At least a half a dozen.

11 Q.   And did he finally come out?

12 A.   Yes.

13 Q.   And did he open the door?

14 A.   He did.

15 Q.   And did he come out at that time?

16 A.   No.

17 Q.   Okay.  Can you tell us, take us through, what did you say

18 to Mr. Monroe at that time, and what he said to you?

19 A.   So when he finally opened the door, he was in there.

20 Again, as we stated earlier, speaking with his hands telling us

21 that he didn't do anything wrong.  We had no right to be there,

22 and that we shouldn't be in the apartment, and that he did

23 nothing wrong.

24     We told him numerous times about, again, about another half

25 a dozen, to come out with your hands behind your back.  You are

1   under arrest.  You are in violation of the order of protection.

2        Mr. Monroe did not do that after several requests.  At that

3   point, I felt, again, like I said earlier, it's not a

4   negotiation.  We don't -- we are not sitting there saying, hey,

5   if you do this for me, then I will help you out.  I felt that we

6   needed to get in there, get Mr. Monroe in custody as quickly as

7   possible for the safety of all involved.  We don't know what's

8   in that room.  It's -- as I stated earlier, it's dark.  And we

9   just felt that it was -- or I felt that it was in everyone's

10  best interests to get Mr. Monroe into custody as quickly as

11  possible.

12  Q.   Now, you testified earlier that when you go in there, you

13  did that so the situation wouldn't escalate.  Can you tell us

14  what you mean by that?

15  A.   Yeah.  So the longer that we plead back and forth with Mr.

16  Monroe to follow our commands, and the longer that he is

17  refusing to follow those commands, the situation potentially

18  could spiral out of control.  He might decide that he has a

19  better chance to try and fight or even though it was learned

20  later that there was no weapon, we didn't know that at the time.

21  There could have been -- that's what we would call like an

22  unknown area that Mr. Monroe has full control over, and we don't

23  know what's in there.  It's a very dangerous and precarious

24  situation to find yourself in.

25        And again, in order to reduce the likelihood of that

1  situation rising to a worse situation, we wanted to get him into

2  custody as quickly as possible.

3  Q.    Okay.  And I would like you to demonstrate to the jury.

4  You said he kept pleading his case.  Can you show us physically

5  what he was doing with his arms at the time?

6  A.    Just flailing them back and forth, kind of like -- like the

7  word you used "gesticulating" was a good word, just kind of back

8  and forth saying that we had no right to be there.

9  Q.    Now, can you tell us first verbally what you did when you

10 went in and decided to try to take him out of the bathroom with

11 his hands behind his back?

12 A.    I entered the bathroom.  I grabbed his right arm, and

13 attempted -- kind of went around the back of him and attempted

14 to bring his left arm to the back.  So when it says I grabbed

15 plaintiff, I grabbed his arm, attempted to bring his other arm

16 behind; and at that point, as he attempted to flail away, as he

17 was still moving his arms, we ended up going into the sink,

18 dislodging some of the pipes from the wall.  Officer Santiago

19 was able to assist me from the threshold of the door; grabbed

20 his other arm, and we were able to get him handcuffed.

21 Q.    Now, with the Court's permission, I would ask that the

22 witness demonstrate with Mr. Foster what he did, the movements

23 he took in that bathroom.

24            THE COURT:  Mr. Greenberg?

25            MR. GREENBERG:  No objection, Your Honor.

```
 1            THE COURT:  All right.  You may proceed.
 2  Q.   I am going to ask Mr. Foster to stand up, and with the
 3  Court's permission if he can come up, and just as you do it,
 4  Officer Campbell, if you can describe to the jury where you are
 5  standing and when you go in and where Mr. Monroe is.  Be gentle
 6  with Mr. Foster.
 7  A.   So this would be the threshold of the door.  I'm just a
 8  foot or two outside.  He's a foot or two inside.  After several
 9  requests for him to come out, and the refusal of those requests,
10  I entered into the room.  I grabbed his right arm, and around
11  the back attempted to grab his left.  As he pulls away, we go
12  into the sink.
13       At that point, Officer Santiago is able to grab him, and we
14  were able to get his hands behind his back at the threshold of
15  the door, and we actually used two sets of cuffs as to
16  accommodate the defendant at that point and, again, properly
17  handcuffed.
18  Q.   Thank you.  You can take the witness stand again.
19       And when you said you used two pairs of cuffs, what was the
20  purpose of that?
21  A.   As noted earlier, Mr. Monroe is a -- was a large gentleman.
22  It would be very uncomfortable for him to try and get his hands
23  so far behind his back to -- into one set of handcuffs, so we
24  locked one set into another so that it has a wider spread, and
25  he wouldn't have to strain his arms so much behind his back.
```

1  Q.   And I want to take you back to that interrogatory that

2  counsel questioned you on, interrogatory number four.

3  A.   Okay.

4  Q.   And is there anything about that interrogatory that is

5  incorrect?

6  A.   No.

7  Q.   Okay.  So where it says here that Campbell went into the

8  bathroom first and grabbed plaintiff, was that accurate?

9  A.   Yes.

10  Q.   Does it say you grabbed him in any place that you didn't

11  grab him?

12  A.   No.

13  Q.   What happened after you were able to get him in handcuffs?

14  A.   Once he was in our custody, we conducted a search of Mr.

15  Monroe's person to ensure that there was no weapons or anything

16  like that on his person, and then he was walked outside.

17  Q.   And, Officer Campbell, can you tell us, did you ever take

18  your foot and stomp on the plaintiff's foot?

19  A.   Absolutely not.

20  Q.   And can you tell us what you were wearing on your feet on

21  that night?

22  A.   I wore rubber-soled sneaker boots.

23  Q.   And what happened after you had him in handcuffs and were

24  walking him out?

25  A.   At that point, the -- at this point, I did actually speak

1  with the landlord.  I wanted to inform her that the sink had

2  been dislodged from the wall, and that the water was spewing

3  from the pipes.

4        MR. GREENBERG:  Your Honor, I object to what -- any

5  conversation with the landlord after the fact is irrelevant.

6        THE COURT:  I'm going to overrule the objection.  He

7  only testified to what he said, and that there is testimony

8  about water spewing.  I don't think it's entirely irrelevant,

9  and it's *de minimis* in value, but I'm going to permit it.

10 Q.   So who walked the plaintiff out of the house?

11 A.   Officer Santiago and Lieutenant Kaye.

12 Q.   And did you hear or see what happened after he walked him

13 out of the house?

14 A.   Yes.

15 Q.   And can you tell us what you saw?

16 A.   As they were walking him over to the car, I could hear the

17 complainant, Mr. Johnson, and Mr. Monroe engage in a screaming

18 match, a yelling match.

19 Q.   Okay.  And can you describe the plaintiff's demeanor during

20 that time?

21 A.   He was quite angry.  He was not happy that Mr. Johnson was

22 there, and obviously not happy that he was under arrest.

23 Q.   Okay.  And was anyone standing by Mr. Johnson at that time?

24 A.   Ms. Locke.

25 Q.   Now, were you there when Officer Santiago placed the

1 plaintiff into the vehicle?

2 A.   I was -- no.  I was not next to Officer Santiago.

3 Q.   Okay.  What happened next?

4 A.   Mr. Monroe was put -- placed into Officer Santiago's patrol

5 car, and we transported him back to our police station to book

6 him.

7 Q.   By the way, did you ever at any point see Mr. Monroe

8 limping, the plaintiff?

9 A.   No.  Never.

10 Q.   So you were asked questions earlier about resisting arrest.

11 He wasn't charged with resisting arrest.  Can you explain why he

12 wasn't charged with resisting arrest?

13 A.   As we said earlier, I am -- I wasn't the charging officer,

14 the primary officer for this particular call, but it's not

15 uncommon for the highest of the charge to be the one that is

16 ultimately charged.  There is no -- not always a need to list

17 subsequent lower level offenses.

18 Q.   Okay.  And does that involve the exercise of discretion,

19 whether or not to charge someone with resisting arrest?

20 A.   It does.

21 Q.   And did he take a swing at you or kick you or get a weapon

22 out?

23 A.   No.

24 Q.   And did you use any weapons on him?

25 A.   No.

1  Q.   Can you describe to the jury the weapons that you had with

2  you that day?

3  A.   On patrol we always carry, obviously, a handgun, a taser,

4  an asp, pepper spray.  None of those were used in this instance.

5  Q.   And what are verbal commands?

6  A.   The commands that are given orally via mouth.

7  Q.   And did you use anything -- force before you used those

8  verbal commands?

9  A.   Any of those weapons?  Any of those --

10 Q.   Any force at all before you used the verbal commands?

11 A.   No.

12 Q.   And you never used a weapon?

13 A.   No.

14 Q.   You were asked questions about Lieutenant Kaye not giving

15 you orders.  Do you have to wait for orders to try to get

16 someone who is violating a stay-away order of protection in

17 custody?

18 A.   No.

19 Q.   And can you tell us why you decided to do it when you did?

20 A.   As I stated earlier, there were several requests initially

21 for him to open the door; and once he did, there were several

22 more requests for him to come out with his hands behind his

23 back.  It did not appear that Mr. Monroe was interested in

24 following any of those directions, in spite of the fact that he

25 wouldn't come out.  And again, he is in an unknown space to us

1 where there may be something that is harmful to us.  So it was

2 in our best interests, and his as well, to get him into custody

3 as quickly as possible.

4         MR. PITCOFF:  Thank you, officer.  No further

5 questions.

6         THE COURT:  Mr. Greenberg, we have got about two or

7 three minutes.  Should we stop or should we continue?

8         MR. GREENBERG:  I would just as soon stop, and I have

9 a short redirect, but I don't think I'm going to do it in two

10 minutes.

11         THE COURT:  Okay.  Ladies and gentlemen, we will stop

12 at this time.  We will pick up promptly at 2:00, and so have

13 some lunch.  Get some in nourishment, and we will go from 2:00

14 to 5:00 with a mid afternoon break.  All right.

15         Mr. Cangelosi, take the jury out, please.

16         (Jury excused)

17         (In open court; jury not present)

18         THE COURT:  All right.  Counsel, we will see you at

19 2:00.  The only thing I would encourage is for the solemnity of

20 the proceedings, if you are going to object, stand up.  That way

21 the witness will know.  I will know.  Everybody will know, and

22 we will be a little smoother in that regard.  All right.  I will

23 see you all at 2:00 promptly.

24         MR. PITCOFF:  Your Honor, can I just mention something

25 quick on scheduling?  Based on what you said the other day, it's

1    been agreed that my doctor is going to come in today to get him

2    in, and counsel has accepted, agreed to take him out of order so

3    give him --

4                THE COURT:  Is he here?

5                MR. PITCOFF:  He will be here before 3:00.  He should

6    be here by 2:30, but we were thinking --

7                THE COURT:  We will finish this witness.  When you say

8    a very few minutes, I'm holding you to very few minutes, and so

9    we'll do that, and start with the next witness and interrupt if

10   we need to, and if he is here before that, we will start with

11   him.

12               MR. PITCOFF:  Right.  And I told him 3:00, so it's a

13   possibility he may not be done when this witness is, but he can

14   always take his next witness.

15               THE COURT:  So we will start with the next witness.

16   Terrific.  See you at 2:00.

17               MR. PITCOFF:  Thanks.

18               (Luncheon recess)

19               THE DEPUTY CLERK:  Jury entering the courtroom.

20               (In open court; jury present)

21               THE COURT:  All right.  Good afternoon, ladies and

22   gentlemen of the jury.  Everybody please be seated.

23               Mr. Greenberg, please proceed.

24               MR. GREENBERG:  Thank you, Your Honor.

25   REDIRECT EXAMINATION

1  BY MR. GREENBERG:

2  Q.   Officer Campbell, a death threat you would regard as a

3  significant matter, wouldn't you?

4  A.   I am sorry.  Could you repeat that?

5  Q.   You regarded this report of a death threat as a significant

6  matter, didn't you?

7         MR. PITCOFF:  Objection.

8         THE COURT:  I don't know where we are going.  I didn't

9  hear any testimony about death threats, so I'm not sure where we

10  are.  Pull that mic a little closer, Mr. Greenberg, so we can

11  all hear you.

12         MR. GREENBERG:  Certainly.  I was referring to the one

13  by Jamal Johnson where he showed up and said, "they are going to

14  try to -- he's going to kill her," words to that effect.

15         THE COURT:  I see.  I see.  I see.  So let's reframe

16  the question so we all get on the same page.  Refer to the death

17  threat that we heard Mr. Johnson refer to.

18         MR. GREENBERG:  Right.  Yes, Your Honor.

19  Q.   So you regarded a death threat by somebody like Jamal

20  Johnson as a significant matter, right?

21  A.   Yes.

22  Q.   And yet you didn't include it in your report, did you?

23  A.   No.

24  Q.   So if you -- let's look at what you said in your report.

25  Let's look at Exhibit G, please.  And turning to the first page

1  of Exhibit G, that is Haverstraw Police Department Incident

2  Report, correct?

3  A.    Yes.

4  Q.    Turning to the second page, there is an original narrative,

5  and the original narrative was written on November 7, 2020.

6  That's at the bottom of the page, correct?

7  A.    Yes.

8  Q.    And that was written by you?

9  A.    No.

10 Q.    It was written by Officer Santiago?

11 A.    Correct.

12 Q.    But you did a supplemental narrative on the next page?

13 A.    That's correct.

14 Q.    And you did that on the date of the incident itself

15 November 6, 2020?

16 A.    That's correct.

17 Q.    And you did it at 10:06 p.m.?

18 A.    Correct.

19 Q.    Which is right after the incident?

20 A.    Correct.

21 Q.    And there is not a -- there is not a single mention of

22 anything about a death threat.

23 A.    No explicit mention, no.

24 Q.    And there is no mention in any report filed with the

25 Haverstraw Police Department of a death threat, is there?

1  A.   Not that I have seen.

2  Q.   All right.  Let's talk about handcuffs.

3       Now, talking about handcuffs, you filed official reports

4  about what it is that Mr. Monroe supposedly did wrong or you

5  claimed he did wrong that required you to go hands on, correct?

6  A.   Yes.

7  Q.   And if you look at Exhibit G, what we are looking at now,

8  and you look in supplemental narrative, which you wrote to the

9  fifth line down, it says, "Mr. Monroe opened the door, but would

10 not follow commands and come out of the bathroom.  So officers

11 went hands on to forcibly remove Mr. Monroe and place him in

12 handcuffs."

13      It does not say he didn't follow commands about handcuffs,

14 did he?

15 A.   It says he would not follow commands and come out of the

16 bathroom.

17 Q.   And come out of the bathroom.  And looking at Exhibit F

18 next.

19 A.   Okay.  Sorry.  I'm having trouble finding it.

20 Q.   Exhibit F is something you wrote, too?

21 A.   Yes.

22 Q.   And that's your signature down at the bottom of page 2?

23 A.   Yes.

24 Q.   And looking at narrative, that -- the thing that says

25 "narrative"?

```
 1  A.    Okay.

 2  Q.    It says "narrative detailed description of events."  You

 3  knew you were supposed to give a detailed description of events,

 4  right?

 5  A.    Yes.

 6  Q.    And it says that, "Mr. Monroe" -- looking at the third

 7  line -- "refused to follow commands and exit the bathroom."

 8  Doesn't it?

 9  A.    Yes.

10  Q.    But it doesn't say anything about handcuffs there, either?

11  A.    No.

12           MR. PITCOFF:  Objection.

13           THE COURT:  Overruled.

14  Q.    Now, let's talk briefly, if I might, about the charges.  It

15  is possible, is it not, to charge a defendant, a person who you

16  have arrested, with multiple offenses?

17  A.    It is.

18  Q.    And from time to time, you and your colleagues have charged

19  defendants with multiple charges?

20           MR. PITCOFF:  Objection.

21           THE COURT:  Overruled.

22  Q.    Sir?

23  A.    Yes.

24  Q.    And the decision about what charges ultimately to charge is

25  up to the district attorney, right?
```

1  A.    I believe so, yes.

2  Q.    But you can tell the district attorney what charges are

3  available?

4  A.    We charge the crimes that fit the fact pattern as we have

5  uncovered in our investigation.  If the district attorney needs

6  more information, they are free to contact us or they can change

7  and charge other crimes.

8  Q.    And on your narrative this fact pattern included resistance

9  to arrest, correct?

10  A.    Yes.

11  Q.    Last point I would like to do on redirect, and this relates

12  to the demonstration that you did with Mr. Foster.

13       So I observed -- but correct me if I am wrong -- that when

14  you went around Mr. Foster to the -- to his rear, and obviously,

15  you were simulating going around Mr. Monroe to his rear, you

16  went around to the left, am I right?

17  A.    Yes.

18            MR. GREENBERG:  That's all I have on the redirect,

19  Your Honor.

20            THE COURT:  Mr. Pitcoff?

21            MR. PITCOFF:  Yes, briefly.  And if I could ask that

22  that just remain on the screen, please?

23  RECROSS-EXAMINATION

24  BY MR. PITCOFF:

25  Q.    Just a couple of questions, Officer Campbell.

1      In that narrative that's up on the screen now where it says

2  "detailed description of events."  Do you see that?

3  A.   Yes.

4  Q.   Is that -- does that represent all of the space that you

5  were given for that in the form?

6  A.   Most of it.

7  Q.   Okay.  In other words, the one, two, three, four, five,

8  six, seven lines under there, are those the lines given for

9  that?

10  A.   Yes.

11  Q.   And did you state in here that he refused to come out of

12  the bathroom?

13  A.   Yes.

14  Q.   Who was the arresting officer in this case?

15  A.   Officer Santiago.

16  Q.   Okay.  And why -- can you explain to us why Officer

17  Santiago was the arresting officer and not you?

18  A.   The way that our patrol sectors are broken up, we have four

19  primary sectors.  They are referred to as 511, 512, 513, and

20  514.  Officer Santiago was 512 sector, which encompassed 10

21  Captain Shankey Drive.  My sector that evening was 515, which is

22  generally an overlap sector used primarily as a backup officer.

23  Q.   Okay.  So the fact that you were a backup officer, what

24  effect did that have, if any, on Officer Santiago being the

25  arresting officer?

1  A.   Him, as the primary officer in that sector, is the main

2  officer responsible for charging, filling out the main reports.

3  My job is on scene to assist him as needed and then fill out,

4  assist him during booking, filling out supplemental reports.

5  Q.   And you had mentioned earlier when you went hands on, from

6  the point that you went hands on until you got him in handcuffs,

7  how long was that, approximately?

8  A.   Seconds.

9  Q.   Okay.

10        MR. GREENBERG:  I am sorry, Your Honor.  I didn't hear

11  the answer.

12        THE COURT:  He said "seconds."

13        MR. GREENBERG:  Seconds.  Thank you.

14  Q.   All right.  And whose decision was it whether or not to

15  charge him with resisting arrest in terms of the police

16  department?

17  A.   Ultimately, it was Officer Santiago's decision.

18  Q.   And did you disagree with that decision?

19  A.   No.

20  Q.   Why not?

21  A.   Because it was -- he charged the highest applicable crime

22  to the situation.

23  Q.   Okay.  You mentioned that he didn't take a swing at you.

24  Did that influence your opinion on whether or not to charge him

25  with that?

1  A.   Yes.  Obviously, if he had been more combative to the point

2  to where he would have struck us or attempted to strike us in a

3  more threatening way, then I'm sure we would have reconsidered

4  that.  But considering it was a mere resistance to being hand-

5  cuffed as opposed to an act of combative situation, we felt that

6  it wasn't necessary.

7          MR. PITCOFF:  Thank you very much.  No further

8  questions.

9          MR. GREENBERG:  I have nothing further of this

10  witness.

11          THE COURT:  All right.  Officer, you may step down.

12          (Witness excused)

13          THE COURT:  Call your next witness.

14          MR. GREENBERG:  I call Lieutenant Kaye.

15          THE COURT:  Lieutenant Kaye.  Okay.

16          THE DEPUTY CLERK:  Step into the box.  Remain standing

17  and raise your right hand.

18  IAN KAYE, having been duly sworn, testified as follows:

19          THE DEPUTY CLERK:  Please be seated.  Please state

20  your full name for the record and spell it.

21          THE WITNESS:  Ian Kaye.  I-A-N, K-A-Y-E.

22          MR. GREENBERG:  May I, Your Honor?

23          THE COURT:  You may proceed.

24          MR. GREENBERG:  Thank you.

25  DIRECT EXAMINATION

1  BY MR. GREENBERG:

2  Q.   Mr. -- sorry, Mr. -- Lieutenant Kaye, you are an

3  experienced police officer?

4  A.   Yes.

5  Q.   A lieutenant in the Haverstraw Police Department on

6  November 6, 2020?

7  A.   Yes, sir.

8  Q.   And you were on duty?

9  A.   Yes.

10 Q.   Acting in the course of your duties for the town?

11 A.   Yes.

12 Q.   And you were present for the events leading up to Mr.

13 Monroe's arrest and the aftermath?

14 A.   Yes.

15 Q.   And you were -- sorry.  Let me try that one again.

16      And you were able to observe what Officers Santiago and

17 Campbell were doing?

18 A.   Yeah.

19 Q.   Now, you were the supervisor on the scene?

20 A.   Correct.

21 Q.   Two ranks up from Officers Campbell and Santiago?

22 A.   Correct.

23 Q.   And you had the authority to direct them what to do and

24 what not to do?

25 A.   Correct.

1  Q.   Including how to do it?

2  A.   Correct.

3  Q.   Now, you know of the requirement not to use excessive

4  force, correct?

5  A.   Correct.

6  Q.   And if you had been -- I realize -- withdrawn.

7       And you didn't give any direct order to Officer Campbell to

8  stop anything he was doing that evening, correct?

9  A.   Everything he did I felt was proper.

10 Q.   It wasn't the question.  The question was:  You didn't give

11 any order to stop him --

12 A.   No.

13 Q.   -- from doing what he was doing?

14      And that would have taken maybe half a second, maybe a

15 second to give that kind of order?

16 A.   I guess.

17 Q.   Now, I would like to talk about Exhibit I.  So if we can

18 look at Exhibit I?

19          THE COURT:  Lieutenant, there is a white binder.  Look

20 for the Tab I.

21          THE WITNESS:  Okay.

22 Q.   Exhibit I, Lieutenant Kaye, is a general order of the

23 police department of the Town of Haverstraw?

24 A.   Yes.

25 Q.   And you are familiar with it?

1  A.   Yes.

2  Q.   It was the general order in force on November 6, 2020,

3  dealing with the subject of the use of force?

4  A.   Yes.

5  Q.   Now, and I note on the top of the first page, in the bottom

6  of the box on the first page, it says "distribution all members

7  of police department."  I am correct that the chief of police

8  distributed Exhibit I -- obviously not labeled Exhibit I -- to

9  the members of the force?

10  A.   I'm sorry.  Just can you repeat that?

11  Q.   Absolutely.  If I ask a question, and it's unclear, it's on

12  me.  Let me try it again.

13  A.   Okay.

14  Q.   Am I correct that the chief of police, either personally or

15  through somebody working for him or her, distributed a copy of

16  Exhibit I to the members of the police department?

17  A.   Yes.  Correct.

18  Q.   So you knew that the police could only use reasonable

19  force, right?

20  A.   Correct.

21  Q.   And this document sets forth some of the factors that you

22  were instructed in about -- by the chief of police -- about what

23  force was reasonable?

24  A.   Correct.

25  Q.   Let's look at them.

1          I would like to start with -- you see the little numbers at

2    the bottom of the page, on the bottom right-hand corner?

3    A.   Yes.

4    Q.   I would like to start with the page that has the -- we

5    lawyers call those Bates stamps -- the Bates stamp Town 35.

6    A.   Okay.

7    Q.   So are you with me?

8    A.   Yes.

9    Q.   All right.  Let's start there.  Let's start with severity

10   of the crime or the circumstance.  The crime involved was a

11   violation of an order of protection?

12   A.   I don't see that, sir.  Hold on one second.  I'm sorry.  35

13   you said, correct?

14   Q.   I'm on page 35.

15   A.   (B)(1)?

16   Q.   35(b)(1).

17   A.   Got you.  Okay.

18   Q.   Are you with me?

19   A.   I got it, yes.

20   Q.   Great.  The first is the severity of the crime or the

21   circumstance.  The crime here was the violation of an order of

22   protection?

23   A.   Yes.

24   Q.   In that Mr. Monroe was at Ms. Locke's apartment?

25   A.   Yes.

1 Q.    And that order of protection was set to expire in a month?

2 A.    Yeah, I didn't have knowledge of that, when the expiration

3 date was.

4 Q.    The police people talked to Ms. Locke twice before they

5 went into the apartment?

6 A.    Correct.

7 Q.    And she did not object to his being there, correct?

8 A.    She did not say that, no.

9 Q.    Let's look at level and -- the next one -- level and

10 immediacy of threat or resistance posed by the subject --

11 suspect.  I'm sorry.  Suspect.

12      Mr. Monroe voluntarily opened the bathroom door?

13 A.    After numerous commands, yes.

14 Q.    And when he -- you encountered him, he was busy pleading

15 his case?

16 A.    Yes.

17 Q.    He was yelling?

18 A.    Yes.

19 Q.    So it made -- the yelling presumably made it harder for him

20 to hear anyone else?

21 A.    I don't believe so, no.

22 Q.    Mr. Monroe had his hands up?

23 A.    Yes, he did.

24 Q.    And he did not put them down, at least until the time that

25 Officer Campbell went hands on; is that right?

050923PMH                    Kaye - Direct - Greenberg

1    A.    During his -- when he was speaking and trying to plead his

2    case with Officer Campbell, I don't know if he put his hands

3    down and any point.

4    Q.    Well, you can't say that he did put his hands down?

5    A.    I can't, no.

6    Q.    Mr. Monroe did not say he would not go peaceably?

7    A.    Did he say that you said?

8    Q.    That's my question.

9    A.    He did not.

10   Q.    And before Officer Campbell went hands on, I want --

11   withdrawn.

12         I want to distinguish between not obeying a command and

13   refusing a command.  Are you with me?  By refusing I mean

14   saying, I won't do it, as opposed to just not following it.

15   A.    Okay.

16   Q.    Do you understand my distinction?

17   A.    One makes a verbal statement, and one doesn't.

18   Q.    Exactly.

19   A.    Okay.

20   Q.    I am correct that Mr. Monroe never refused to step out of

21   the bathroom, did he?

22   A.    No.

23   Q.    Let's look at the next one, potential for injury.

24   Potential for injury to citizens, officers, and suspects.  Let's

25   start with citizens.

1      At that point, at the point that Officer Campbell went

2   hands on, there were no -- I recognize that Mr. Monroe and all

3   three officers were citizens of the United States.  You

4   understand this word "citizens" here to refer to civilians,

5   right?

6   A.   Correct.

7   Q.   All right.  At the time that Officer Campbell went hands

8   on, there were no civilians or citizens in the apartment,

9   correct?

10  A.   No.  Correct.

11  Q.   So there were -- at that point, at the time that Officer

12  Campbell went hands on, there was no danger of any injury to any

13  of the civilians?

14  A.   Correct.  The officers, not civilians.

15  Q.   Oh, I understand that.  We are just doing the --

16  A.   Okay.

17  Q.   -- civilians for the time being.

18       Mr. Monroe did not brandish a weapon?

19  A.   He did not.

20  Q.   You did not see him have a weapon?

21  A.   I did not.

22  Q.   None of the police was injured?

23  A.   No.

24  Q.   There was no threat by Mr. Monroe to injure anybody?

25  A.   No.

1  Q.   Risk of escape.  The next one is risk or attempt of the

2  suspect to escape.

3       Mr. Monroe did not attempt to escape, did he?

4  A.   No.

5  Q.   And there were three police people in front of Mr. Monroe

6  at the door, correct?

7  A.   I don't -- I don't think all three were directly in front

8  of the door.  We were in the room.

9  Q.   All right.  Fine.  So you were all within a couple of feet

10 of Mr. Monroe?

11 A.   Sure.

12 Q.   And you were all armed?

13 A.   Yes.

14 Q.   And had tasers?

15 A.   I did not have a taser.

16 Q.   The other two did.

17 A.   I don't know if they both did or just Officer Campbell.

18 Q.   Fair enough.  So -- and Mr. Monroe never attempted to

19 escape?

20 A.   No.

21 Q.   Next one:  Knowledge, training and experience of the

22 officer.  All three officers were experienced?

23 A.   Yes.

24 Q.   They all were trained?

25 A.   Yes.

1  Q.   And they knew how to do their jobs?

2  A.   Yes.

3  Q.   Officer subject consideration such as age, size and

4  relative strength.  All three of you were in reasonably good

5  shape?

6  A.   Sure.

7  Q.   Because that was your job, and Mr. Monroe was 5'8" and

8  270 pounds?

9  A.   Yes.

10 Q.   And to be charitable, not in the greatest shape to your

11 observation?

12 A.   He is a large fellow.

13 Q.   I will go with that.

14      Let's go to the next one.  Seven, other environmental

15 concerns or exigent circumstances.  There weren't any, were

16 there?

17 A.   There was, actually, yeah.  I would say what Officer

18 Campbell alluded to is Mr. Monroe owned that bathroom.  We

19 didn't know what was in there.  We had no idea what was inside

20 that bathroom.

21 Q.   And Mr. Monroe didn't make any moves --

22 A.   He did not.

23 Q.   -- in the bathroom --

24           (Reporter clarification)

25           THE WITNESS:  He did not.

1  Q.   None of the officers felt it necessary to draw a weapon?

2  A.   No.

3  Q.   And you didn't wait to see whether Mr. Monroe could be

4  voluntarily arrested after he had had his say?

5  A.   We gave him numerous commands to put his hands behind his

6  back.  We did wait.

7  Q.   That's not my question again, lieutenant.

8       My question was:  You didn't wait to see whether, after he

9  had his say about why he hadn't done anything wrong, you

10 couldn't just arrest him?

11 A.   Well, he didn't end his say, as you are speaking.  He just

12 kept going on.  He did not ever comply to the commands.

13 Q.   And he just kept going on, and it was at that point that

14 Officer Campbell went quote-unquote hands on?

15 A.   Correct.

16          MR. GREENBERG:  I have nothing further of Lieutenant

17 Kaye.

18          THE COURT:  Mr. Pitcoff?

19          MR. PITCOFF:  Thank you.

20          And if we can keep that exhibit up on the board,

21 please?

22 CROSS-EXAMINATION

23 BY MR. PITCOFF:

24 Q.   Lieutenant, I want to just ask you about that use of force

25 exhibit you were just questioned on and go right back to

1  page 35, where Roman numeral V, "determining the objective

2  reasonableness of force."

3      If you wouldn't mind going to number one when you get a

4  chance.  The first factor that the guidelines mention is the

5  severity of the crime or circumstances.

6      We had heard earlier that violating an order of protection

7  is a mandatory arrest.  Can you describe the nature of orders of

8  protection?

9  A.  Well --

10          MR. GREENBERG:  Excuse me.  Objection.  Counsel is

11  leading his witness.

12          THE COURT:  All right.  I don't think it's leading his

13  witness.  Overruled.

14          THE WITNESS:  Orders of protections are given to

15  usually victims of a crime, and in my experience, a lot of these

16  are domestic violence situations where the victim is either

17  abused, and the Court orders an order of protection for that

18  person to protect them.  And I know in the Town of Haverstraw

19  one of our major crimes -- not necessarily crimes -- is one of

20  our major calls is domestics.  We deal with a lot of them, and

21  we do deal with a lot of orders of protections.  And again, it's

22  all to protect the victims.

23  Q.  Can you describe for us, are there any particular dangers

24  that officers face when responding to domestic calls, and

25  specifically when they have to enter into a home?

1  A.   Yes.  Again, domestics are some of the most violent calls

2  that we go on.  You never know what you are going to get with

3  domestics.  Everything that could be used as a weapon.  I mean,

4  I have had toasters thrown at me.  It runs the gamut.  I mean,

5  anything could be used as a weapon.  So we use the utmost

6  caution, and again, we try and remove the victim from the scene

7  to make sure they are safe.

8  Q.   And as it goes to the number one, severity of the crime,

9  would you characterize violating a court order of protection as

10 a severe crime?

11 A.   Yes.  Most definitely.  That, and what we had of the

12 knowledge going there of the woman screaming.  Together with

13 that, we were, you know, just making sure everything was okay at

14 the scene.

15 Q.   Now, number two is the level and immediacy of the threat or

16 resistance posed by the subject.

17      Now, how many times was Mr. Monroe told to come out of that

18 bathroom with his hands up?

19 A.   I would say it was probably close to a half dozen before he

20 opened the bathroom door, and then another half a dozen when the

21 door was opened.

22 Q.   And you discussed earlier the close confines of that

23 bathroom.  How was that relevant to this discussion?

24 A.   Well, when Officer Campbell went to get Mr. Monroe into

25 custody, and he went into the bathroom, it was very hard for

1  Officer Santiago to get in there to assist him.  I mean, it was

2  such a tight bathroom.  So we had to get him out in order to get

3  him into custody.

4  Q.  And then number six, you were asked questions about the

5  subject considerations such as age and size and relative

6  strength.

7      You mentioned that the plaintiff, Mr. Monroe, was a big

8  man.  Would you describe what he was doing with his arms as he

9  was being told to come out of the bathroom with his hands behind

10 his back?

11 A.  I would just say flailing his arms.  Again, he was pleading

12 his case, why we shouldn't be in the house, why he has every

13 right to be in there, and he's not doing anything wrong.  That

14 was his main argument to us.

15 Q.  And I want to make it clear.  You said his hands were up.

16 Do you mean his hands were up straight in the air like this?

17 A.  No, they weren't.  He was talking with his hands, again,

18 pleading his case to us, flailing his arms up and down.

19 Q.  At any time at all were his hands straight up in the air

20 during the entire encounter?

21 A.  Never.

22 Q.  And you had mentioned in paragraph 7, other environmental

23 conditions or exigent circumstances, and you mentioned him

24 owning the bathroom.  Can you just tell us what you meant by

25 that and whether that qualifies as an exigent environmental

1  condition or circumstance?

2  A.    Sure.  What I meant by environmental circumstances or

3  conditions is, is that when we went into the house initially, we

4  checked the one room that was open to us where he, Mr. Monroe

5  wasn't in.  We checked behind the bed, anything else in there.

6  We did not see him.

7        The only place he could be was in that bathroom, and we

8  hadn't checked that for any kind of weapon or anything like that

9  yet.  So we have no idea what was behind that door, and once he

10 opened it, we still couldn't see the entire bathroom.  So again,

11 that's what I meant by we didn't own that real estate, so we

12 didn't know.

13 Q.    Weren't these officers trained?

14 A.    They were trained, yeah.

15 Q.    So was there any danger -- did that alleviate the danger,

16 the fact that they were trained?

17 A.    No, it doesn't.

18 Q.    Why not?

19 A.    Again, it's just the unknown, what's behind that door.  I

20 have been on this job 26 years.  I've seen a lot of domestics go

21 bad because of somebody barricaded in a room or whatnot and use

22 anything as a weapon, and officers get hurt.  And that's one of

23 the conditions why Officer Campbell attempted to get him into

24 custody as soon as possible, because the longer this goes, the

25 worse it's going to get.

1  Q.   Did anyone use a weapon on Mr. Monroe?

2  A.   No.

3  Q.   Did you see Officer Campbell do anything other than what he

4  described to us earlier?

5  A.   No, he did not.

6  Q.   Now, I want to just go back.  Can you tell us about your

7  educational history, briefly?

8  A.   I also graduated from North Rockland High School, which is

9  in the Town of Haverstraw.  That's where I grew up.  I went to

10 college, got an associate degree.  Shortly after, I ended up

11 starting my career with the NYPD back in 1997.  I moved.  I

12 transferred to the Town of Haverstraw in October of 2000; became

13 an officer there.  In June of 2005, I was promoted to sergeant.

14 2008, I took over as a sergeant in the Street Crime Unit, which

15 was tasked with narcotic crimes and any kind of quality of life

16 type offenses in the Town of Haverstraw.

17        2013, within the Street Crime Unit I was promoted to

18 detective sergeant.  In 2017, I got promoted to lieutenant.  I

19 have been on the Rockland County REACT Team, which is the Rescue

20 Entry and Counterterrorism Team, which is basically the county

21 SWAT team since its inception in 2003.  Currently, I stopped as

22 an operator on that team in 2017 when I got promoted to

23 lieutenant.  I am currently it's called a SOC member, which is

24 the Standard and Oversight Committee.  We are charged with

25 basically training.  We guide the training of the team, and when

1  any kind of callouts, whether it's a barricaded subject or

2  narcotic warrant or search warrant, whatever it is, we respond

3  to command posts, and we give the direction on what the team is

4  going to take on that scene.

5  Q.   Now, I want to take you to that night.

6       Where were you when you heard about this call at Captain

7  Shankey Drive?

8  A.   I was on my way to 7-Eleven, actually, to get a tea.

9  Q.   Okay.  And how far away was that from the residence of

10 Captain Shankey Drive?

11 A.   Two minutes.

12 Q.   Two minutes?

13 A.   Approximately two minutes.

14 Q.   Okay.  And were you required to go?

15 A.   No.

16 Q.   Can you tell us why you went?

17 A.   I went because I was right around the corner from the call,

18 and I heard the call was dispatched as a check-the-welfare, and

19 a woman screaming in the background.  So I went just as an extra

20 body to assist the two officers that were on the scene.

21 Q.   Okay.  And did you have a conversation with Officer

22 Campbell and/or Officer Santiago when you got there?

23 A.   Yeah.  Actually, Officer Santiago.

24 Q.   And can you just tell us what was said?

25 A.   Real quick, he -- I don't have a computer in my car.  When

1  he showed up, he received a call as well.  He checked the

2  computer system with the address and saw that Michael Monroe had

3  a full stay-away order of protection, and he related that to me

4  as well.

5  Q.   And what did you do next?

6  A.   Officer Santiago or Officer Campbell, again, knocked on the

7  door.  We tried to make contact with Mrs. Locke.  They walked

8  around the side to try and see if they could see in the windows.

9  Several knocks, several looks, we had no response at the door.

10 Q.   What happened next?

11 A.   At some point the landlord comes down.  She heard us

12 knocking.  She asked us, you know, what was going on, and we

13 said we were responding here for a call.  Do you know if anyone

14 is inside the residence?  She said, "I heard yelling.  I don't

15 know if they are still there now, but they are always fighting."

16 That's what she kind of relayed to us.  With that, she went back

17 inside.

18 Q.   So after she said that she heard yelling, and then did the

19 dispatch also mention yelling?

20 A.   Yes.  They mentioned a woman screaming, unknown problem.

21 Q.   Okay.  What happened next?

22 A.   We proceeded to knock on the door again, to which point

23 Mrs. Locke came to the door.

24 Q.   And can you tell us what was said?

25 A.   The officers asked her if everything was okay, if there is

```
 1  any problem there.  She came to the door.  She was very flushed.
 2  She was red-faced.  She appeared she had been crying, and she
 3  related to us that there was no problem at the residence, and
 4  she was very hasty with us, the way she answered us, and just
 5  kind of went back into the house quick and closed the door.
 6  Q.   So at that point, why didn't you just leave?
 7  A.   None of us felt right.  I mean, the hairs on the back of
 8  our necks stood up.  We just weren't -- we felt something was
 9  wrong; she wasn't being truthful with us.  We didn't know if he
10  was in there.  We didn't know what was going on.
11       So we were talking about our options and what had just
12  occurred, and within a minute or two, the caller, Jamal Johnson,
13  actually came up.  Again, as Officer Campbell -- he screeched
14  his tires up, left the door open, and just ran up and started
15  yelling.  He was asking us why we were just standing there.  He
16  is like -- he is -- again, he said, "Mr. Monroe, he is going to
17  kill her.  He's going to kill her.  You got to get her out of
18  there."  And he began to bang on the doors and the windows.
19  Q.   Now, did he say he heard Mr. Monroe give a death threat?
20  A.   No.  He just -- no.  He just said, "He is going to kill
21  her."
22  Q.   Okay.  So that was Jamal Johnson telling you guys that he
23  thought that that was going to happen; is that how you took it?
24  A.   Correct.  Yes.
25  Q.   Okay.  So is that a death threat under the penal code?
```

1  A.    I'm not sure what you mean about that.  It's not a crime.

2  Q.    Right.  Okay.  And what did Jamal Johnson do after he

3  pulled up and said, "He is going to kill her"?

4  A.    He kept banging on the doors, and eventually she came out

5  again, and she was crying.  She went into his arms, Jamal, and

6  he kind of whisked her away, but before she did, one of the

7  officers asked her if he was in the house.  She acknowledged he

8  was, Mr. Monroe was in the house, and that's when we went in.

9  Q.    Now, we heard earlier when you went in, did you see Mr.

10 Monroe?

11 A.    Not initially, no.

12 Q.    Okay.  And eventually, tell us what happened.

13 A.    I believe Officer Campbell went in first, and when he

14 entered the house, he went towards the left.  Officer Santiago

15 went in straight, and I went in lastly.

16 Q.    Okay.  And we heard mention of a bathroom door being shut.

17 Eventually, did that become the focus?

18 A.    It did, yes.

19 Q.    And was the light in the bathroom on or off at that time?

20 A.    I don't recall.

21 Q.    Okay.  And what was said while the bathroom door was shut?

22 A.    Officer Campbell was not yelling.  He was asking Michael to

23 come out with his hands up; that he was under arrest.

24 Q.    How many times did he say that while the door was still

25 shut?

050923PMH                   Kaye - Cross - Pitcoff

1  A.   Probably half a dozen.

2  Q.   Okay.  And eventually, did Mr. Monroe open the door?

3  A.   He did.

4  Q.   And what was discussed at that point?

5  A.   Between Officer Campbell?  Officer Campbell was just

6  directing Mr. Monroe to put his hands behind his back; that he

7  was advising him he was under arrest.

8  Q.   Did he tell him to do anything else other than put his

9  hands behind his back?

10 A.   He did not.

11 Q.   Did he ever tell him to come out of the bathroom?

12 A.   Oh, I'm sorry.  Yes.  Yes.

13 Q.   And how many times did he say that?

14 A.   Again, once the door was open, about half a dozen.

15 Q.   And did Mr. Monroe voluntarily come out of the bathroom?

16 A.   He didn't.

17 Q.   Now, you were asked questions earlier about giving

18 commands.  Can you tell us why -- withdrawn.

19      Was a command from you necessary for Officer Campbell to

20 remove the plaintiff from that bathroom?

21 A.   No.

22 Q.   Can you explain, even though you are the commanding

23 officer, why it wasn't necessary?

24 A.   Again, these guys are well-trained officers.  They are

25 actually both SWAT officers as well.  And again, they felt that

1  as this went on, this was only going to get worse, and they

2  wanted to get him in custody as soon as possible.

3           MR. GREENBERG:  Your Honor, I object and move to

4  strike about what they felt.

5           THE COURT:  I'll sustain the objection.

6           Ask a different question, Mr. Pitcoff, please.

7           MR. PITCOFF:  Sure.

8           THE COURT:  We're not having a discussion.  We are

9  answering lawyers' questions.

10           The jury should disregard the comment about what the

11  officers felt.

12  Q.  Can you tell us why -- you were asked questions earlier

13  about why you did not intervene and stop Officer Campbell.  Can

14  you tell us why that was?

15  A.  The amount of force that they used on Mr. Monroe was

16  proper.  There was no need to intervene at all.  I would have

17  done the same thing in their situation.

18  Q.  At any time did Officer Campbell ever strike Mr. Monroe

19  with his hand?

20  A.  No.

21  Q.  Did he ever use a taser on him?

22  A.  No.

23  Q.  He never used a gun?

24  A.  No.

25  Q.  What is an asp?

1   A.   An asp is a collapsable baton.  It's a metal stick that you

2   expand that can be used as a nonlethal control tool.

3   Q.   And was the plaintiff ever struck with an asp?

4   A.   No.

5   Q.   What is OC spray?

6   A.   Pepper spray, Mace.

7   Q.   I'm sorry.

8   A.   Mace.

9   Q.   And did both Officer Santiago and Officer Campbell have an

10  asp with them?

11  A.   I know Officer Campbell did.  I'm not sure about Officer

12  Santiago.

13  Q.   What about OC spray?

14  A.   I believe they both have that.

15  Q.   And did anybody use either an asp or OC spray on --

16  A.   No.

17  Q.   -- Mr. Monroe?

18       And what happened when Officer Campbell went into that

19  bathroom?

20  A.   Again, he attempted to get Mr. Monroe into custody.  They

21  both went back into the sink, at which point the pipes broke,

22  and then Officer Santiago assisted Officer Campbell with getting

23  Mr. Monroe into custody.

24  Q.   Okay.  By the way, was he -- at any point after he was put

25  in cuffs, was he patted down?

1  A.   After he was put in cuffs, yes.

2  Q.   And when we say "patted down," what does that mean?

3  A.   He was checked for weapons.

4  Q.   Okay.  And you said that was after he was in cuffs.  Was he

5  ever checked for weapons before he was in cuffs?

6  A.   No.

7  Q.   What happened next?

8  A.   Mr. Monroe was placed in handcuffs, and he was let out by

9  myself and Officer Santiago to the car.

10 Q.   By the way, before we get to that, did Officer Campbell

11 ever stomp on the plaintiff's foot?

12 A.   No.

13 Q.   And as he was being led out in handcuffs and brought to the

14 car, who was actually doing that?

15 A.   Myself and Officer Santiago.

16 Q.   And can you describe how you did that?

17 A.   Yeah, I -- we were both on each side of him and walked him

18 right to the door, and then exited the front door, and I could

19 show you the way we walked if you want to bring up that picture.

20 Q.   Why don't we -- and I can have Mr. Foster do it -- but

21 while he works on that, thank you, while he works on that, let's

22 keep going and go back to the photograph.

23 A.   Okay.

24 Q.   What happened, if anything, when you got him out of the

25 house on the way to the car?

1  A.   So once we exited the house, Mrs. Locke and Jamal Johnson

2  were -- again, they were on the hill on the grassy area off the

3  driveway.  We proceeded to walk Mr. Monroe past them, and Mr.

4  Monroe and Mr. Johnson were just cursing at each other.  "I'll

5  get you.  I'll kick your ass," all of that stuff.

6       We proceeded to walk Mr. Monroe to the car, at which point

7  Officer Santiago put him in the car.  And again, Mr. Monroe was

8  constantly trying to pull away to yell at Mr. Johnson who was

9  behind him.

10 Q.   Now, you mentioned that he was put in the car.  Was the

11 plaintiff ever slammed against the car before he was put in?

12 A.   No.

13 Q.   And were you there?

14 A.   I was there, yeah.

15 Q.   Okay.  And can you describe how he was put in the car?

16 A.   He -- just for lack of a better term -- he had one hand

17 maybe on his back and escorted him into the car.  I mean,

18 that's -- he is a big guy.  He turned him around; had him sit

19 down, and then he was in the car.

20 Q.   Did anybody push him across the entire length of the back

21 seat into the other door?

22 A.   No.

23 Q.   If we can pull up now Exhibit L2?

24      And just can you describe for us using L2 where Ms.

25 Locke -- maybe we can zoom in a little more -- where Ms. Locke

 1  and Jamal Johnson were standing when you brought Mr. Monroe out

 2  of the house?

 3  A.   They were on the top of that retaining wall, probably in

 4  the area of the mailbox right there.

 5  Q.   Okay.  So the retaining wall -- the retaining wall you

 6  referred to, is that the retaining wall?

 7  A.   Yes.

 8  Q.   And where were they compared to that?

 9  A.   That mailbox, standing in that general area.

10  Q.   Okay.  Am I pointing to it now?

11  A.   Yes.

12  Q.   Okay.  And what did you see them doing at that time?

13  A.   She was in his arms, Mr. Johnson's arms, and Mr. Johnson

14  was yelling back and forth with Mr. Monroe.

15  Q.   You talked -- you were asked questions earlier about

16  whether there was testimony in the case about resisting arrest.

17  Let's go back to the order of protection.

18       Does the officer have any discretion in deciding to arrest

19  someone for an order of protection -- violation of a court order

20  of protection?

21  A.   For that, no.

22  Q.   And when you say "for that," what are you referring to?

23  A.   For the order of protection, no.

24  Q.   What about resisting arrest?

25  A.   Yes.

```
 1  Q.   And can you describe the discretion that officers have?
 2  A.   Again, there's multiple charges.  They have the option.
 3  They can charge the higher charge, and if the DA wants to add
 4  charges, they can always do that at a later date.
 5  Q.   And as you walked Mr. Monroe to the car, did you ever see
 6  him limp at all?
 7  A.   No.
 8  Q.   Did you ever see him limp at any time?
 9  A.   No.
10          MR. PITCOFF:  Thank you.  No further questions.
11          MR. GREENBERG:  Nothing further, Your Honor.
12          THE COURT:  All right.  Lieutenant, you may step down.
13          (Witness excused)
14          Mr. Greenberg?
15          MR. GREENBERG:  I would like to admit some exhibits if
16  that's all right with the Court.
17          THE COURT:  I didn't hear you.
18          MR. GREENBERG:  I'm sorry, Your Honor.  I would like
19  to publish some exhibits with the Court's permission.
20          THE COURT:  All right.  What do you have in mind?
21          MR. GREENBERG:  Some medical records.  So first --
22          THE COURT:  They are in evidence.  So --
23          MR. GREENBERG:  They are in evidence.  And I would
24  like the jury to see them before I go ahead to Mr. Monroe.
25          THE COURT:  Well, I will let you go along with this --
```

1  I'll go along for with this for a minute or so.  Let's see what

2  you got in mind.

3          MR. GREENBERG:  It's going to take longer than a

4  minute or so.  So --

5          THE COURT:  No, we are not going to read exhibits that

6  are in evidence.  You can do that in your close.

7          MR. GREENBERG:  Very well, Your Honor.  In that case,

8  I won't do that now.  I will do it at a later time.

9          I will call Mr. Monroe instead.

10          THE COURT:  All right.

11          THE DEPUTY CLERK:  Step into the box.  Remain

12  standing, and raise your right hand.

13  MICHAEL J. MONROE, having been duly sworn, testified as follows:

14          THE DEPUTY CLERK:  Please be seated.  Please state

15  your full name for the record and spell it.

16          THE WITNESS:  Michael Monroe, M-I-C-H-A-E-L,

17  M-O-N-R-O-E.

18  DIRECT EXAMINATION

19  BY MR. GREENBERG:

20  Q.  Mr. Monroe, where do you live?

21  A.  Excuse me?

22  Q.  Where do you live?

23  A.  Now?

24  Q.  Yes.

25  A.  I live in Wilkes-Barre, Pennsylvania.

1  Q.   And how old are you?

2  A.   Forty-six.

3  Q.   For how long have you been living in Wilkes-Barre?

4  A.   About seven, eight months.

5           (Reporter clarification)

6           THE COURT:  Pull the mic close to you, Mr. Monroe, and

7  just speak into it so the reporter can hear you.  She only hears

8  what's goes through the mic.  She's got the earphones on for a

9  reason.  All right?  Thank you.

10 Q.   Where were you living in November 2020?

11 A.   At 10 Captain Shankey Drive.

12 Q.   All right.  Now, Mr. Monroe, are you married?

13 A.   No.  I am a widow.

14 Q.   And do you have children?

15 A.   Yes, I do.

16 Q.   Did you -- do you know Jessica Locke?

17 A.   Yes, I do.

18 Q.   What was your relationship to Ms. Locke at the time of the

19 incident?

20 A.   She was my girlfriend.

21 Q.   I'm sorry.  You need to speak up because I'm having trouble

22 hearing you, too.

23 A.   She's my girlfriend.

24 Q.   Let me refer you to the night of November 6, 2020.  And we

25 are talking about the time up to the time you were arrested.

1  Where were you?

2  A.   At her apartment.

3  Q.   And who else was present?

4  A.   Jessica Locke.

5  Q.   Was there anyone else there?

6  A.   No.

7  Q.   Now, were you subject to the order of protection that we

8  looked at earlier that evening?

9  A.   Yes.

10 Q.   Why were you there, then?

11 A.   Because she called me and told me to meet her at the

12 apartment.

13            MR. PITCOFF:  Objection.  Hearsay.

14            THE COURT:  I will allow it.  It is hearsay, but I'll

15 allow it.  It's been answered already.

16            Let's try to stick to what you say, Mr. Monroe, and

17 not what she says.

18 Q.   Did you eventually plead guilty to violating the order of

19 protection?

20 A.   Yes.

21 Q.   And were you sentenced to imprisonment?

22 A.   Yes.

23 Q.   Have you served the sentence?

24 A.   Yes.

25 Q.   What are you doing now?

1   A.   Now?

2   Q.   Yes.  I don't mean this minute.  I mean, are you currently

3   employed?

4   A.   Yes.

5   Q.   Now, that evening did you -- did you do anything physical

6   to Ms. Locke?

7   A.   No.

8   Q.   Did you threaten to do anything physical to Ms. Locke?

9   A.   No.

10  Q.   Did you do any damage to the apartment?

11  A.   No.

12  Q.   Did you threaten to do any damage to the apartment?

13  A.   No.

14  Q.   What happened that evening -- withdrawn.

15       At some point that evening did you observe Ms. Locke

16  getting exercised, agitated?

17  A.   She was, yes.

18  Q.   What happened immediately before that she got agitated?

19  A.   She thought I was cheating on her.

20  Q.   By cheating on her, you mean what?

21  A.   Messing with another woman.

22  Q.   And did you overhear Ms. Locke calling somebody else at

23  that point?

24  A.   Yes.

25  Q.   Whom?  With whom was she speaking?

050923PMH                    Monroe - Direct - Greenberg

1  A.   To Mr. Johnson.

2  Q.   How do you know that?

3  A.   Because she said "Jamal."

4  Q.   Did you at the time know what Mr. Johnson's and Ms. Locke's

5  relationship was?

6  A.   Yes.

7  Q.   What was it?

8  A.   That was her best friend.

9  Q.   Now let's talk about the apartment.  The apartment was --

10  how many rooms were there in the apartment?

11  A.   It's just a studio.  It's just one open room.

12  Q.   And the bathroom?

13  A.   And the bathroom.

14  Q.   And what were the dimensions of the main room?

15  A.   Um, it's a bed area, kitchenette, and a small table.  There

16  was a small sofa towards the front of the apartment where the

17  window is, and microwave, toaster oven and sink.

18  Q.   About how big?  About how big was the main room?

19  A.   I can't exactly say, but no more than 10, 15, 10-by-15,

20  something like that.

21  Q.   Was there anyone -- anyplace in the main room for you to

22  hide?

23  A.   No.  None whatsoever.

24  Q.   Now, at some point you learned the police had entered the

25  apartment, right?

1   A.   Yes.

2   Q.   Where were you when the police entered the apartment?

3   A.   In the bathroom.

4   Q.   Why were you there?

5   A.   I was using the bathroom when she went to the door.

6   Q.   How many -- did you hear the police say anything?

7   A.   Initially, no.

8   Q.   Eventually, did you hear something?

9   A.   Yes.

10  Q.   What did you hear?

11  A.   They were -- called my name.

12  Q.   And how many times did they call your name?

13  A.   I can't say, but I did hear it once or twice, and that's

14  when I opened the bathroom door.

15  Q.   After you heard the police calling your name, what did you

16  do?

17  A.   I opened the bathroom door.

18  Q.   All right.  Now, we can't put this exhibit on the screen

19  yet because it's not yet in evidence, but Mr. Monroe, let me ask

20  you to look in the book at Plaintiff's Exhibit 11 for

21  Identification.  Are you with me, Mr. Monroe?

22  A.   Yes.

23  Q.   What is it?

24  A.   A diagram of the bathroom, a drawing of the bathroom.

25  Q.   Who drew the diagram?

1  A.   I did.

2  Q.   Does it fairly and accurately represent the layout of the

3  bathroom in the apartment at 10 Captain Shankey Drive?

4  A.   Yes, sir.

5        MR. GREENBERG:  Your Honor, I offer Exhibit 11 in

6  evidence.

7        MR. PITCOFF:  Objection, Your Honor.  Can I have voir

8  dire of the witness on this exhibit?

9        THE COURT:  Okay.  Well, we are talking about two

10 different things.  You want to voir dire.

11       I assume, Mr. Monroe, on the day of these events this

12 is an accurate depiction of the bathroom, right?  In other

13 words, the bathroom didn't change?

14       THE WITNESS:  Didn't change, no.  Yes.  That's how it

15 always is.

16       THE COURT:  I'm sorry?

17       THE WITNESS:  That's how it's always.

18       THE COURT:  Right.  You want to voir dire, Mr.

19 Pitcoff, you may.

20       MR. PITCOFF:  Sure.

21 VOIR DIRE EXAMINATION

22 BY MR. PITCOFF:

23 Q.   Sir, the diagram that you are looking at now, you said you

24 drew this diagram?

25 A.   Yes, sir.

1  Q.  When did you draw it?

2  A.  I don't remember.

3  Q.  Was it close in time to the date of the incident or was it

4  recently or something else?

5  A.  No.  It was after the incident.

6  Q.  No, I understand that, but was it close in time to when the

7  incident happened or was it recently from today or something

8  else?

9  A.  It was -- I don't understand.  It wasn't when the incident

10  happened, and it wasn't like last week, no.

11  Q.  Yes.  So was it a year after?  Was it --

12  A.  Possibly.

13  Q.  Okay.

14  A.  A few months or a year.  I would say a year after.

15  Q.  Is it fair to say that you never went back to this

16  residence --

17  A.  No.

18  Q.  -- after that date?

19  A.  No.

20  Q.  That's correct?

21  A.  Yes.

22  Q.  Okay.  And am I correct that this is not to scale?  In

23  other words, you didn't measure everything out?

24  A.  No.

25  Q.  Okay.  So this is -- you are just offering this to show

1  generally where everything was?

2  A.    Yes.

3          MR. PITCOFF:  Okay.  With that proviso, I don't have

4  an objection.

5          THE COURT:  All right.  Exhibit 11 is now in evidence.

6          (Plaintiff's Exhibit 11 received in Evidence)

7          MR. GREENBERG:  Thank you, Your Honor.

8          Can we show Exhibit 11 to the jury, please?

9          THE COURT:  Sure, of course.

10         MR. GREENBERG:  Would you please, Mr. Tiwari?

11  DIRECT EXAMINATION (CONT.)

12  BY MR. GREENBERG:

13  Q.    Is there -- so can you just describe what's -- there we go.

14  Can you describe what's depicted on the drawing?

15  A.    It's the entrance to the bathroom.  To the right of the

16  entrance to the bathroom is a little space where the garbage can

17  was, and there was a two-burner electric stove, and then it's

18  the bathroom door, which opens into the bathroom.

19         Behind the bathroom door would be the toilet.  Directly in

20  front going into the bathroom is the bathroom sink, and to the

21  right is the standalone shower.

22  Q.    And the door hinges on the door were on which side looking

23  at it from the outside of the bathroom?

24  A.    The door -- the hinges are on the left-hand side.

25  Q.    All right.  So you said that the -- going back -- you can

1    take that down, if you would, please.

2        Going back to where we were, you said that the police

3    called out your name, and you opened up the door.  How many

4    police people did you see?

5    A.    Three.

6    Q.    And were the police in uniform?

7    A.    Yes.

8    Q.    Were they armed?

9    A.    Yes.

10   Q.    Did you have a weapon?

11   A.    No.

12   Q.    At the time you saw the police, to your knowledge, was

13   anyone else in the apartment?

14   A.    No.

15   Q.    After you opened -- after you opened the bathroom door,

16   what did you do?

17   A.    I had my hands in the air.

18   Q.    Why did you do that?

19   A.    Because I'm scared.  There's three officers standing in the

20   -- the bathroom is tiny.  The apartment is tiny, and there is no

21   room for movement.  So I'm a big guy.  I just wanted to avoid

22   any other type of situation.

23   Q.    Did you ever put your hands down?

24   A.    No.

25   Q.    Why not?

1  A.   Because, again, I just wanted to avoid any type of

2  altercation or situation.

3  Q.   Now, where were the police standing?

4  A.   Officer Campbell was at the doorway of the bathroom, and

5  behind him where the sink and the microwave and the toaster oven

6  stand is, that's where Lieutenant Kaye and Officer Santiago were

7  standing.

8  Q.   Just to clarify, was the sink near Officer Santiago and

9  Officer Kaye the sink in the bathroom or the sink the kitchen?

10  A.   In the kitchen.

11  Q.   Where were you standing?

12  A.   I was on the other side of the doorway in the inside of the

13  bathroom.

14  Q.   And relative to the door, were you over to one side or in

15  the middle or where?

16  A.   Centered in the doorway.  You really can't stand to one

17  side or the other.

18  Q.   How much distance was there between you and the sink?  I'm

19  talking about the bathroom sink now.

20  A.   Maybe about 12 inches or foot, a foot and a half at the

21  most.

22  Q.   And how much room was there to either side of you as you

23  were standing in the doorway?

24  A.   Standing in the doorway, like I said, the bathroom door

25  opens in, and it bangs against the toilet.  So there is only

1  like maybe six or seven inches from one elbow.  On the left-hand

2  side would be the opening of the standalone shower.

3  Q.   And when you say the left-hand side, are you talking about

4  from inside the bathroom or outside the bathroom?

5  A.   Right, if I'm facing -- if I'm standing in the bathroom

6  facing out, the door would be -- opens to the inside and would

7  be on my right-hand side, and the shower is on my left.

8  Q.   Did you come out of the bathroom?

9  A.   I couldn't.

10 Q.   Why not?

11 A.   Because Officer Campbell was standing in the doorway.

12 Q.   Did Officer Campbell do anything after you opened the door?

13 A.   I couldn't --

14 Q.   I am sorry.  You have to talk up.  My hearing is --

15 A.   He -- no, it's not like -- it's like a charge, like a

16 tackle, pushed.

17 Q.   Before we get there, did he do anything else before he went

18 hands on?

19 A.   No.  Because you can't -- you can't fit in the bathroom.

20 He doesn't fit in the doorway.

21 Q.   When you say "he doesn't fit in the doorway," why do you

22 say that?  What's the basis for that?

23 A.   If I am standing in the doorway, there is no way that two

24 people can go, either -- even if I turn sideways, neither one of

25 us are going to fit.  We are not going to fit.  The door was too

1  small.

2  Q.  So the door is open; you are standing there.  What were you

3  doing in terms of talking to the police?

4  A.  I had my hands in the air, and pretty much it's a low

5  ceiling, so my hands were up against the ventilation that was in

6  the bathroom.

7  Q.  Were you talking to the officers?

8  A.  Yes.

9  Q.  What were you saying?

10  A.  I was asking, what was the problem?  And how -- why were

11  they there?  Why were they in the apartment?

12  Q.  Was there ever any time when they gave you an order, and

13  you refused to follow it?

14  A.  No.

15  Q.  What happened after you're standing there, you're talking

16  to the officers; what, if anything, did Officer Campbell do

17  next?

18  A.  That's when the charge came, pretty much.  He charged me

19  into the bathroom.

20  Q.  Explain what you mean by "charged you into the bathroom."

21  A.  It's -- like I said, it's like a tackle, like a shoulder

22  tackle.  It's like one shoulder -- one shoulder up against the

23  body, like the head on one side, shoulder on one side, and wrap

24  around and pushed me into the bathroom.  Like I went backwards

25  into the bathroom.

1  Q.   How much time passed from the time you opened the door
2  until Officer Campbell threw his shoulder into you?
3  A.   It was quick, but I can't really pinpoint an exact amount
4  of time, but it was quick.
5  Q.   And what happened after Officer Campbell threw his shoulder
6  into you?
7  A.   I slammed into the sink.  The pipes broke.  The water
8  squirted all over the bathroom.  I'm still -- now I'm yelling.
9  I'm not resisting.  My hands are still in the air.  It was like
10 a tussle type of thing going on, like a dance almost.  I'm
11 telling the lieutenant or Officer Santiago, one of them, to get
12 a hold of Officer Campbell, to get me out of the bathroom pretty
13 much, and nothing happened.  I still had my --
14 Q.   Why did you want to get out of the bathroom?
15 A.   Because at one point the -- next to the shower was a socket
16 was the shower had flooded inside the wall prior to this, and
17 the sheetrock was like wet.  So the landlord had cut out the
18 sheetrock from the -- around the wall, and the socket was
19 exposed with the wiring from inside the wall exposed, and I did
20 not want to go on the floor next to some water shooting out of
21 the -- from the piping with an exposed socket and wiring on the
22 floor.
23 Q.   Did anything happen to the light fixture in the bathroom?
24 A.   That was -- it was bent, twisted sideways.  It didn't
25 break, but it was just bent and twisted.

1  Q.   Did you or, to your knowledge, did Officer Campbell ever

2  make direct contact with the pipes that broke?

3  A.   No.   I did because I was in-between the sink and the -- and

4  the doorway.

5  Q.   How did the pipes break?

6  A.   When I was slammed backwards into the sink, that broke the

7  piping on the sink.

8  Q.   Did you ever attack any of the police people?

9  A.   No.

10 Q.   Did you threaten to attack any of the police people?

11 A.   No.

12 Q.   Did you fight back against Officer Campbell?

13 A.   No.

14 Q.   Did you refuse to be arrested?

15 A.   No.

16 Q.   How did you get out of the bathroom?

17 A.   Eventually, when -- it was either the lieutenant or Officer

18 Santiago intervened and one had my arm and pulled me out of the

19 bathroom.

20 Q.   Did either of the police -- other people, the police people

21 other than Officer Campbell actively assist Officer Campbell?

22 A.   At the time of the shoving, no.   After the piping and

23 everything was broken and the other tussling things were going

24 on, yes.

25 Q.   Did either of them try to stop Officer Campbell?

1  A.   No.

2  Q.   Were there any injuries to any of the police?

3  A.   No.

4  Q.   Were you injured as a result of events in the bathroom?

5  A.   There was like a bruise on my back, but it wasn't like I

6  was hurt, but the stomping of my foot.

7  Q.   What do you base the statement that your foot was stomped

8  on?

9  A.   Because it was.  I don't know who stomped on it, but

10 someone stomped on it, and when I was transported to the county

11 jail, I spoke with the doctor.  I said, my foot was stomped on

12 the night before, and he ordered an X-ray.  It came back and the

13 X-ray -- he said that my toe was fractured.

14 Q.   Were you handcuffed?

15 A.   When?

16 Q.   No.  I am asking, were you handcuffed that night?

17 A.   Yes.

18 Q.   Did you ever refuse to be handcuffed?

19 A.   No.

20 Q.   When and how were you handcuffed?

21 A.   I don't know exactly when.  When I was pulled out of the

22 bathroom, I was handcuffed with one set of handcuffs, not two.

23 Q.   And after you were handcuffed, what happened next?

24 A.   Officer Santiago walked me out of the apartment and to the

25 truck, to his truck.

050923PMH                    Monroe - Direct - Greenberg

1  Q.   How much time elapsed?  How much time passed between your

2  being handcuffed and your being escorted to Officer Santiago's

3  car?

4  A.   It was also again quick.  It was like maybe like two

5  minutes, something like that, a minute or two.

6  Q.   Did anything happen on the way to the car?

7  A.   Yeah.  As he was -- as Officer Santiago was walking me up

8  through the parking lot, through the driveway to his truck at

9  the end of the driveway, me and Mr. Johnson were having words

10 going back and forth, yelling at each other, yes.

11       And then when I got to his truck, he slammed me into the

12 side of the truck.  He opened the door.  I was still yelling at

13 Mr. Johnson back and forth.  He told me to shut the fuck up.  He

14 told Mr. Johnson, "You are supposed to be helping us out.  Why

15 are you going back and forth with" -- and proceeded to get me

16 into the back seat of his SUV.

17 Q.   Did you try to get at or get to Mr. Johnson while you were

18 on your way to the car?

19 A.   No.

20 Q.   Why not?

21 A.   Because I was in handcuffs.  I was already arrested.  There

22 was no reason to fight.

23 Q.   Did Officer Santiago -- withdrawn.

24       Did you resist getting into the car when Officer Santiago

25 asked you to get in or pushed you in or put you in or however

1  you want to put it?

2  A.  No.  I -- I stepped up because it's an SUV.  It's not a

3  car, so I had to step up.  Sat down.  He made me like sit my

4  butt first with my feet outside and then twist inside to swing

5  my feet into the car, and as I was swinging my feet into the

6  back of the truck, I was still yelling back and forth with Mr.

7  Johnson, and that's when he shoved me across the seat.

8  Q.  Were you injured as a result of any episodes or any events

9  at or inside the car?

10 A.  As I slammed into the other side, the passenger side door.

11 It was, again, a bruise on my -- like a lower back bruise, but

12 it wasn't like I was -- I didn't have to go to the hospital for

13 it, no.

14 Q.  Let's --

15        MR. PITCOFF:  I am sorry.  I couldn't hear.

16        THE WITNESS:  I didn't have to go to the hospital for

17 it.

18        MR. PITCOFF:  Thank you.

19 Q.  All right.  Now let's talk about what happened at the

20 station house.  So Officer Santiago drove you to the station

21 house?

22 A.  Yes.

23 Q.  And what happened after you got there?

24 A.  He pulled into the back of the station.  Got out.  He

25 walked me inside.  You know, I said I wanted to see a doctor.

1  That was just a conversation as we were walking into the back of

2  the police station.  I was handcuffed to a little blue bench in

3  the processing area and waited to be processed.

4  Q.  After you were processed, what did you do that evening?

5  A.  I was in a holding cell.

6  Q.  What did you do in the holding cell?

7  A.  I slept.

8  Q.  Why did you do that?

9  A.  There was nothing else to do.  I had to wait for the

10 transportation to the county jail.

11 Q.  When were you first seen by a medical professional?

12 A.  The next day when I was transported to the county jail.

13 Q.  And when was the first X-ray taken of your foot?

14 A.  That morning -- that afternoon when I was brought into --

15 when I saw the triage at the county jail.

16 Q.  Let's talk about your medical conditions if we might.

17      First, do you have any medical conditions, chronic medical

18 conditions?

19 A.  I am a diabetic, a type 2 diabetic.

20 Q.  And do you take medicine for that?

21 A.  Yes, I do.

22 Q.  And is the diabetes under control?

23           MR. PITCOFF:  Objection.

24 Q.  Let me withdraw that and rephrase it.

25      Was the diabetes under control at the time of the injury?

050923PMH                    Monroe - Direct - Greenberg

1  A.   The A1C was a little high.

2  Q.   Now, before --

3         MR. PITCOFF:  I apologize.  I didn't hear that.  What

4  was a little high?

5         THE WITNESS:  My A1C.

6         MR. PITCOFF:  Thank you.

7  Q.   Before November 6, 2020, had you had any previous injury to

8  your feet?

9  A.   No.

10 Q.   Had you had any previous bone break in your feet, to your

11 knowledge?

12 A.   I have never broken a bone in my body ever.

13 Q.   After the -- after November 6, 2020, did you experience any

14 symptoms?

15 A.   Now it's just like with this changing of the seasons or the

16 changing of the weather, I get about pain in my feet now, well,

17 in my foot, rather.

18 Q.   I would like to -- and I appreciate that, and we will get

19 to now in a little while, but let's go back to then.

20      So I'm talking about right after November 6, 2020, and

21 after the incident in the bathroom, did you experience any

22 symptoms?

23 A.   Yes.  It was because of the fracture, the pain that I had

24 to take like some pain medicine and wear the boot thing that the

25 doctor gives you.

050923PMH                    Monroe - Direct - Greenberg

1  Q.   So how long did this hurt?  So you had pain in your foot if

2  I understand you correctly?

3  A.   Right.

4  Q.   For how long did that last?

5  A.   Couple of --

6  Q.   In other words, for how many days, months, whatever did the

7  pain in your foot --

8  A.   The pain didn't completely subside until about maybe three,

9  three and a half months.

10 Q.   Did you have any other symptoms?

11 A.   In my foot?  No.  It was just the pain and --

12 Q.   Have you had -- have you had symptoms in your foot more

13 recently?

14 A.   Yes.  That's what -- when I was speaking about with the

15 changing of the weather and the seasons and things like that.

16 Q.   And when that -- when you have such pain, what is it like?

17 A.   It's a deep ache, I would say, like an aching pain.

18 Q.   And what was the pain like after the original injury?

19 A.   That was more sharp.

20 Q.   Sharp pain?

21 A.   Yes.

22 Q.   Did you have any later injury to your feet?

23 A.   No.

24 Q.   Now, I want to go through treatment.  You received I think

25 you said something about something for your foot?  I mean, a

1  device for your foot.  Did I understand that correctly?

2  A.   From the doctor, yes.

3  Q.   What exactly was that?

4  A.   It's -- I guess they call it an orthopedic boot, I would

5  say.

6  Q.   How long did you wear that?

7  A.   About four months.

8  Q.   Did you have to take any medicine?

9  A.   Just the painkillers.

10  Q.   For how long?

11  A.   In the beginning it was pretty much every day.  Then after

12  like the third month, it was like a prn, like as necessary.

13  Q.   Did you have any restrictions on your activities?

14  A.   Yeah.  I wasn't allowed to go up stairs.  I couldn't run,

15  no jumping.  You know, no basketball, no extracurricular

16  activities like that.

17  Q.   How long did those -- for how long did those symptoms last?

18  A.   Oh, the doctor wouldn't let me play like any -- you know, I

19  couldn't do any sports or anything like that for at least six to

20  seven months because he said that regardless like if it heals,

21  you can always -- it will refracture itself because it's not

22  completely healed.

23         MR. GREENBERG:  I have no further questions of Mr.

24  Monroe at this time, Your Honor.

25         THE COURT:  All right.  I know you have a witness

1  situation.  What I was thinking we do is we go to 3:30, and then

2  give the jury a break, and put the doctor on.  That will give us

3  an hour and a half, and that should be plenty of time because

4  we've allocated time for that.  And then we will put the

5  plaintiff back on either today or tomorrow morning.

6           Does that work for you?

7           MR. PITCOFF:  Yeah.  That's fine.  So cross-examine

8  for 15 minutes and then a break?

9           THE COURT:  We will take a break.

10          MR. PITCOFF:  Sure.

11          THE COURT:  And then we will take the witness out of

12 turn.

13          All right, Mr. Greenberg?  You have agreed to that?

14          MR. GREENBERG:  Yes, Your Honor.

15          THE COURT:  Thank you.  All right.

16          Ladies and gentlemen, just so you understand, we are

17 going to take a witness out of turn just to help the scheduling

18 along.  So we will start with a little bit of cross.  We will

19 stop.  We will take a mid afternoon break.  We will bring the

20 other witness in, and we will continue with that witness.  I

21 think it may take most of the afternoon.  If it does, we will

22 pick up with Mr. Monroe first thing in the morning.  All right?

23 Just trying to accommodate the lawyers' and witnesses's

24 schedules.  You may proceed.

25 CROSS-EXAMINATION

1   BY MR. PITCOFF:

2   Q.  Good afternoon, sir.

3       I want to take you back to before the incident.  You were

4   staying at a hotel, correct?

5   A.  Yeah.

6   Q.  And you knew that there was a stay-away order of protection

7   that prevented you from going to Captain Shankey Drive, Ms.

8   Locke's residence, correct?

9   A.  Yes.

10  Q.  And despite the fact that you knew that there was a full

11  stay-away order of protection against you, you still decided to

12  go there, correct?

13  A.  Yes.

14  Q.  And you were concerned that you and Ms. Locke would get

15  into an argument, correct?

16  A.  It happens.

17  Q.  That was a concern of yours that night, correct?

18  A.  Not -- not that night.  It was just concerned, period.

19  Q.  Okay.

20  A.  Arguments happen.

21  Q.  Well, sir, do you remember testifying at a deposition in

22  this case where Mr. Foster asked you questions?

23  A.  The deposition?

24  Q.  Yes.

25  A.  Yes.

1  Q.   Okay.  I'm going to -- Mr. Foster is going to hand you,

2  with the judge's permission, a copy of your testimony.

3           THE COURT:  Okay.  You want to mark it for

4  identification as Defendant's Exhibit M?  So we have a nice

5  clean record, we will mark the deposition transcript as

6  Defendant's Exhibit M for ID.  Okay.

7           (Defendant's Exhibit M marked for Identification)

8           THE COURT:  Mr. Cangelosi, show it to Mr. Monroe.

9           Do you have one for me?  Thank you.  Just hand it up.

10 All right.

11          MR. PITCOFF:  And, Your Honor, maybe to save time if I

12 could also have Mr. Foster hand a copy of the 50-h hearing

13 testimony and have that marked?

14          THE COURT:  All right.  We are going to do two things

15 at once; is that what you would like to do?

16          MR. PITCOFF:  If we can or if Your Honor would prefer

17 otherwise.

18          THE COURT:  Why don't we do one thing at a time, and

19 see how we do with that --

20          MR. PITCOFF:  Sure.

21          THE COURT:  -- and then go to Item 2.

22 Q.   Okay.  Sir, you testified at a deposition where Mr. Foster

23 asked you questions, correct?

24 A.   Yes.

25 Q.   And you swore to tell the truth at that deposition?

1   A.   Yes.

2   Q.   And you did tell the truth, correct?

3   A.   Yes.

4   Q.   Now, I want to direct you to page 57 of your testimony.

5   You can tell me when you are there, and I'm going to be on

6   line 18.

7   A.   Okay.

8   Q.   QUESTION -- I'm going to read it to you, and then I'm going

9   to ask you a question.   Okay?

10       "QUESTION:  How did it come about -- how did it come about

11  to be that you ended up at 10 Captain Shankey Drive at Jessica

12  Locke's apartment?

13       "ANSWER:  She came to the hotel room, and we were hanging

14  out, and she didn't want me to spend any more money on a hotel

15  room, so she told me to come home.

16       "QUESTION:  And this was even though you still had the full

17  stay-away order in effect, you went back to her apartment?

18       "ANSWER:  Yes.  I was kind of like hesitant.  I didn't want

19  to do it because I said we are going to get into another

20  argument.  I'm going to get in trouble, but against my better

21  judgment, I still went."

22       Do you remember being asked those questions and giving

23  those answers?

24  A.   Yes.

25  Q.   Okay.

1  A.   Now.

2  Q.   So -- and the arguments -- you had had arguments with

3  Jessica Locke before, correct?

4  A.   Yes.

5  Q.   And those arguments had gotten physical before, correct?

6  A.   No.  Not every argument is physical.

7  Q.   I'm sorry?

8  A.   Not every argument is physical.

9  Q.   No, no.  I'm not saying every argument is physical, but I'm

10 saying, you have had arguments with Ms. Locke before that had

11 gotten physical?

12 A.   Yes.

13 Q.   And you got a ride to 10 Captain Shankey Drive from a

14 friend of yours, Jalissa, correct?

15 A.   Yes.

16 Q.   And you don't know Jalissa's last name; isn't that correct?

17 A.   Yes.

18 Q.   And you got to the apartment about 2:00 p.m., correct?

19 A.   That's what it says.  I can't remember now.  It was a long

20 time ago, but I guess, yeah.

21 Q.   And you went to sleep, correct?

22 A.   Yes.

23 Q.   And when Jessica Locke got home from work, you got in an

24 argument with her, correct?

25 A.   Not right away, no.

1  Q.   I'm not saying right away, sir, but sometime after she got

2  home from work, you got into an argument with her, correct?

3  A.   Yes.

4  Q.   And she found lingerie in your bookbag, correct?

5  A.   I believe so, yes.

6  Q.   And the lingerie wasn't hers?

7  A.   Right.

8  Q.   And she accused you of cheating?

9  A.   Right.

10 Q.   And you told her that you had just found the lingerie at

11 the hotel?

12 A.   Right.

13 Q.   And she didn't believe you, correct?

14 A.   Right.

15 Q.   So she got very angry, correct?

16 A.   Right.

17 Q.   And in your words she "went crazy," correct?

18 A.   In my words?  She was upset.  I don't know about saying she

19 went crazy, but if that's what it was in the deposition.

20 Q.   Let's go to page 61 of that same transcript, line 7.  Tell

21 me when you are there.

22 A.   Got it.

23 Q.   Line -- make it line 16.  Are you there?

24 A.   Yes.

25 Q.   "QUESTION:  And what did she do when she found the

```
 1  lingerie?
 2       "ANSWER:  She went crazy.  Got like very angry."
 3       Do you remember giving that answer -- those answers to that
 4  question?
 5  A.   It was a long time ago, but now that I see it, yes.
 6  Q.   And you denied cheating to her, correct?
 7  A.   Yes.
 8  Q.   And then the argument escalated, didn't it?
 9  A.   How does an argument escalate?
10  Q.   Well, turn to page 61 of your transcript.
11  A.   61?
12  Q.   61, yes.
13  A.   Yeah.
14            THE COURT:  I thought we were on 61, Mr. Pitcoff.
15            MR. PITCOFF:  Oh, I may have the wrong page.  Sorry
16  about that.
17  Q.   Well, at some point the argument became physical, didn't
18  it?
19  A.   No.
20  Q.   Well, isn't it true that she called her friend, Jamal
21  Johnson, correct?
22  A.   Yes.
23  Q.   And when she called -- that was her best friend, correct?
24  A.   Her best friend.
25  Q.   Correct.  And you didn't like Jamal Johnson, correct?
```

1  A.   No.

2  Q.   Is that correct?

3  A.   Yeah, I didn't like him none.

4  Q.   And when she called him -- and she was talking to him on

5  the phone, correct?

6  A.   Yeah.

7  Q.   And when you and Ms. -- I'm sorry, when Jamal and Jessica

8  Locke were on the phone, you and Jessica kept going back and

9  forth verbally, correct?

10 A.   Possibly.  I don't remember, but yeah.

11 Q.   Okay.  Go to page 65 of your transcript, line number 2.

12     "QUESTION:  And were you arguing with Ms. Locke while she

13 was on the phone with Mr. Johnson?

14     "ANSWER:  Not like arguing, but yeah, we were going back

15 and forth with our words."

16     Do you remember being asked those questions and giving

17 those answers?

18         MR. GREENBERG:  Your Honor, before he answers, that's

19 not the complete quotation.  I would like the entire quotation

20 read.

21         MR. PITCOFF:  I will keep reading it.

22 Q.   "But we weren't yelling and screaming at each other."

23 A.   Yes.

24 Q.   Do you remember being asked those questions and giving

25 those answers?

```
 1  A.   Yes.
 2  Q.   And you heard Ms. Locke tell Jamal that she wanted him to
 3  come because he wanted -- she wanted to get out of there,
 4  correct?
 5  A.   Yeah.  Yes.
 6  Q.   And then the argument turned physical, didn't it?
 7  A.   No.
 8  Q.   Well, isn't it true that at that time you reached out and
 9  smacked the phone out of Jessica's hands?
10  A.   No.
11  Q.   All right.  I would like you to go to page 63 of your
12  transcript.  Tell me when you are there, and I'm on line 5.  Are
13  you there?
14  A.   Uh-huh.
15  Q.   "QUESTION:  Did you make any physical contact with her
16  before she called her friend?
17       "ANSWER:  I smacked her phone.  I think because she told
18  her friend was going to call the police, and I knocked the phone
19  out of her hands.  I was like -- I was reaching for it.  I was
20  like, yeah, call your friend.  Tell your friend not to call the
21  police or whatever, and the phone dropped, and by the time she
22  picked it up, her friend had already called the police."
23       Do you remember being asked those questions and giving
24  those answers?
25  A.   Yes.  But I didn't get physical.
```

1   Q.   But you smacked the phone out of her hand, correct?

2   A.   I reached for her phone, and it fell.

3   Q.   I'm sorry.  What?

4   A.   I reached for the phone, and it fell.

5   Q.   So when you -- that's what you meant when you said you

6   smacked it out of her hands?

7   A.   I reached for the phone.  It says it right there.

8   Q.   It also says, "I smacked her phone," correct?

9   A.   It says it, yeah.  Yeah, that's what it says.

10  Q.   And when she picked the phone up again, Jamal was not on it

11  anymore, was he?

12  A.   That's a question?

13  Q.   Yeah.

14  A.   I don't know.  This is a long time ago, so I don't remember

15  really.  If it says --

16  Q.   And you tried to convince Ms. Locke to call him back and

17  have him tell the police not to come; isn't that true?

18  A.   No.

19         MR. PITCOFF:  Okay.  If I could have the plaintiff's

20  50-h hearing brought to him at this point, Your Honor.

21         THE COURT:  Sure.  We can mark that as N for

22  Identification.

23         MR. GREENBERG:  Your Honor, I never received a copy of

24  the 50-h hearing.  So might I get one?

25         MR. FOSTER:  I have one.  It was marked.

1           MR. GREENBERG:  Thank you.

2           (Defendant's Exhibit N marked for Identification)

3  Q.   And I'd ask you to go to page 43 of that transcript, sir.

4  Okay.  And I'm going to go to line 22 when you are ready.

5  A.   I am ready.

6  Q.   Are you there, sir?

7  A.   Uh-huh.

8  Q.   The 50-h transcript, that's testimony you gave on

9  April 15th of 2021?  Does that sound right?

10 A.   Again, it's a long time ago, so -- but, yes, I do remember

11 giving the 50-h hearing.

12 Q.   Well, if you look at the front page of the transcript, it

13 has a date April 15, 2021, correct?

14 A.   I believe you.  I'm not saying that it's wrong.  I just

15 don't remember.

16 Q.   And you swore to tell the truth at that time as well,

17 correct?

18 A.   Yes, sir.

19 Q.   And Mr. Foster asked you questions then, too, correct?

20 A.   Yes, sir.

21 Q.   And line 22, I am going to read.

22      "QUESTION:  So you couldn't hear what he was saying?

23      "ANSWER:  No.  She told me after the fact she was like, I

24 think he is going to call the police.  And I was like, well,

25 call him back and tell him not to call the police.  What is he

1  going to call the police for?"

2      Do you remember being asked those questions and giving

3  those answers?

4  A.   Okay.  Yes.

5  Q.   So you were trying to get her to call back and tell him not

6  to call the police, correct?

7  A.   I suggested it, yes.

8  Q.   And you suggested this after you smacked the phone out of

9  her hands, correct?

10 A.   No.  I didn't smack the phone.  I reached for it, and it

11 fell.

12          MR. PITCOFF:  Okay.  Your Honor, this -- with your

13 permission -- may be a good time or I can just keep going and

14 break.

15          THE COURT:  All right.  So we'll take a break now,

16 ladies and gentlemen, until 3:40, and then we will swap out

17 witnesses, and we will continue with Mr. Monroe when we get done

18 with your next witness.  All right?

19          Mr. Cangelosi, please take the jury.  All rise.

20          THE DEPUTY CLERK:  All rise.

21          THE COURT:  Mr. Monroe, you may step down.

22          (Witness temporarily excused)

23          (Jury excused)

24          THE COURT:  We will start up promptly at 3:40 with

25 your doctor, right?

```
 1              MR. PITCOFF:  Yes, thank you.

 2              (Recess)

 3              THE COURT:  Bring the witness up before we get the

 4    jury.

 5              Mr. Greenberg, thank you for this courtesy.  I

 6    appreciate it.

 7              MR. GREENBERG:  Any time, Your Honor.  It's the way

 8    law ought to be practiced.

 9              THE COURT:  Yes, it is.

10              Step up, doctor.

11              THE DEPUTY CLERK:  Jury entering the courtroom.

12              (In open court; jury present)

13              THE COURT:  All right.  Ladies and gentlemen of the

14    jury, please be seated.

15              Mr. Cangelosi, swear in the witness.

16              THE DEPUTY CLERK:  Please stand and raise your right

17    hand.

18    DR. BARRY KRAUSHAAR, having been duly sworn, testified as

19    follows:

20              THE DEPUTY CLERK:  Please be seated.  Please state

21    your full name for the record and spell it.

22              THE WITNESS:  My name is Barry Kraushaar,

23    K-R-A-U-S-H-A-A-R.

24              THE COURT:  All right.  You may proceed, Mr. Pitcoff.

25              MR. PITCOFF:  Thank you, Your Honor.
```

050923PMH                     Kraushaar - Direct - Pitcoff

1  DIRECT EXAMINATION

2  BY MR. PITCOFF:

3  Q.   Good morning -- good afternoon, doctor.

4  A.   Good afternoon.

5  Q.   Are you a doctor --

6          THE COURT:  Hold on one second.  Doctor, would you

7  just pull the mic a little closer to you?  The court reporter

8  only hears what goes through the microphone.  Thank you.

9          Please proceed.

10         MR. PITCOFF:  Sure.

11 Q.   Are you a doctor certified to practice medicine in the

12 state of New York?

13 A.   Yes, I am.

14 Q.   And can you give us a brief overview of your education?

15 A.   So I am an orthopedic surgeon engaged in active practice.

16 In other words, I see patients every week, and I do surgeries

17 every week.  In order to get here, after graduating high school

18 and college, went to the Albert Einstein College of Medicine in

19 the Bronx for four years, and then an internship at Lenox Hill

20 Hospital in surgery for one year, and then four years of

21 orthopedic surgery training centered in the South Bronx at

22 Bronx-Lebanon and Lincoln Hospitals, and then a year of

23 fellowship in sports medicine training with the Washington Red

24 Skins at the time, and the team doctors for professional

25 athletes at Georgetown University.

050923PMH                Kraushaar - Direct - Pitcoff

1      Then I came into practice in Bergen and Rockland Counties,
2  and I have been in practice for 27 years.  During this time, I
3  see between 120 and 150 patients every week, and I have done
4  close to 8,000 surgeries, including trauma, fracture care,
5  sports medicine, joint replacement, hand surgery.
6  Q.   Thank you.  And can you just tell us generally what the
7  field of orthopedics is?
8  A.   So my light way of saying this is:  You break it, we fix
9  it.  So we take care of fractures and trauma and dislocations,
10 but we also take care of arthritis, painful joints.  It's
11 primarily the specialty of the muscles, and the skeleton,
12 tendons, bones, joints.
13 Q.   And you mentioned your practice.  Where do you presently
14 work?
15 A.   So I grew up in Rockland County, and there are two
16 hospitals in Rockland County, so I practice in both of them,
17 which pretty much covers the county.
18 Q.   And can you tell me your practice, do you treat people with
19 foot fractures?
20 A.   Routinely.
21 Q.   And are you able to estimate how many patients with foot
22 fractures you have treated over the years?
23 A.   In the hundreds.
24 Q.   Now, did there come a time --
25          MR. PITCOFF:  Your Honor, at this point I offer Dr.

1  Kraushaar as an expert in the field of orthopedics.

2           THE COURT:  Any objection, Mr. Greenberg?

3           MR. GREENBERG:  No, Your Honor.

4           THE COURT:  All right.  Dr. Kraushaar is an expert in

5  orthopedics.

6  Q.  Now, doctor, did there come a time that at our request you

7  performed an examination and records review of the plaintiff,

8  Mr. Michael Monroe?

9  A.  I did.  I was asked to perform an independent medical

10 evaluation on March 2nd of 2022.

11 Q.  Okay.  And do you on occasion examine people who are suing

12 for injuries at the request of attorneys?

13 A.  I do.  As a small part of my practice, I do independent

14 medical evaluations for plaintiffs, as well as for defense; and

15 I have a rather even-keeled practice where I see patients after

16 work and do some examinations and write opinion reports about

17 injuries.

18 Q.  And do you charge for the report and for being here and

19 testifying?

20 A.  I do.  It represents time and special skill and knowledge.

21 Q.  Do you have to cancel any office visits to be here?

22 A.  I do.  I block off time for this.

23 Q.  And by the way, before you got this case, did we know each

24 other at all?

25 A.  No.

050923PMH                    Kraushaar - Direct - Pitcoff

1  Q.  Did we meet at any point before our Zoom call in

2  preparation for this trial?

3  A.  The first time we ever met was ten minutes ago.

4  Q.  And what percentage of your income would you say is from

5  these exams and testifying?

6  A.  Less than five percent.  I am primarily a clinician.

7  Q.  And I am going to ask you about your report and your

8  conclusions.  Would it help you in testifying to have your

9  report in front of you?

10 A.  It would.

11 Q.  And to refer to it?

12 A.  It would help refresh my recollection of the evaluation.

13         MR. PITCOFF:  Your Honor, with your permission, I

14 would like the doctor to be able to refer to his report, which

15 he has with him.

16         THE COURT:  Should we mark it for identification?  Mr.

17 Greenberg, you have a copy of it, I assume?

18         MR. GREENBERG:  I do, Your Honor.  I do, Your Honor.

19         THE COURT:  All right.  Let's mark it for

20 Identification as Defendant's O for Identification.  I don't

21 think I have a copy.  Do you have a copy for me to look over?

22         MR. TIWARI:  Yes.

23         THE COURT:  Thank you.  Do we have a copy in front of

24 the witness?

25         MR. PITCOFF:  I think he has a copy.

 1          THE COURT:  All right.  We are going to take yours
 2  from you from a minute and just mark it if you don't mind.  Is
 3  that a clean copy, doctor?  You didn't make any notes on it or
 4  anything?
 5          THE WITNESS:  There is a coffee stain.
 6          THE COURT:  Besides the coffee stains.  We will take
 7  coffee stains.  Mark it as Exhibit O for Identification.  All
 8  right.
 9          (Defendant's Exhibit O marked for Identification)
10          THE COURT:  All right.  You may proceed.
11  Q.  Now, doctor, at some point did you perform -- did you
12  obtain a history from Mr. Monroe?
13  A.  I did.
14  Q.  And can you tell me what the history he gave you was?  If
15  you will refer to page 3 of your report.
16  A.  Sure.  So after I reviewed the records, I evaluated Mr.
17  Monroe in my office, and he -- we discussed what he was there
18  for, and I -- I asked him about his injuries and let him say it
19  in his own words, and he complained of no issues, actually, at
20  the time I examined him regarding his right foot.  He said he
21  wanted to be examined because he --
22  Q.  Sorry, doctor.  Sorry to interrupt.  Could you adjust your
23  voice up a little?  I'm having trouble hearing you.
24  A.  Sorry.
25  Q.  Thank you.

1  A.   So he said he wanted to be examined because he was injured

2  after he was arrested in October of 2020, and he claimed that

3  during the process of the arrest, a policeman stomped on his

4  right foot.  So he said that during his intake physical

5  examination in the jail, he complained about his right foot, and

6  that X-rays were taken, and he was found to have a fracture.  So

7  he was treated.

8  Q.   I'm sorry.  What was the date of your examination?

9  A.   I believe it was -- it's dated -- the report is dated

10 March 2nd, which is usually the date that I would have seen him.

11 Q.   And --

12 A.   2022.  Sorry.  2022.

13 Q.   Did he discuss with you how he was doing then?

14 A.   Yes.  Basically he said he was -- skipping ahead, but he

15 said he was doing very well at that time, and he had no residual

16 complaints.

17 Q.   And did he -- withdrawn.

18      Did you perform an exam of the plaintiff?

19 A.   Sure.  The rest of it, he said he was working at The

20 Cheesecake Factory, and that he was opening his own business

21 doing power washing and car detailing, and that he was even

22 playing handball at the time he saw me.  So then I examined him.

23 Q.   And can you take me through the examination?  First off,

24 let me ask you this, and you should have a binder of exhibits in

25 front of you?  If you can go to Exhibit 2?

1              THE COURT:  It's the other binder, doc.  The black

2    binder is the numbered exhibits.

3    Q.   And that should be an X-ray report dated 11/8/2020, which

4    is in evidence.  Do you see an X-ray report?

5    A.   I have it.

6    Q.   And was this one of the records that you reviewed?

7    A.   It is.

8    Q.   And was it an X-ray report of Mr. Monroe's foot?

9    A.   It was an X-ray of his right foot, yes.

10   Q.   And what did that X-ray report dated 11/8/2020 reveal

11   according to the report?

12   A.   So the way they worded it was that he had a displaced

13   spiral fracture of the distal fifth metatarsal bone.

14   Q.   Where is that located, distal fifth metatarsal bone?

15   A.   So I can explain each word.  So "displaced" means

16   separated, and "spiral" means it was rotated or like in a

17   twisting fashion, and then the "distal," that means the far end,

18   not the close end, but the far end of the fifth metatarsal bone.

19   So if my hand were my foot, the outer border of the foot just

20   above the toe.  So distal means down at the lower end.  Fifth is

21   the pinky side.  The metatarsal bone, which is equivalent to

22   this bone in my hand.  So where I'm pinching is about where it

23   would be in the foot, on the outer side of the foot, right foot.

24   Q.   And you mentioned the term "spiral fracture" and

25   "twisting."  Can you explain how the two are related?

1  A.    Sure.  It's my job to know how fractures occur and what

2  they look like on X-rays as part of the routine care for

3  fractures.  A spiral fracture means that there is a twisting

4  event that occurs, in other words, a rotational fracture.

5  There's different types of fractures.  There is a transverse

6  fracture, which means it goes straight across.  There's a spiral

7  fracture, which this was.  There is something called comminuted,

8  C-O-M-M-I-N-U-T-E-D, fracture, which means it's crushed in

9  multiple pieces, and this one was a spiral fracture.

10 Q.    Did the plaintiff have a comminuted fracture, that crushed-

11 like fracture that you just referred to?

12 A.    No.  I gave three of the main categories of fractures, and

13 in this case it was a spiral fracture, not a crushing type

14 fracture, such as a comminuted fracture.

15 Q.    And that was on November 8th.  I'm going to ask you to turn

16 to the next exhibit, which is Exhibit 6 in the same book.  It

17 should be another X-ray report dated 12/9 of 2020.  Let me

18 know --

19 A.    I have the December 9 in front of me.

20 Q.    So now we are a little over a month later.  Can you tell us

21 what this report states?

22 A.    Sure.  On the bottom, the impression is that it's a

23 subacute to chronic fracture of the distal diathesis of the

24 fifth metatarsal with mild displacement and angulation.  In

25 comparison in the prior exam, mild callus formation compatible

1  with significant healing.

2  Q.   Okay.  So at this point was it completely healed?

3  A.   So the translation on that is that they recognized -- when

4  it says it's subacute, it means it's healing, so no, it's not

5  completely healed, but the word "callus" is the most important

6  part of this.  Callus doesn't mean evil.  It's spelled

7  differently or cold, cold-hearted, that's a callous person.

8  Callus in bone healing means new bone formation.

9       So there was new bone forming in the fracture area, and it

10  was evidence that it was healing.  You can see it by it looks

11  like cotton candy or fluffy bone on X-ray, and he was developing

12  that quickly a month after his alleged injury.

13  Q.   Okay.  And number two, it says mild osteopenia.  What is

14  osteopenia?

15  A.   Well, osteopenia means that the bone isn't as dense as one

16  would expect it to be on an X-ray.  "Mild" means in this case it

17  wasn't severe, but it suggests that he's got bone that's not as

18  hard as or as thick or as dense as would be expected by this

19  radiologist who read this X-ray.

20  Q.   And could that osteopenia have been caused by having his

21  foot stomped on a month before?

22  A.   In my opinion, no.

23  Q.   Can you tell us why?

24  A.   Osteopenia is -- I hate to get technical -- osteopenia is a

25  metabolic phenomenon.  In other words, it takes years to develop

050923PMH                    Kraushaar - Direct - Pitcoff

1  osteopenia or many months, and this soon after the event it

2  doesn't make sense that the fifth metatarsal would be growing

3  bone while the rest of his foot would have soft or thin bone or

4  weak bone.  It just doesn't make sense that that would happen at

5  the same time in the same foot a month after the injury.

6  Q.   And it also says mild degree of osteoarthritis.  Do you see

7  where it says that?  Do you have -- what is osteoarthritis first

8  off?

9  A.   Right.  I treat osteoarthritis every day.  Osteoarthritis

10 is the typical degenerative arthritis that happens as we go

11 through our lives, and it means erosion.  So he's got mild

12 evidence of decades of erosion of the joints in his feet.

13 Q.   And do you have an opinion within a reasonable degree of

14 medical certainty as to whether that osteoarthritis was caused

15 by an incident approximately one month before this X-ray?

16 A.   I do.  My opinion is that there is no way that

17 osteoarthritis would be at all related to something that

18 happened a month earlier.

19 Q.   And I will ask you the question in the same format:  Do you

20 have an opinion within a medical certainty as to whether the

21 mild osteopenia of the bone was caused by an incident

22 approximately a month earlier?

23 A.   I do.  It's very clear to me that osteopenia or a metabolic

24 weakness in the bone, it would have not been caused by an injury

25 a month earlier.

1  Q.   Now, does weight play any role in either one of those

2  diagnoses?

3  A.   Well, definitely plays a role in the likelihood of

4  developing a foot fracture because at the time or in the past

5  Mr. Monroe, he's been 280 pounds, that's pretty big.  And so

6  weight throws off balance; makes it harder see things; makes it

7  more likely to stumble and fall, but it also plays a lot of -- a

8  strong role in arthritis of the foot.  So if you come down on a

9  foot every day with 280 pounds of force, multiply that by

10 gravity, it's a thousand pounds of pressure on the foot when you

11 come down hard on a staircase.  Heavy people get arthritis in

12 the feet.

13 Q.   And I want you to -- I want you to assume -- well, were you

14 aware that the plaintiff is a diabetic at the time of the exam?

15 A.   I am aware that he is diabetic.

16 Q.   And can you tell us, does diabetes play any role in foot

17 conditions and fractures?

18 A.   It does.

19 Q.   And can you explain to us how?

20 A.   So diabetes causes injury to the small blood vessels at the

21 ends of the feet all the way down at the lower extremity, and

22 the reason why is diabetic people have small vessel disease.

23 And so the small -- the further away you go from the core, the

24 farther away you go from the big arteries and the big veins.  So

25 all the way out at the tips of the toes, the blood vessels get

050923PMH                    Kraushaar - Direct - Pitcoff

1  smaller, and as the blood vessels get clogged by diabetic
2  vascularity, the nerves stop working as well.  So the vessels
3  and the nerves are closely related in the foot, and that's what
4  diabetic neuropathy is, and it increases the likelihood of
5  arthritis in the foot and spontaneous fractures that can occur
6  in the foot.
7  Q.   Now, you mentioned spontaneous fractures.  How is that
8  relevant when we are talking about a spiral fracture?
9  A.   Well, if a person steps on the foot the wrong way or rolls
10 his or her foot the wrong way, that causes a twisting injury;
11 and I said that a spiral is a twist.  So a spiral fracture
12 occurs kind of like when you take a paper towel roll, and you
13 untwist it.  That's the way a spiral fracture occurs.
14      Bones aren't strong when it comes to twisting.  You can
15 twist a bone and crack it easier than you can to bend it,
16 actually; and so when you have neuropathy, if you step on the
17 foot the wrong way, you can break your own bone and not know it,
18 especially because in a neuropathic foot, people have poor
19 sensation, and they don't even know they have a fracture.
20      So in this case his records show that he had pain of three
21 over ten in intensity after he allegedly broke his foot.  In the
22 first report, his pain was three on a scale of 0 to 10.  If you
23 broke a bone in your foot, and you don't have neuropathy, you
24 are going to have 10 over 10 pain.  He didn't report that.  He
25 reported mild pain in his foot, and it barely got worked up.

1  Q.   So going back to the X-rays, I want you to now look at an

2  X-ray dated January 14th, 2021, which is Exhibit 7 in the book,

3  and can you tell me what that X-ray shows?

4  A.   So this is getting on to the fracture healing, another

5  snapshot X-ray showing again that he had the osteopenia and the

6  arthritis in the foot.  That's not going to change.

7       And then the radiologist read it as in comparison to the

8  prior exam, the alignment was stable, and mild callus compatible

9  with further healing.  In other words, the bone was healing

10 better.  Nothing else changed.

11 Q.   Okay.  And was there any -- this X-ray in January 14th, a

12 couple of months after the alleged fracture, what significance

13 does this have, if any?

14 A.   That's a good thing.  You know, as a doctor, I can't resist

15 saying I'm happy that the bone healed.  This bone is healing.

16 It's going well.  In a diabetic sometimes healing is slower.  In

17 this case he was fortunate the bone is healing on schedule.

18 Q.   And I want to bring your attention to the last X-ray that

19 was done on March 4th of 2021, which is Exhibit 9 in your book.

20      And can you tell me what the reported results of that X-ray

21 were?

22 A.   So by March 4, 2021, there was a healed oblique fracture

23 seen on the fifth metatarsal; and in this case, even though

24 arthritis had been mentioned previously, it was not mentioned.

25 In fact, the radiologist said that the joint spaces appear to be

050923PMH                    Kraushaar - Direct - Pitcoff

1  within normal limits.  In other words, in this case the
2  radiologist doesn't see arthritis.
3  Q.    So what does that mean, the joint spaces appear to be
4  within normal limits?
5  A.    This is good.  There is no arthritis near the fracture.
6  Q.    Okay.  And it says the fracture was healed?
7  A.    It does.
8  Q.    Okay.  That's March 4th of 2021, correct?
9  A.    Yes.  And for perspective, that's a very appropriate amount
10 of time to heal a fracture.
11 Q.    Now, would you expect somebody with this type of spiral
12 fracture to have any residuals after the bone was healed?
13 A.    No.  I don't expect it, particularly because this fracture
14 was not in the joint.  So since it didn't go into the joint
15 space, it was in the shaft of the bone, not where the joint is,
16 it's not going to cause arthritis because there is no crack in
17 the center of the joint.  There is no stepoff in the joint.
18 It's still a smooth joint; doesn't affect the joint surface at
19 all.
20 Q.    What is AC1?
21 A.    A1C.
22 Q.    A1C.  Sorry.
23 A.    So it's a measure of sugar in the blood.  So it's called
24 hemoglobin A1C, and it's a chemical measurement of your blood to
25 see if you have diabetes.  So normally, if you are a diabetic,

050923PMH                     Kraushaar - Direct - Pitcoff

1  you get a finger stick glucose test in the morning and at night

2  maybe, and you can check your sugar levels, and that's nice for

3  testing from day to day or moment to moment what your sugars

4  might be, and if you eat a meal, your sugar levels will go up

5  and go down.

6       But the A1C, that's a measure of measuring diabetes over a

7  longer period of time.  In other words, even if you just had

8  breakfast, your A1C is probably going to be the same as it was

9  last night when you went to sleep.  So it's a smoother way of

10 measuring diabetes, and it's a way to monitor if a person is

11 getting better or getting worse in their diabetic condition.

12 Q.   And did plaintiff have high blood sugar levels?

13 A.   He had very high blood sugar levels.

14 Q.   Now, from your review what -- can you give me a range of

15 those levels?

16 A.   Well, with normal blood sugar levels for us in the room --

17 I am not aware if there is any diabetics in the room, but if you

18 are, you know it.  You want to have your glucose or your sugar

19 levels stay in under 135, 140.  But his diabetic situation was

20 so bad his sugars were 480.  We think of admitting people to the

21 hospital for a 480 if they stay that way.  They have to be given

22 insulin, and they have to push that number down, but four times

23 normal, his diabetes is out of control or was out of control, at

24 least, at the time of the records.

25 Q.   And what significance does that have that he had high A1C

1  or high sugar levels around the time of the incident?

2  A.   Well, they mirror each other, so if one record of one

3  person says that the A1C is elevated, and another record says

4  the sugars or the glucose are elevated, they go together.  They

5  go hand in hand.  But as I mentioned, the A1C is a smoother way

6  of checking the long-term version of having sugar problems, and

7  the checking the finger stick glucose checks whether there is a

8  spike today, it's very momentary.

9  Q.   And what relevance does that have, if any, with respect to

10 spiral fractures?

11 A.   Well, as I described briefly, diabetic neuropathy, diabetic

12 vascular disease, this is the reason why diabetes is bad for

13 you.  It hurts your small blood vessels, and the small blood

14 vessels are all the way down in the foot.  So although a person

15 may not be specifically worked up for diabetic neuropathy, it

16 goes hand in hand.  The diabetic neuropathy goes hand in hand

17 with poorly controlled diabetes, and it definitely increases --

18 it's very well established that a person is more likely to have

19 fractures and arthritis in their foot if they have out-of-

20 control diabetes.

21 Q.   Okay.  And based on your review, did Mr. Monroe have

22 uncontrolled diabetes?

23 A.   Yes.

24 Q.   And I want to take you back to your exam, which you

25 detailed on page 4 of your report.  Can you tell us about your

1  exam?  Section -- I believe it's the first full paragraph.

2  A.   So he was wearing sneakers, and he took his right shoe off

3  so I could look at it.  There was no heat, no redness, no

4  swelling.  Actually, it looked rather normal to me.  And he had

5  some -- some -- a different type of callus now, a dorsal callus

6  over the fifth toe proximal to the phalangeal joint.  Basically,

7  he had a corn over his toe.  So if you have seen people with

8  friction or corns in their foot, it means he is wearing shoes

9  that are rubbing against the edge of his toe.  That's all it

10 means.

11         He had normal toe movement, including flexing and

12 extension, and he had normal power when doing that.  His ankle

13 was normal.  His injury was to the foot at the shaft of the

14 fifth metatarsal, which didn't really limit his range of motion;

15 and his fifth metatarsal felt normal on examination.  He had

16 normal alignment.  In other words, there wasn't a rotational

17 abnormality of the toe.  Sometimes a toe will underlap or

18 overlap or point to the side if it's healed wrong.  This healed

19 fine.  And there was no tenderness.  So he wasn't tender at all,

20 and the soft tissue was normal, and at this point, he had no

21 numbness or tingling.

22 Q.   And did you come to a conclusion about what type of

23 recovery Mr. Monroe made?

24 A.   Sure.  He completely recovered.

25 Q.   And do you have an opinion, within a reasonable degree of

1  medical certainty, whether Mr. Monroe's spiral fracture was

2  caused by his foot being stomped on?

3  A.   I wasn't there, but I've testified actually in a child

4  abuse case in the Bronx long ago about fracture patterns, and

5  I'm trained to identify patterns that signal certain injuries;

6  and in my opinion, this spiral fracture was more likely caused

7  by a twisting injury such as rolling over the foot in a --

8  instead of spraining his foot, instead of spraining his ankle,

9  he likely rolled over his foot causing a twisting injury to the

10 metatarsal rather than a crush injury, such as being stomped on

11 by a boot.

12       And the reason why I say that I don't believe that his foot

13 was stomped on by a boot was that that would cause a different

14 pattern of injury where there would be three or four fragments,

15 not just a twist of two fragments, but rather if somebody came

16 crushing down onto a bone and broke it into pieces, there would

17 be evidence of shattering of the bone, and that wouldn't be a

18 spiral fracture.  That would be -- the word we used was

19 "comminuted."  It would be crushed.  It would be broken in

20 parts.

21 Q.   And I just want to make sure I understand "displaced."  He

22 does have a displaced fracture; is that the same as comminuted?

23 A.   No.  Displaced just means separated.  So the pieces weren't

24 exactly touching each other.  They were separated or rotated,

25 and sometimes we think about fixing such fractures with screws

1  and plates, but usually -- usually 95 percent of the time we

2  just let them heal in a boot.  He was treated appropriately.

3  Q.  All right.  And did you come to a determination within a

4  reasonable degree of medical certainty as to whether Mr. Monroe

5  made a complete recovery from his injuries?

6  A.  Yes.  I mean, he testified himself to me.  He said he's

7  power washing, playing handball, working in Cheesecake Factory.

8  He said he was not in pain at the time of my examination, and

9  objectively, when I palpated, when I examined him, when I

10  touched him, he wasn't tender.  So objectively and subjectively

11  and from his history, he's healed completely.

12  Q.  Last thing.  You mentioned diabetic neuropathy.  How is

13  that relevant at all as to whether people feel pain in their

14  foot?

15  A.  Well, that's -- that leads to underreporting of pain in the

16  foot.  There is something called Charcot -- C-H-A-R-C-O-T --

17  Charcot foot, that's well known among podiatrists as well as

18  orthopedic surgeons and anybody who knows somebody with it, and

19  that is when you get spontaneous fractures in the foot that you

20  just don't know about because you just don't feel the foot as

21  much as you might.  And although a person from moment to moment

22  might have sensation, and on my examination, he actually could

23  feel his foot.  He wasn't numb -- completely numb at the time,

24  so he is not completely numb.  But when you have diabetic

25  neuropathy, you lose the ability to have proprioception.  In

1  other words, you lose the ability to get instant feedback, and

2  what happens is you lose that momentary ability to adjust to

3  rolling your foot.

4      For example, if you walk down a staircase, and you have

5  diabetic neuropathy, and then somebody left something on the

6  stairs, and you step on it, you don't recover.  You don't get

7  that quick reflex, and it makes it more likely to fracture your

8  foot spontaneously, which is an open possibility in this case

9  and makes more sense to me that he rolled his foot.  I can't say

10 how.  I wasn't there.  But that makes more sense to me than it

11 being crushed based on the fracture pattern and the existence of

12 poorly controlled diabetes.

13          MR. PITCOFF:  Thank you, doctor.  I have no further

14 questions.

15          THE COURT:  Mr. Greenberg?

16          MR. GREENBERG:  I am just waiting for my colleague to

17 turn on the machine.

18          THE COURT:  You can start without him.

19          MR. GREENBERG:  Very well, Your Honor.

20 CROSS-EXAMINATION

21 BY MR. GREENBERG:

22 Q.  Dr. Kraushaar, you didn't conduct an independent medical

23 evaluation, did you?

24 A.  Well, I have never seen the patient before.  I reviewed

25 records, and I gave an opinion based upon my personal

1  examination of the claimant.  So to that extent, it was

2  independent.

3  Q.    You weren't chosen to do this -- to do this examination by

4  His Honor or the Court, right?

5  A.    No.  But most independent evaluations aren't chosen by the

6  Court.

7  Q.    And you weren't chosen to do the evaluation by the Rockland

8  County Medical Society?

9  A.    They never do that.

10 Q.    You were chosen to do the evaluation by Mr. Pitcoff or his

11 firm; isn't that true?

12 A.    A company called Support Claim Services, actually, is an

13 independent contractor that sends me cases.

14 Q.    And they were acting on behalf of the plaintiff's firm --

15 the defendant's firm?  I'm sorry.

16 A.    It appears so.

17 Q.    And you weren't paid by the Court?

18 A.    No.  The Court doesn't pay doctors.

19 Q.    You weren't paid by the medical society?

20 A.    Of course not.

21 Q.    You were paid by somebody acting on behalf of the

22 defendants' firm?

23 A.    That's how it goes.

24 Q.    And you issued a report, right?

25 A.    I did.

1   Q.   The one that's been marked Defendant's Exhibit O for

2   Identification?

3   A.   Yes.

4   Q.   And you didn't issue that report to the Court, did you?

5   A.   Why would I?

6   Q.   The question isn't why would you.  The question is, did

7   you?

8   A.   I didn't.

9   Q.   And you didn't issue the report to the medical society?

10  A.   I did not.

11  Q.   You issued the report to the defendants' lawyers, didn't

12  you?

13  A.   Upon their request.

14  Q.   Now, in addition to -- oh, and at the time that you were

15  retained, you knew that this case was in litigation?

16  A.   I didn't know the details of the case.  I was handed a

17  report and asked to give an opinion about the medical facts in

18  the case.  I didn't know the stages of litigation.

19  Q.   I didn't ask you about the stages, Dr. Kraushaar.  I asked

20  whether you knew that the case was in litigation?

21  A.   Yes.  The claimant himself told me he was litigation.

22  Q.   And you knew that your report was issued for purposes of

23  the litigation?

24  A.   Yes.

25  Q.   Now, you have a business called Kraushaar Orthopedic

1  Consulting, PLLC?

2  A.   I do.

3  Q.   Of which you are the only professional?

4  A.   Yes.

5  Q.   And what you do is you review cases from a legal

6  perspective at the request of lawyers?

7  A.   I do.

8  Q.   Now, we talked a little bit about money here.  You got paid

9  $3,300 to review some medical records, do a physical exam, and

10 write a report?

11 A.   I don't recall how much that was, so if that's what they

12 said, but that means that the records were rather extensive

13 because I charge a base of $1,350 to do a report and review

14 300 pages.  So if it got to $3,300, then it was a lot of pages.

15 Q.   And you are being paid $10,000 for your testimony here?

16 A.   And preparation for this, as well as reviewing the records.

17 Again, time.

18 Q.   You are being paid $10,000 irrespective of the length of

19 your testimony?

20 A.   Correct.

21 Q.   Let's talk about the case.

22      So you know that the date of the incident was November 6,

23 2020?

24 A.   On or about, yes.  I didn't actually see the specific --

25 Q.   And you don't have --

050923PMH              Kraushaar - Cross - Greenberg

1  A.   -- report from that day.

2  Q.   -- any personal knowledge about what happened?

3            THE REPORTER:  Wait, wait, wait.

4            THE COURT:  Hold on a second.  Hold on a second.  So

5  you are talking a bit over each other, and the court reporter is

6  unable to take both of you.  She's really talented, but she

7  can't take both of you at the same time.

8            So, doctor, if you don't mind, let him finish his

9  question.

10           And Mr. Greenberg, I already know you know this.  Let

11 the witness finish his answer, and then we will proceed

12 expeditiously.  All right?  Thank you.

13 Q.   You lack any personal knowledge of what happened?

14 A.   Correct.

15 Q.   Now, you reviewed medical records, correct?

16 A.   Yes.

17 Q.   And there were at least -- well, some number over 500 pages

18 of medical records?

19 A.   Many more.

20 Q.   Well, if you look at your report on page 1, I believe --

21 you are right.  It says at least 537 pages of medical records,

22 right?

23 A.   Yes.

24 Q.   Covering the space of over a year?

25 A.   Correct.

050923PMH                Kraushaar - Cross - Greenberg

1  Q.   How many of those medical records did you write?

2  A.   Those aren't my records.

3  Q.   I'm sorry.  So the answer to my question, sir, is that you

4  wrote none of those medical records, correct?

5  A.   Correct.

6  Q.   And that's because you neither ordered nor provided any

7  medical services to Mr. Monroe?

8  A.   Right.  That's what makes me independent.

9  Q.   Now, all of the multiple medical care providers who did

10 provide medical care to Mr. Monroe, to your knowledge, they are

11 in Rockland County?

12 A.   I'm not sure.  I'm not aware of the residence of all of

13 these providers.

14 Q.   Well, you knew they were affiliated with the Rockland

15 County Correctional Facility, right?

16 A.   Sure.  But that doesn't mean they work in Rockland.  I know

17 at least Dr. Semble works in Rockland County, but I don't know

18 where their offices are based.

19 Q.   And presumably at least some of these were available to

20 talk to you by telephone?

21         MR. PITCOFF:  Objection.

22         THE COURT:  Overruled.  It's cross-examination, and I

23 don't see any harm in that question.

24 Q.   Sir?

25 A.   I have no idea what their availability to speak to me was.

050923PMH                Kraushaar - Cross - Greenberg

1  Q.   And that's because you didn't try to talk to any of them?

2  A.   Why would I?  It's an independent medical examination.

3  Q.   Sir, it's not why would you.  It question is:  Did you?

4  A.   No.

5  Q.   The answer to my question is -- you can answer it of

6  course, and I would appreciate if you would -- you didn't try to

7  talk to any of them, did you?

8  A.   No.  That would be inappropriate.

9  Q.   Now, there are references to X-ray reports.  We looked at

10 some of those.  They are in evidence as Plaintiff's Exhibits.

11 That would suggest that there were multiple X-rays taken.

12 A.   There were.

13 Q.   How many of those did you look at?

14 A.   I wasn't provided them.

15 Q.   I gather, then, that the answer to my question is, you

16 didn't look at a single one of the X-rays?

17 A.   No.  I offered --

18            MR. PITCOFF:  Objection to form.

19            THE COURT:  I'm going to overrule the objection.

20            Doctor, let's do this this way.  You are very bright

21 and very capable.  Mr. Greenberg is very bright and very

22 capable.  He is eliciting testimony from you.  This will go a

23 lot faster if you just answer his questions.  When he is done,

24 Mr. Pitcoff is going to get back up and ask you some more

25 questions, I presume.  So if we just get a little rhythm going,

050923PMH                 Kraushaar - Cross - Greenberg

1  answer his questions.  Don't worry about what the significance

2  of the question is.  You are here to answer his questions.

3           And if Mr. Pitcoff needs to clean something up

4  afterward, he will do that with you.  All right?

5           THE WITNESS:  Sure.

6           THE COURT:  Let's just move on.

7           MR. GREENBERG:  Yes, Your Honor.

8  Q.  So we established that the incident allegedly occurred on

9  November 6, 2020, and you saw Mr. Monroe how many times?

10 A.  One.

11 Q.  And the one time you saw him was on March 2nd, 2022?

12 A.  Yes.

13 Q.  So that would have been a year and a half or so after the

14 incident?

15 A.  Yes.

16 Q.  And you have no personal knowledge of his symptoms for the

17 year and a half between the incident and the time you saw him?

18 A.  No personal knowledge.

19 Q.  And then after March 2nd, 2022, you never saw him again

20 until you saw him in court today?

21 A.  Correct.

22 Q.  So you never saw him again professionally?

23 A.  Until now.

24 Q.  And that means you have no idea what symptoms he

25 experienced in the interim?

1  A.   Well, the records continue after that, so I have an idea of

2  his symptoms in the records.

3  Q.   Let's talk about your examination.  So let me see if I can

4  summarize what you did.  One of the things you did is you looked

5  at his right foot for swelling and other abnormalities?

6  A.   I did.

7  Q.   The second thing you did is you felt for heat and

8  tenderness?

9  A.   Yes.

10  Q.   The third thing you did is you saw the toe moved up and

11  down and around?

12  A.   Yes.

13  Q.   And is that a fair summary of everything you did?

14  A.   No.

15  Q.   What else did you do, doctor?

16  A.   So I checked for appearance such as calluses, which I

17  mentioned.  I checked for alignment, which means angulations.  I

18  looked for swelling.  I don't know if you mentioned that.

19  Q.   I did, but go ahead.

20  A.   I palpated or touched for tenderness.

21  Q.   I think I mentioned that, also.

22  A.   I examined his ankle and documented normal motion of his

23  ankle.

24  Q.   That entire physical examination took less than five

25  minutes, didn't it?  I'm not talking about talking to him; I am

050923PMH                Kraushaar - Cross - Greenberg

1  talking about the physical examination.

2  A.   Can you repeat?

3  Q.   I'm sorry?

4  A.   What was your question?

5  Q.   The entire physical examination took less than five

6  minutes, didn't it?

7  A.   Yes.

8  Q.   And, of course, you took an X-ray of Mr. Monroe's toe and

9  foot at that time, didn't you?

10  A.   No.  It's not part of the IME.

11  Q.   Ah, so you are testifying about what his foot looked like

12  internally, and you didn't do an X-ray?

13  A.   Yes, sir.

14  Q.   We talked about an alleged injury.  Well, you used the term

15  "alleged injury."  Do you have any doubt that Mr. Monroe was --

16  experienced an injury?

17  A.   No.

18  Q.   And, in fact, we know from the medical records that he had

19  a normal gait less than a month before November 6, 2020?

20         MR. PITCOFF:  Objection.  Referring to a document

21  that's not in evidence.

22         MR. GREENBERG:  Well, actually, I'm referring to his

23  report, and it is on page 1 about seven lines up from the

24  bottom.

25         THE COURT:  I'll overrule the objection.

1   Q.   Sir?

2              THE COURT:  Do you have the question in mind, doctor?

3              THE WITNESS:  It appears he had a normal gait before

4   the injury.

5   Q.   And there was no report of pain in his foot, his ankle or

6   his toe before the injury, before the date in question, correct?

7   A.   Not to my knowledge.

8   Q.   And your knowledge includes looking at all the medical

9   records before and after the date of the incident?

10  A.   All that were provided to me.

11  Q.   Now, you do know that Mr. Monroe reported pain that night,

12  the night of November 6, 2020, right?

13  A.   Ask the question again?

14  Q.   You do know that Mr. Monroe reported experiencing pain in

15  his foot the night of November 6, 2020?

16  A.   I believe so, yes.

17  Q.   And by November 7th, the next day, he had been seen by

18  medical care professionals, right?

19  A.   Yes.

20  Q.   And those medical care professionals diagnosed him as

21  having had a broken toe?

22  A.   Yes.

23  Q.   And you have no knowledge, from the medical records or

24  otherwise, other than speculation about anything that happened

25  to Mr. Monroe other than what happened to him the night of

1  November 6, 2020, to cause that injury?

2  A.    I do not.

3  Q.    Mr. Monroe was given an orthotic shoe, correct?

4  A.    Correct.

5  Q.    And he -- with a restriction on doing stairs?

6  A.    Yes.

7  Q.    And the -- these all, the orthotic shoe and restrictions

8  continued into the following spring?

9  A.    Yes.

10          MR. GREENBERG:  Now let's take a look at Exhibit 6.

11          And can you make the thing that says Findings a little

12  larger, please, Mr. Tiwari, if that's possible?  Thanks.

13  Q.    So these -- this is the X-ray report of December 9, 2020?

14  A.    It is.

15  Q.    And that was about a month, a little more than month after

16  the incident?

17  A.    Yes.

18  Q.    I would like to translate a few things here.  Subacute to

19  chronic fracture means it takes time to heal?  The fact that it

20  is subacute to chronic fracture, the fact it is chronic means

21  it's still healing?

22  A.    No, it doesn't, actually.

23  Q.    Is it fair to say that somebody with a fracture of the

24  fifth metatarsal bone would be in some pain?  You would expect

25  that, wouldn't you?

1  A.    It depends on the patient and their ability to sense pain.

2  Q.    With mild displacement.  Displacement means an abnormal

3  position of the bone fragment?

4  A.    Yes.

5  Q.    Angulation.  Angulation means the fragment is aimed in the

6  wrong direction?

7  A.    Doesn't tell you how much, but yes.

8  Q.    Now we talked about callus formation, which is in there

9  also, and what that means is that after inflammation at a site

10 for about a week the bone slowly hardens?

11 A.    Correct.

12 Q.    But it takes time to harden?

13 A.    By the time you see callus formation, it's at least

14 50 percent hardened.  And so --

15 Q.    In this case it wasn't completely hardened for about four

16 months?

17 A.    Somewhere between the third and fourth X-rays, actually.

18 Q.    You would expect a broken toe to be more painful for

19 somebody who was substantially overweight?

20 A.    Not necessarily.

21 Q.    Well, isn't it true that the overweight person is placing

22 the excessive weight on his toe?

23 A.    The overweight diabetic neuropathic patient wouldn't even

24 know he has a fracture sometimes.  It depends on the patient.

25 Q.    Is it your testimony to a reasonable degree of medical

1 certainty that Mr. Monroe didn't know he was in pain?

2 A.   I don't know what was in his head.

3 Q.   And is it your testimony, to a reasonable degree of medical

4 certainty, that because of his diabetes he didn't know that he

5 had broken the bone?

6 A.   I don't know.  I do know that he would be less likely to

7 report severe pain, and his pain, to my recollection, there was

8 a three-over-ten rating on pain.  So --

9 Q.   Isn't it a fact that Mr. Monroe reported the pain and

10 reported the fracture or requested -- more accurately requested

11 to seek medical attention the very night of the incident?

12 Doesn't that cause some question in your mind about whether he

13 wasn't experiencing pain?

14 A.   Respectfully, I didn't say he wasn't experiencing pain.  I

15 don't know where you got that from.  I believe he broke his

16 bone.  I believe he felt pain.  I believe he reported it.  I

17 believe he got an X-ray.  I believe that he was in pain after he

18 broke his bone for sometime.  I don't know how much pain he was

19 in.  Eventually, the fracture healed.

20 Q.   I would like to look at Exhibit 12.  Sorry.  Wrong exhibit.

21 My mistake.  Exhibit 9.  Findings, bones, no acute fracture.  It

22 doesn't say anything about chronic fracture, does it?

23 A.   No.

24 Q.   It says, "or aggressive-appearing osseous lesion."  Osseous

25 refers to the bones?

```
 1  A.   Yes.  And aggressive lesions means there is no tumors, no

 2  cancer.  It's irrelevant.

 3            MR. GREENBERG:  And -- no.  I will withdraw that.  I

 4  have no further questions.

 5            THE COURT:  Mr. Pitcoff?

 6            MR. PITCOFF:  Thank you.  Just a couple of brief

 7  followup.

 8  REDIRECT EXAMINATION

 9  BY MR. PITCOFF:

10  Q.   Doctor, you said you reviewed more than 437 medical

11  records.  Did they all have to do with the foot?

12  A.   No.  There was lots of extraneous unrelated medical

13  records.  He had diabetes listed everywhere.  They were

14  following that, and he had shoulder issues and back issues, all

15  of that stuff was -- I had to review those.

16  Q.   I am not going to ask you to get into everything, but if

17  you could approximate how many of those records had to do with

18  the foot in terms of percentage that you reviewed?

19  A.   A sliver, but I had to review them all.

20  Q.   No, I understand.

21       Do you know whether -- you were asked questions about why

22  you didn't call his treating doctors.  As an examining doctor,

23  are you allowed to call his treating doctors?

24  A.   I don't know where that question would come from because it

25  would be inappropriate for -- if I serve as an independent
```

1  medical examiner, and I do examinations regarding plaintiffs or

2  defense.  In other words, I call balls and strikes.  And if I

3  examine a patient of any type, if I examine you, and I want to

4  give an independent position, I'm not going to ask your treating

5  doctor, what do you think?  That's inappropriate.  That's wrong

6  to do.

7       By definition, I'm being independent.  I'm reviewing the

8  records, and I'm telling whoever is reading it that this is what

9  an orthopedic surgeon who treats patients every day believes and

10 would be willing to testify to under oath in court.

11 Q.  Now, I want to make it clear.  You are saying you didn't

12 review the X-ray films.  Did you review the X-ray reports?

13 A.  I did.  And I am particularly trained and skilled at

14 reading reports and reading into the reports and reading the

15 details and the significance of things like mild angulation or

16 callus formation.  It's what I do for a living.

17 Q.  And that X-ray report in early March 2021, four months

18 after the accident, did it say that the fracture was healed?

19 A.  It was way past healed.  It was a solid fracture.

20        MR. PITCOFF:  Thank you, doctor.

21        MR. GREENBERG:  I have nothing else, Your Honor.

22        THE COURT:  All right.  Doctor, I'd get the heck out

23 of that stand as quick as you can before somebody thinks of

24 something else to ask you.  Thank you.

25            (Witness excused)

1                THE WITNESS:  Thank you.

2                THE COURT:  All right.  Let's bring Mr. Monroe back.

3                All right.  Mr. Pitcoff, you may proceed.

4    CROSS-EXAMINATION (CONT.)

5    BY MR. PITCOFF:

6    Q.  Okay.  So Mr. Monroe, where we left off was right before

7    you went into the bathroom, and you said that you went into the

8    bathroom because you had to use the bathroom earlier, correct?

9    A.  Yes.

10   Q.  And you had to urinate; that's why you were in there,

11   right?

12   A.  I had to use the bathroom.  I never said anything about

13   urinating.

14   Q.  Okay.  Well, isn't it true that you wanted to leave before

15   the police got there?

16   A.  Sure did.

17   Q.  And you knew -- and that was because you knew if you got

18   caught there by the police, you would go to jail for violating

19   the order of protection, right?

20   A.  Yes.

21   Q.  And you claim that you were urinating when the police came

22   to the door the first time and spoke with Ms. Locke, correct?

23   A.  I don't know.  I was in the bathroom, but yes, she was at

24   the door when I was in the bathroom.

25   Q.  And you were urinating at that time, weren't you?  Wasn't

1   that your testimony?

2   A.   It was a long time ago.  I don't know what I was doing in

3   the bathroom.

4   Q.   Okay.  Well, I would like you to turn to your deposition

5   testimony dated April 15th of 2021, page 74.

6   A.   Okay.

7   Q.   Okay.  I am going to start from page 74, line 24.

8        "QUESTION:  And when you say they were banging on the door,

9   we are talking about the door that's most outside, the most

10  outside door, right?  We are not talking about the second door?

11       "ANSWER:  Right.  The outside door.

12       "QUESTION:  And so you couldn't see anything from where you

13  were in the bathroom, but you can hear because of the window?

14       "ANSWER:  Yes.

15       "QUESTION:  What were you doing in the bathroom at this

16  time?

17       "ANSWER:  I was actually using the toilet.  I was urinating

18  and getting ready to wash my hands.

19       "QUESTION:  So Jessica answered the door when the police

20  banged on the door and said it was the police?

21       "Yes."

22       So, sir, do you remember being asked those questions and

23  giving those answers?

24  A.   Yes.

25  Q.   And then you heard, after Ms. Locke spoke to the police,

1 she came back to you and told you that the police had just been

2 there, correct?

3 A.   Yes.

4 Q.   And you were washing your hands when she told you that,

5 right?

6 A.   I don't know.

7 Q.   Well, go to page 78 of that same deposition transcript,

8 line 3.  Tell me when you are there.

9 A.   Okay.

10 Q.   "QUESTION:  So even though the police had left, you were

11 planning on leaving anyway?

12      "ANSWER:  Yes.

13      "QUESTION:  And when she was talking to you through the

14 door, at that exact point when she started talking to you, were

15 you still using the restroom or were you washing your hands?

16      "ANSWER:  I was washing my hands.

17      "QUESTION:  So you were almost done using the bathroom?

18      "Yeah.  As far as like washing my hands and stuff, yeah."

19      Do you remember being asked those questions and giving

20 those answers?

21 A.   No.  I don't remember being asked those questions, but the

22 answers are here because it's in a deposition.

23 Q.   Okay.  And isn't it true that it was three to four minutes

24 from the first time the police came to the door when Ms. Locke

25 said everything was okay, until she came -- until they came the

050923PMH                    Monroe - Cross - Pitcoff

1  second time, correct?

2  A.   Again, this is like two years -- a couple of years ago.  I

3  do not remember the timeframes.

4  Q.   Okay.

5  A.   If that's what's said in the deposition, then yes, that's

6  the answer that I gave.

7  Q.   All right.  Let's go to page 80 of your deposition, line 6.

8      "QUESTION:  Okay.  How much time went by from when Ms.

9  Locke told you that the officer had left to when they came back

10  to the front door?

11     "ANSWER:  Like three minutes, four minutes at the most."

12     Do you remember being asked those questions and giving

13  those answers?

14 A.   It's here in the deposition.

15 Q.   And during that time, you had finished using the bathroom,

16 and you were actually looking out the window of the bathroom

17 waiting for the police to leave, correct?

18 A.   Wrong.

19 Q.   That's wrong?

20     Okay.  Go to that same deposition page 77.

21     Sir, is it your testimony you were never looking out the

22 windows waiting for the police to leave?

23 A.   I'm 5'8".  It's a six-foot window.  I can't see out the

24 window.

25 Q.   And when the police came back to the door, you heard Jamal

1   was there, correct?

2   A.   I didn't hear who was at the door, no.

3   Q.   Sir, you heard the police were at the door, correct?

4   A.   The first time.

5   Q.   Well, the second time they came you eventually heard your

6   name called multiple times, correct?

7   A.   When the officers came in the apartment.

8   Q.   Correct.  And you were still in the bathroom with the door

9   shut, correct?

10  A.   Yes.

11  Q.   And isn't it true that you did not come out of the bathroom

12  as soon as you heard your name called?

13  A.   No.

14  Q.   That's not true?

15  A.   I did not come out of the bathroom.  I was using the

16  bathroom.

17  Q.   And the reason that you didn't come out of the bathroom,

18  according to you, is that you don't like the police.

19  A.   No.  Because I was using the bathroom.

20  Q.   All right.  If you go to your deposition, page 117?

21  A.   Excuse me.  Which one of these?

22  Q.   The deposition testimony.

23          THE COURT:  M for Identification, Mr. Monroe.  M as in

24  Mary.

25  Q.   Line 8.  Tell me when you are there.

050923PMH                    Monroe - Cross - Pitcoff

```
 1  A.   All right.
 2  Q.   "QUESTION:  Why didn't you come out of the bathroom when
 3  they called your name the first time?
 4       "ANSWER:  Because I don't associate with the police.  I
 5  don't talk to them.  I don't like them.  I disassociate myself
 6  from the police."
 7       Do you remember giving those answers to those questions?
 8  A.   Yes.  The complete answer?  Yes.
 9  Q.   So you did say that, correct?
10  A.   I said all of that.  I didn't just say I don't like the
11  police.
12  Q.   No.  You didn't come out of the bathroom when they called
13  you because you don't like them?
14  A.   No.  I didn't come out of the bathroom because I was using
15  it.
16  Q.   I am going to read it one more time.
17       "QUESTION:  Why didn't you come out of the bathroom when
18  they called your name the first time?
19       "ANSWER:  Because I don't associate with the police.  I
20  don't talk to them.  I don't like them.  I disassociate myself
21  from the police."
22       That's what you said under oath, correct?
23  A.   Yes.  So what do you want me to say, I was taking a crap?
24  I was using the bathroom.  I don't like the police.  I don't
25  associate with the police.  No.  Yes.  It's true.  Yes.
```

1  Q.   Was that not true when you said --

2  A.   Yes, it's true.

3  Q.   -- you didn't come out of the bathroom because you don't

4  like the police?

5  A.   Yes.  It's true.  I'm scared of the police.

6  Q.   Isn't it true that you were in the bathroom, sir, hiding

7  from the police?

8  A.   Where am I going to go?  It's a --

9  Q.   That's not true?

10 A.   No, it's not true.  You can't hide in a studio apartment.

11 I'm sorry, sir.

12 Q.   Well, isn't it your testimony, sir, that you weren't hiding

13 from the police because you don't have -- you've never had a

14 problem getting arrested until then?

15 A.   Excuse me?

16 Q.   Isn't that your testimony?

17 A.   I don't understand what you are saying.

18        MR. GREENBERG:  Excuse me.  Excuse me.  I object to

19 this line of questioning.

20        THE COURT:  Yes, I'm going to sustain the objection.

21 I see the testimony, but I'm going to sustain the objection.  We

22 have had some *in limines*, Mr. Pitcoff, and so you are going to

23 limit yourself to what I have already ruled in this case.

24 Q.   Well, isn't it true, sir, that you have pled guilty to

25 possession of a forged instrument in the third degree on

050923PMH                          Monroe - Cross - Pitcoff

1  August 7th of 2014?

2  A.  Yes.

3  Q.  And that involved using a credit card that wasn't yours?

4  A.  Yes.

5  Q.  And isn't it also true that you pled guilty to attempted

6  forgery in the second degree on August 1st of 2018?

7  A.  Yes.

8  Q.  And that also involved using a stolen credit card, correct?

9  A.  Yes.

10 Q.  Now, sir, you -- when you did open the door, it's your

11 testimony that you shut off the light; isn't that correct?

12 A.  The bathroom light?

13 Q.  Yes.

14 A.  I don't remember if I shut off the light or not.  It's a

15 long time ago.

16 Q.  Isn't it true it's your testimony that none of the

17 officers, once the door was open, gave you any commands?

18 A.  Again, I don't remember.

19 Q.  Well, isn't it true that no officers told you to put your

20 hands up?  That's your testimony?

21 A.  I put my hands up on my own.

22 Q.  Nobody told you to do that, correct?

23 A.  Not that I remember, no.

24 Q.  And isn't it true it's your testimony that nobody told you

25 to put your hands behind your back?

1  A.   I don't know.  I had my hands in the air.

2  Q.   That's not what I am asking you.  I'm asking you:  Isn't it

3  true that no officer, according to you, told you to put your

4  hands behind your back?

5  A.   I don't remember.

6  Q.   Well, let me go to your 50-h hearing testimony, page 71.

7          THE COURT:  That's the other volume, Mr. Monroe.

8  Exhibit N for Identification.

9  Q.   Go to line 22.  "QUESTION:  Did they tell you at any

10  time -- before Officer Campbell made contact with you, did they

11  tell you to put your hands behind your back?

12       "ANSWER:  No."

13       Do you remember giving that answer to that question on

14  April 15th of 2021?

15          MR. GREENBERG:  Your Honor, that isn't the complete

16  answer.  If counsel is going to read the answer, he should read

17  the complete answer.

18          THE COURT:  I'm actually looking at the transcript,

19  and I don't see anything after the word "no."  Unless we are on

20  different pages?

21          MR. GREENBERG:  Maybe we are right now.

22          THE COURT:  You may be on -- are you on Exhibit N for

23  Identification or are you on M for Identification?

24          MR. GREENBERG:  I'm on N.  I'm on page 71, and I am

25  looking at lines 20 and 21.  I don't know if I'm in the wrong

 1  place.

 2          THE COURT:  So we're looking at the question that

 3  began, Mr. Greenberg, on page 71, line 22.  And the answer

 4  actually appears on page 72, line 2, and it appears to my eyes

 5  to be simply, "No."

 6          MR. GREENBERG:  I apologize, Your Honor.  I was

 7  looking --

 8          THE COURT:  You don't need to apologize.

 9          MR. GREENBERG:  -- at the wrong question and answer.

10          THE COURT:  Okay.  They make erasers on pencils,

11  although not everybody uses pencils anymore.  I make my law

12  clerks every day, every month I use pencils.  I make them hold

13  pencils so they understand, millennials, what a pencil is so

14  they remember that piece of history because they don't use

15  pencils.  So go ahead.  The answer is "no."  That's the end of

16  that.  Next question.

17  Q.  Isn't it also true that it's your testimony that no officer

18  ever told you to come out of the bathroom?

19  A.  I don't remember, sir.  This is a long time ago.

20  Q.  Well, isn't it true that you don't remember any officer

21  giving you a command to come out of the bathroom?

22  A.  No, I don't remember.

23  Q.  I am going to page 72, continuing that same transcript,

24  line 3.

25          "QUESTION:  Did they give you any commands to come out of

1  the bathroom before Officer Campbell made contact with you?

2      "ANSWER:  No.  Because I couldn't come out of the bathroom

3  if they wanted me to because they are standing in the way."

4      Did you give those answers to those questions?

5  A.  Yes, I did.

6  Q.  So nobody told you to come out of the bathroom, and nobody

7  told you to put your hands up or behind your back, correct?

8  A.  Correct.  That's what it says.

9  Q.  And then for no reason Officer Campbell charges you, and

10 it's like a football tackle, correct?

11 A.  That's correct.  I don't know what's going on inside

12 someone else's head.

13 Q.  And the whole time you are standing there with your hands

14 straight up?

15 A.  That is correct.

16 Q.  And even after you make contact with that sink, your hands

17 are still up, correct?

18 A.  That is correct.  That's how the fixture -- the lighting

19 fixture was broken.

20 Q.  And you hit that sink hard, correct?

21 A.  Hard enough to break the pipes.

22 Q.  And he slammed you into that sink, right?

23 A.  Hard enough to break the pipes, sir.

24 Q.  And your hands never came down?

25 A.  No.  That's how the lighting fixture was bent and broken.

1  Q.   I want to talk to you about your claim that Officer

2  Campbell stomped on your foot.  Isn't it true that it's your

3  testimony that you were looking at the other officers and not

4  Officer Campbell?

5  A.   Yes.  That's correct.

6  Q.   And as a matter of fact, you weren't paying attention to

7  Officer Campbell, correct?

8  A.   That's correct.

9  Q.   And you don't know -- withdrawn.

10       You never saw Officer Campbell's foot come down on yours;

11  isn't that true?

12  A.   His was the only other two feet in the bathroom with me.

13  Q.   I'm not asking you that, sir.  You never saw his foot come

14  down on your foot, correct?

15  A.   No, I did not see it.

16  Q.   And it's your -- well, the truth is, you don't know when

17  his foot made contact with your foot, correct?

18  A.   I know when the contact was made.  I just don't know -- I

19  wasn't looking at his feet when it was made.

20  Q.   Well, isn't it true that you don't know if the contact --

21  withdrawn.

22       Isn't it your testimony that the contact may have occurred

23  when you were being pushed back?

24  A.   I never said that.

25  Q.   So it didn't occur when you were pushed back?

1  A.   I never said that.

2  Q.   Sir, I'm not asking you what you said.

3       Is it your testimony that the contact with your foot did

4  not occur as Officer Campbell was pushing you back?

5  A.   I never made that testimony, no.

6  Q.   So that's not true?

7  A.   I never said that.

8  Q.   Okay.  Well, let's go to page 109 of your deposition dated

9  February 10th.

10      Question, line 4:  "And so it is your testimony" -- I'm

11 sorry.  "So it is your understanding that Officer Campbell

12 was -- withdrawn.

13      "Did Officer Campbell take his boot and stomp on your foot

14 or did it happen as you were being pushed back?

15      "ANSWER:  I really couldn't tell, and I couldn't see

16 because his body was in the way.  So I can't -- I can't make

17 that assumption."

18 A.   Correct.

19 Q.   Okay.  So, sir, you don't know whether it happened when you

20 were pushed back or not, correct?

21 A.   That's correct.

22 Q.   And you are not saying that he actually stomped on your

23 foot, are you?  You can't make that assumption?

24 A.   I can't say that I seen him do it, but I know who stomped

25 on my foot.

1  Q.   Well, I'm just going to -- your answer was:  "I really

2  couldn't tell.  I couldn't see because his body was in the way.

3  So I can't -- I can't make that assumption."

4  A.   Correct.

5  Q.   And the truth is, you don't know whether that was just

6  incidental contact or whether he meant to do it?

7  A.   I don't know what's going on inside someone else's head, so

8  I cannot make that assumption if it was intentional or not.

9  Q.   And, sir, isn't it true that when you had your foot stomped

10  on, you did not feel any pain?

11  A.   Who said -- I never said that, either.

12  Q.   Sir, I am not asking you what you said or you didn't.

13       Isn't it true, though, that when you had your foot stomped

14  on, you did not feel any pain?

15  A.   No.  It's not true.

16  Q.   Okay.  If you can go to your 50-h hearing, and go to

17  page 80.  Okay.  And line 9.

18       "QUESTION:  So you didn't feel any pain at the time that

19  the contact to your right foot happened?

20       "ANSWER:  No.  I just felt the stomp on my foot."

21  A.   Okay.

22  Q.   So isn't that true, you never felt any pain?

23  A.   That's what it says in the deposition.

24  Q.   Okay.  And you swore to tell the truth at the time of that

25  deposition, right?

1  A.   Yes, I did.

2  Q.   So that was true; you didn't feel pain when your foot was

3  contacted?

4  A.   You are correct.

5  Q.   So you didn't see it, and you didn't feel any pain when it

6  happened?

7  A.   That's correct.

8  Q.   And by the way, because you didn't see it, you don't know

9  what part of his boot made contact with your foot, correct?

10 A.   That is correct also.

11 Q.   Okay.  And you prepared a complaint in this case, correct?

12 A.   Yes, I did.

13 Q.   And you wrote out how the incident happened, right?

14 A.   Yes, I did.

15         MR. PITCOFF:  With Your Honor's permission, I will

16 mark a copy of the complaint.  I will have it handed to the

17 witness.

18         THE COURT:  It's a complaint, so I assume it would be

19 part of the evidence, right?

20         MR. PITCOFF:  Well, not in evidence, but I'm using it.

21         THE COURT:  I am asking the question.

22         Mr. Greenberg, what's your druthers here?  You want to

23 mark it for identification?

24         MR. GREENBERG:  I don't think that's necessary.  It's

25 part of the court file.  He can examine about prior inconsistent

1  statements, obviously, under the rules, but I don't think the

2  complaint comes in.

3          THE COURT:  We'll mark it P for Identification.  I

4  have a copy.  Show it to the witness.  P for Identification.

5  Five-minute warning, Mr. Pitcoff.

6          MR. PITCOFF:  Okay.

7  Q.  Sir, I'm going to have you take a look at that.  Is that

8  the complaint that you filled out regarding this to start this

9  lawsuit?

10 A.  Yes, sir.

11 Q.  And that's in your handwriting?

12 A.  Yes, sir.

13 Q.  And I want you to turn to page 4.  By the way, you knew it

14 was important that be accurate in this complaint?

15 A.  Yes, sir.

16 Q.  And I'm going to go all the way to the bottom, to the last

17 full sentence on page 4, and you wrote, "Officer Campbell starts

18 yelling something and then slams the heel of his boot on the top

19 of my right foot."

20 A.  Okay.

21 Q.  You don't know that it was any type of heel; you don't know

22 what part of the foot it was, correct?  What part of the boot?

23 A.  Nope.  I didn't know what part of the boot.  It was a boot,

24 his foot.

25 Q.  And even though you said he slammed it, you just told us

050923PMH                    Monroe - Cross - Pitcoff

1  you weren't in any pain when it happened?

2  A.   Okay.

3  Q.   But then -- I'm going to keep reading, and you allege in

4  the complaint that you were in so much pain from having your

5  foot stomped on you almost fell down, right?

6          MR. GREENBERG:  Objection, Your Honor.  That's not

7  what it says.

8  Q.   Well, let me read it to you.

9          THE COURT:  The objection is sustained.  The jury

10 should disregard the comment by counsel.  Next question.

11 Q.   Let me read you the next sentence, starting at the very end

12 of page 4.  I will read you the one I just did, continued.

13     "Officer Campbell starts yelling something and then slams

14 the heel of his boot on top of my right foot.  I almost go down

15 to the floor, but it's such a very small space filled with four

16 grown men, three police officers and myself."

17     So you claim that you almost went down to the floor when

18 you had your foot stomped on, correct?

19 A.   No.

20 Q.   Sir, was that accurate what I just read?

21 A.   It's accurate what you just read, but it has nothing to do

22 with my foot being stomped on.

23         MR. PITCOFF:  Your Honor, we are go to start a new

24 area of questioning.

25         THE COURT:  We are going to stop now for the day.

1          Mr. Monroe, you may step down.  Go back to counsel's

2   table.

3          (Witness temporarily excused)

4          THE COURT:  Ladies and gentlemen, as I indicated

5   before the trial started, you as jurors will decide this case

6   based solely on the evidence presented in this courtroom.  That

7   means that after you leave here for the night, you must not

8   conduct any independent research about this case, the matters in

9   this case, the legal issues in this case, or the individuals or

10  other entities involved in the case.  This is important for the

11  same reasons that jurors have long been instructed to limit

12  their exposure to traditional forms of media and information

13  such as television and newspapers.

14         You must also not communicate with anyone in any way

15  about the case, and you must ignore any information about the

16  case that you might see while browsing on the Internet or social

17  media feeds.  Tomorrow morning I will ask each of you whether

18  you have learned about or shared any information about this case

19  outside of this courtroom, even if this was accidental.  If you

20  did, you don't have to wait for me to ask.  Tell Mr. Cangelosi

21  right away, and if you don't want to share it in front of the

22  other jurors, send me a note through Mr. Cangelosi.

23         I appreciate you very much adhering to my rules.  Get

24  a good night's rest.  We are going to start promptly at 9:30.

25  We are moving along here quite well.  Leave your juror notes, I

1  guess, on your seats, and Mr. Cangelosi will take you.

2            THE DEPUTY CLERK:  All rise.

3            (Jury excused)

4            (In open court; jury not present)

5            THE COURT:  All right.  Be seated for a moment.  We

6  are doing quite well.  We are moving right along.  I think we

7  will be done sometime tomorrow morning, so we will meet at 9:00.

8  We will have a charging conference.  I don't think there is very

9  much to talk about.  You were kind enough to agree.

10            Let's -- as we are winding up here, let's just remain

11  calm and respectful of the rules of evidence.  You both --

12  whatever happens here, nobody can complain about the lawyering

13  here.  It's just excellent.  I don't get to see excellent very

14  often, so I appreciate excellent when I see it.  So nobody can

15  really complain.  I don't know what a jury is going to do.  Who

16  knows what they do.  They do what they do, but the lawyering

17  here is rock solid.  So I appreciate you continuing in that

18  vein.  Get along with each other.  We will meet at 9:00.  We

19  will do our charging conference.

20            My intention will be to finish Mr. Monroe.  I sense we

21  have a little more to go, and probably some redirect.  Officer

22  Santiago will come to the stand.  He will get done.  We will do

23  closings immediately thereafter.  So I would be prepared to -- I

24  will give you a two-minute break, bathroom break, but this is

25  not that complex, and it's really fairly straightforward.  I

1    will give you time to get your closings lined up and done.

2    Depending on how long it takes, I may be able to charge the

3    jury.  This is really a one-count complaint when you get to it.

4    It's not more or less than that.  Depending on the pace, you

5    know, that's 90 minutes to two hours for me with all of the

6    accoutrements going with the charge.  So we will see.  We'll

7    space it out.  I don't want to rush a jury charge, and I don't

8    want it to linger.

9            I think, Mr. Cangelosi, though, we should probably --

10   I don't know what the rule is about lunch and the jurors.  If we

11   are pre-charge, they are on their own?  Post charge they get

12   lunch.  So those are the new rules.  We used to buy lunch for

13   everybody for Covid reasons so they would stay in the building,

14   but if we haven't charged by lunchtime -- so okay.  Probably

15   take a lunch break, but that's my plan.  All right?

16           Anything on your mind, Mr. Greenberg?

17           MR. GREENBERG:  No, Your Honor.

18           THE COURT:  Mr. Pitcoff?

19           MR. PITCOFF:  One thing, Your Honor?

20           THE COURT:  Yes.

21           MR. PITCOFF:  During the questioning of cross-

22   examination of Mr. Monroe, I went to read some testimony from

23   Mr. Monroe's transcript at the deposition where he testified

24   that, in essence, that he wouldn't be hiding from the police

25   because he's been arrested a million times.

1          THE COURT:  Yeah, we are not going to get into that.

2          MR. PITCOFF:  But -- I understand, but I just wanted

3   to ask a question about that.  Because he was arrested, in his

4   words, a million times and never had a problem with getting

5   arrested, and I understand from Your Honor's ruling that you did

6   not think that that opened up the door for me, and I want to

7   make sure you understand where I was going with that.

8          He has pled guilty on numerous occasions to resisting

9   arrest, so to me that now opens up the door now that he said he

10  never had a problem with getting arrested before.  I think

11  that's inconsistent.  So I understand Your Honor's previous

12  ruling, but I --

13         THE COURT:  No, no, no.  The testimony here was -- Mr.

14  Greenberg made the point that the officers didn't charge him

15  with resisting arrest.  And so his point was -- I assume the

16  point he is going to make in closing was the officers didn't

17  consider this so bad that they needed to charge him with

18  resisting arrest.  So that's a legitimate point.  That

19  circumscribes the conduct, but it wasn't -- so far, the witness

20  hasn't said, you know, I've never been arrested for resisting

21  arrest or anything like that.  That testimony that you are about

22  to go to was elicited during a deposition, and had it come up in

23  connection with a motion *in limine*, I would have precluded it

24  because you don't need it.  It doesn't go to his character for

25  truthfulness, right?  That's the limitation that I put and I

1  wrapped around prior convictions.

2          The reason I let you talk about your possession of a

3  forged instrument, possession of a forged instrument in the

4  second and third degree, was it goes to falsehood.  It goes to

5  truthfulness, and character and truthfulness, and that's what

6  the rule permits, 609(a)(2) permits.  So the testimony you were

7  going to go to goes a little beyond that, and frankly, I don't

8  think you need it.

9          MR. PITCOFF:  Judge, I would just say, I think they

10  should come in for another purpose now because it goes to

11  credibility.  This is something that Mr. Monroe stated under

12  oath as a reason that he wasn't hiding in the bathroom; that he

13  never had problems getting arrested before.  That's not true.

14  So he opened up the door, and it goes to --

15          THE COURT:  See, you are talking to me in double

16  negatives.  You are trying to convince me that I should permit

17  something that's a double negative, and you can think about it

18  overnight; and if you want to frame this in a positive, in a

19  positive thought, you know, I will consider it again in the

20  morning.  But you are saying he didn't have trouble getting

21  arrested because he's never had trouble getting arrested a

22  million times before.  I'm nonplussed.  So what?  What does that

23  do for credibility?

24          MR. PITCOFF:  Well, because it wasn't true, and I

25  think the jury should be able to hear that --

1         THE COURT:  It wasn't true that he hasn't had trouble

2    being arrested before or that he hasn't been arrested before or

3    that he hasn't been arrested a million times before?  What would

4    you like them to read into that?

5         MR. PITCOFF:  The fact that he said he's never had

6    problems getting arrested before was not true, and not only the

7    convictions -- and I don't know if Your Honor knew where I was

8    attempting to go with this -- also he has had multiple lawsuits

9    where he has claimed excessive force before in getting arrested.

10        THE COURT:  But you are both very capable lawyers, and

11   this kind of a discussion comes up *in limine*, and we have

12   discussed this exact topic *in limine* by your motions, and I

13   ruled, and if there were other tentacles about it that you

14   forgot about, shame on you.

15        If you want to press this with me, I've said no.  I'm

16   not going to permit that testimony tonight, and I also said to

17   you -- unless you want me to reverse that thinking -- you can

18   think about it overnight, and if you want to reconsider your

19   approach to this and give me a positive thought about it, and

20   tell me why with some case law guidance at 9:00 a.m. tomorrow

21   morning, I will reconsider my point.

22        But I think, A, it's a double negative.  You don't

23   prove anything by proving negatives, and I'm not sure I really

24   capture the double negative anyway; and if I am not getting it,

25   I'm concerned that it would confuse the jury.  B, this is a

1   prior crimes backdoor attempt to bring in testimony that's not

2   necessary, and I think you've laid out the prior crimes that are

3   permissible by the Federal Rules of Evidence.

4           So if you have some other way of talking to me about

5   this, share it with Mr. Greenberg in the morning, and give him a

6   chance, and if you figure out something tonight, email him

7   tonight because I'll want his good thinking on it, too, and I

8   will consider it in the morning.  All right?

9           MR. PITCOFF:  Thank you.

10          THE COURT:  All right.  We will see you at 9:00 a.m.

11          THE DEPUTY CLERK:  All rise.  Court is in recess.

12          (Trial adjourned to May 10, 2023 at 9:00 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   SEAN CAMPBELL

 4        Direct by Mr. Greenberg             86

 5        Cross by Mr. Pitcoff                115

 6        Redirect by Mr. Greenberg           136

 7        Recross by Mr. Pitcoff              140

 8   IAN KAYE

 9        Direct by Mr. Greenberg             143

10        Cross by Mr. Pitcoff                153

11   MICHAEL J. MONROE

12        Direct by Mr. Greenberg             170, 178

13        Voir dire by Mr. Pitcoff            176

14        Cross by Mr. Pitcoff                193, 240

15   DR. BARRY KRAUSHAAR

16        Direct by Mr. Pitcoff               205

17        Cross by Mr. Greenberg              224

18        Redirect by Mr. Pitcoff             238

19                   PLAINTIFF EXHIBITS

20   Exhibit No.                I.D.      Received

21   11                         --        178

22                   DEFENDANT EXHIBITS

23   Exhibit No.                I.D.      Received
     M                          194       --
24   N                          202       --
     O                          209       --
25   P                          255       --
```

DARBY GINSBERG, RPR (914) 390-4102